Sharwline **NICHOLSON**, individually and on behalf of her infant children, and on behalf of all others similarly situated, and J.A. and G.A., infants on behalf of all others similarly situated, **Plaintiffs**

v.

Nat **WILLIAMS**, et al. Defendants.

Ekaete Udoh, individually and on behalf of her infant children, and J.A. and G.A., infants on behalf of all others similarly situated, Plaintiffs

v.

Nicholas Scoppetta, et. al. Defendants.

Sharlene Tillett, individually and on behalf of her infant children, and J.A. and G.A., infants on behalf of all others similarly situated, Plaintiffs,

v.

Nicholas Scoppetta, et al. Defendants.

Nos. 00–CV–2229, 00–CV–5155, 00–CV–6885.

United States District Court, E.D. New York.

March 18, 2002.

Lansner & Kubitschek, New York, By David Lansner, Esq., Carolyn Kubitschek, Esq., Joanne Sirotkin, Esq., Sanctuary for Families, Center For Battered Women's Legal Services, New York, By Jill Zuccardy, Esq., for Plaintiffs Subclass A.

Legal Aid Juvenile Rights Division, By Monica Drinane, Esq., Leslie Abbey, Esq., Barrie Goldstein, Esq., Kay G. McNally, Esq., Judith Waksberg, Esq., Henry Weintraub, Esq., Lawyers for Children, New York, By Karen Freedman, Esq., Karen Walker Bryce, Esq., Betsy Kramer, Esq., for Plaintiffs Subclass B.

Martha Olson, Esq., Citizens' Committee for Children, Riverdale, for Next Friend of Children in Subclass B.

New York City Law Department, Office of the Corporation Counsel, Brooklyn, By Michael D. Hess, Esq., Jonathan Pines, Esq., Martha Calhoun, Esq., Carolyn Wolpert, Esq, Daniel A. Shacknai, Esq., Administration for Children's Services Deputy General Counsel, New York, for Defendant City of New York and Administration for Children's Services.

NYS Attorney General, New York, By William H. Bristow III, Esq., Robert

Kraft, Esq., for Defendant State of New York and Governor George E. Pataki.

Mintz Levin Cohn Ferris Glovsky & Popeo, P.C., Washington, D.C., By Greg E. Haber, Esq., Fernando R. Laguarda, Esq., Noam B. Fischman, Esq., for Amici National Network to End Domestic Violence and National Network to End Domestic Violence Fund.

Law Offices of Joanne C. Fray, Lexington, MA, By Joanne C. Fray, Esq., Helene Sullas Huggins, Esq., for Amicus National Coalition for Child Protection Reform.

Missouri Coalition Against Domestic Violence, Jefferson City, MO, By Nina Balsam, Esq., for Amicus Missouri Coalition Against Domestic Violence Against Women.

Davis Polk & Wardwell, New York, By Frank S. Moseley, Esq., Zachary S. McGee, Esq., Joan Loughane, Esq., Kelli J. Stenstrom, Esq., Of Counsel, New York County Lawyer's Association, New York, By Craig A. Landy, Esq., Norman L. Reimer, Esq., for Amicus New York County Lawyers' Association.

Ohio Domestic Violence Network, Columbus, OH, By Alexandria M. Ruden, Esq., for Amicus Ohio Domestic Violence Network.

*Supplemental Memorandum, Findings of Fact and Law, and Order*

## Table of Contents

I. Introduction ............................................................163

II. Procedural History.....................................................164

III. Facts.................................................................165

 A. Current Institutional Framework.......................................165
 1. Reports to the State Central Register ...............................166
 2. Child Protective Proceedings .......................................167
 B. Plaintiff Families ..................................................168
 1. Nicholson .........................................................168
 a. Background ......................................................168
 b. Domestic Violence Against Ms. Nicholson .........................169
 c. Removal .........................................................169
 d. Court Proceedings ...............................................170
 e. Subsequent Case History .........................................172
 2. Rodriguez .........................................................173
 a. Background ......................................................173
 b. Domestic Violence Against Ms. Rodriguez .........................173
 c. Intervention by ACS and Removal .................................173
 d. Court Proceedings and Further Removal............................175
 e. Subsequent Case History .........................................176
 3. Udoh..............................................................176
 a. Background ......................................................176
 b. Domestic Abuse Against Ms. Udoh .................................177
 c. Abuse Triggering Removal ........................................178
 d. Removal .........................................................178
 e. Court Proceedings ...............................................179
 f. Subsequent Case History .........................................180
 4. Tillett ...........................................................180
 a. Background ......................................................180
 b. Domestic Violence Against Ms. Tillett ...........................180
 c. Removal .........................................................180
 d. Court Proceedings ...............................................181

 5. Garcia ....................................................................182
 a. Background .......................................................182
 b. Domestic Violence Against Ms. Garcia ...........................182
 c. Intervention by ACS ...........................................183
 d. Removal .......................................................184
 e. Court Proceedings .............................................185
 f. Subsequent History ...........................................185
 6. Norris ....................................................................185
 a. Background .......................................................185
 b. Domestic Violence Against Ms. Norris ..........................185
 c. Removal .......................................................186
 d. Court Proceedings .............................................186
 e. Subsequent History ...........................................187
 7. Rhodes ....................................................................187
 a. Background .......................................................187
 b. Intervention by ACS ...........................................188
 c. Removal .......................................................188
 d. Court Proceedings .............................................188
 e. Subsequent History ...........................................188
 8. Berisha ....................................................................188
 a. Background .......................................................188
 b. Removal .......................................................189
 c. Court Proceedings .............................................189
 d. Subsequent History ...........................................190
 9. Jane Doe .................................................................190
 a. Background .......................................................190
 b. Investigation by ACS ..........................................190
 c. Domestic Violence Against Jane Doe ............................190
 d. Removal .......................................................191
 e. Court Proceedings .............................................191
 f. Subsequent History ...........................................191
 10. Xiomara C .................................................................192
 a. Background .......................................................192
 b. Domestic Violence Against Mrs. C. .............................192
 c. Removal .......................................................192
 d. Court Proceedings Against Ms. C ...............................192
 11. Other Cases ..............................................................192
C. Modern Perspectives on Domestic Violence and Child Welfare ..............193
 1. Historical Background .....................................................193
 a. Domestic Violence .............................................193
 b. Child Welfare .................................................194
 2. Views of Experts .........................................................197
 a. Effects of Domestic Violence on Children ......................197
 b. Effects of Removals on Children ...............................198
 3. Best Practices ...........................................................200
 a. Mothers Should Not Be Accused of Neglect For Being Victims
 of Domestic Violence ........................................200
 b. Batterers Should Be Held Accountable ..........................201
 c. Children Should Be Protected by Offering Battered Mothers
 Appropriate Services and Protection ...........................202
 d. Separation of Battered Mothers and Children Should Be The
 Alternative of Last Resort ....................................203
 e. Child Welfare Employees Should Be Adequately Trained to Deal
 with Domestic Violence ......................................205
 f. Agency Policy Should Provide Clear Guidelines to Caseworkers.....205
D. ACS Policy and Practice ...................................................205
 1. Historical Background .....................................................205
 2. Previous Domestic Violence Initiatives ...................................206
 3. Present Policy and Practice ..............................................207

a. ACS Regularly Alleges and Indicates Neglect Against Battered Mothers .................................................207
b. ACS Rarely Holds Abusers Accountable .........................210
c. ACS Fails to Offer Adequate Services to Mothers Before Prosecuting Them or Removing Their Children ......................211
d. ACS Regularly Separates Battered Mothers and Children Unnecessarily ..........................................212
e. ACS Fails to Adequately Train Its Employees Regarding Domestic Violence.........................................216
f. ACS Written Policies Provide Insufficient and Inappropriate Guidance to Employees ......................................218
4. Future Plans of ACS ............................................221
E. Judicial Oversight of ACS Action .......................................221
1. Family Court.......................................................221
2. Representation ....................................................222
a. Representational Framework .................................222
b. 18–B Crisis.......................................................223
F. Summary of Findings of Fact .......................................228

IV. Law......................................................................229
A. Jurisdiction and Abstention ............................................229
1. Pullman ...........................................................230
2. Burford ............................................................231
3. Younger ...........................................................231
4. Rooker–Feldman ..................................................232
B. Section 1983 .........................................................232
C. Constitutional Issues.................................................233
1. Fourteenth Amendment ..........................................233
a. Procedural Due Process ...................................237
b. Substantive Due Process ..................................241
2. Fourth Amendment ..............................................246
3. Ninth, Thirteenth, and Nineteenth Amendments ......................247
4. Equal Protection .................................................248
D. Relief Available ......................................................249
1. Injunction .........................................................249
2. Preliminary Injunction ...........................................249

V. Application of Law to Facts ..............................................249
A. Unnecessary Removals...............................................250
B. Improper Prosecutions of Mothers...................................252
C. Inadequate Representation ...........................................253

VI. Relief .....................................................................257
A. Appropriateness of Injunction.........................................257
B. Preliminary Injunction ...............................................258

VII. Conclusion ................................................................260

WEINSTEIN, Senior District Judge.

## I. Introduction

The evidence reveals widespread and unnecessary cruelty by agencies of the City of New York towards mothers abused by their consorts, through forced unnecessary separation of the mothers from their children on the excuse that this sundering is necessary to protect the children. The pitiless double abuse of these mothers is not malicious, but is due to benign indifference, bureaucratic inefficiency, and outmoded institutional biases.

This class action is brought on behalf of abused mothers and their children who are

separated from each other because the mother has suffered domestic abuse and the children are for this reason deemed neglected by the mother. Three sometimes conflicting principles control: First, as a parent, a mother has rights to uninterrupted custody of her children and a child has rights to remain with parents; within wide limits, adults and children in a household are immune from state prying and intrusion. Second, domestic abuse—particularly if physical—of a mother or child will not be tolerated. Third, the state has the obligation to protect children from abuse, including, where clearly necessary to protect the child, the power to separate the mother and child. It is this third element that the defendants are misusing in unjustified reliance on the second and in violation of the first. The resulting denial of constitutional rights of both mothers and children cannot go unchecked.

The term "mother" includes other legal or actual custodians of children; it usually is a female, but in relatively rare cases, the abused custodian will be a male. The abuser is usually a member of the household, such as a husband, paramour, father of the children, or person having had such a relationship with the mother in the past.

In a heterogeneous, non-theocratic and democratic society such as ours, there is enormous diversity in domestic relationships and in the degree that they are founded on mutual respect and love (the norm) or malevolence. Particularly if there is a sexual relationship between the adults, the emotional interaction may be intense, sometimes flaring into psychological or even physical abuse. The abuse may be endemic. It may be directed against the children as well as the mother. The children may be indirectly affected, as when they observe an abusive incident. Even when the abuse is not physical, it may be so fierce as to be the equivalent of a beating. *See Poppe v. Poppe,* 3 N.Y.2d 312, 165 N.Y.S.2d 99, 144 N.E.2d 72, 75 (1957) (Fuld, J.) ("statements made … may have an effect no less cruel and no less destructive of the marital relation, though their impact be upon the mind and spirit rather than the body."). The mother may lack the ability or resources to either protect herself or the children. Economic, emotional, moral or other ties may, as a practical matter, prevent the mother from separating from the abuser or seeking governmental protection against him. She may hope for eventual reconciliation—and sometimes it does occur. Myriad subtle reasons may prevent her from separating from the abuser, protecting the children, or seeking assistance. In some households ethnic or social mores are relied upon to justify abuse as a "traditional right." Ability to deal with tensions induced by self, a partner, children, and economic and social factors varies enormously among those who become embroiled in domestic violence. In short, this case presents the most intricate and recondite relationships, the stuff of thousands of novels, poems, newspaper accounts, and legal proceedings.

Whatever the explanation, physical abuse of mothers and children, or the imminent threat of such ill treatment, is not tolerated in our American society. Whether the mother, the family, or the immediate social group accepts cruelty as the norm or as permitted, it is a minimum assumption of our twenty-first century United States that it will not be tolerated. The government has the obligation to stop it and to prevent its recurrence whenever it can.

## II. Procedural History

In April 2000, Sharwline Nicholson filed a complaint on behalf of herself and her

two children, Destinee Barnett and Kendell Coles, against officers and employees of the Administration for Children Services and the City Of New York ("City defendants"). A few months later, Ekaete Udoh filed a similar action on behalf of herself and her four children, Edu, Ima, Nsikak, and Asuno. On November 20, 2000, a complaint was filed by Sharlene Tillett on behalf of herself and her two children, Winston Denton and Uganda Gray. City defendants answered and discovery commenced.

In January 2001, plaintiffs moved for class certification. Fed.R.Civ.P. 23. In view of a potential conflict between the interests of the children, the battered mothers, and alleged batterers, the court ordered creation of a subclass of children, subclass B, and appointed counsel for this subclass. The mothers were organized into subclass A and were represented by their original counsel. The court announced by published memoranda and advertising that it was prepared to recognize a subclass of alleged batterers who might have an interest in not being separated from the children or the mothers; no representatives came forward and the court determined that the case could proceed effectively without this potential subclass. New representative plaintiffs were added or substituted.

A next friend was appointed to protect the interests of the children. Various friends of the court participated in the litigation.

Sometime after the case had been pending subclass A amended the complaint to state a cause of action against the State of New York and some of its officials. The State itself was dismissed on consent.

In June 2001, the court directed the parties to submit briefs on whether a preliminary injunction was warranted. That month, plaintiffs moved for a preliminary injunction against City defendants.

On July 9, 2001, a trial began on whether class certification was appropriate and whether and in what form a preliminary injunction should issue. The trial lasted for twenty-four trial days, forty-four witnesses testified, 212 documents were introduced, and extensive briefing and argument followed. After the trial concluded at the end of December, following further briefing and documentary supplementation of the record, a memorandum and preliminary injunction were issued. 181 F.Supp.2d 182 (E.D.N.Y.2002). Operation of the injunction was stayed until June 22, 2002, except for the requirement of monthly reports from the City defendants on the steps they were taking to protect the subclasses' rights. This present memorandum further explicates the reasons for the preliminary injunction.

## III. Facts

### A. Current Institutional Framework

Responsibility for governmental protection of children rests primarily on the state or municipality. *See, e.g.,* Lois A. Weithorn, *Protecting Children from Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment Statutes,* 53 Hast. L.J. 1, 19–26 (2001) (various forms of direct state intervention in child abuse and neglect matters). The federal government assists with statutory protection and funds. *See, e.g.,* Child Abuse Prevention and Treatment Act ("CAPTA"), P.L. 93–247, 88 Stat. 4 (1974), *amended by* P.L. 104–235, 110 Stat. 3063 (1996) (CAPTA provides federal funding to states, provides grants to public agencies and nonprofit organizations, identifies the Federal role in supporting research, establishes the Office on Child Abuse and Neglect, and sets forth a minimum definition of child abuse and neglect.).

The State of New York has enacted laws aimed at protecting children from abuse and neglect. *See, e.g.*, N.Y. Fam. Ct. Act §§ 1011–1121 (Consol.2001) (Family Court's civil jurisdiction to protect children from abuse and neglect); N.Y. Penal Law § 260.10(2) (Consol.2001) (abuse or neglect of a child is a misdemeanor). A state agency, the Office of Children and Family Services ("OCFS"), regulates and monitors local service agencies and maintains the State Central Register for Child Abuse and Maltreatment ("SCR"). The State largely delegates responsibility for enforcing child protection laws to counties and municipalities. In New York City, the primary responsibility for protection of children against abuse is assigned to the Administration for Children's Services ("ACS"). It is assisted by such agencies as the Family Court, District Attorneys' offices, the City Police Department, and many public and private institutions.

1. Reports to the State Central Register

SCR serves as the conduit through which all investigations of child abuse and neglect are initiated. Tr. 1130. SCR maintains a telephone hotline with a toll-free number, staffed twenty-four hours a day, seven days a week, to receive information about child abuse, child neglect, or child maltreatment. N.Y. Soc. Serv. Law § 422(2)(a) (Consol.2001). Anyone who believes a child is being abused or neglected is free to report to SCR. Individuals in specified positions and professions such as health care professionals, school officials, social services workers, day care center employees, and law enforcement personnel are required by law to report such suspicions to the SCR. *Id.* §§ 413, 414. A person who makes a report is immune from liability even if the report is eventually proven false, unless it was made in bad faith. *Id.* § 419.

SCR screens reports it receives to ensure that the allegations and identifying information are sufficient to begin an investigation. *Id.* § 422(2)(b); Tr. 673, 684–85. If the report passes this initial screening, SCR transmits the report as well as any background information to a field office in the county where the child is located. Tr. 673. The Administration for Children's Services (ACS) is responsible for investigating reports involving children in New York City. There is an ACS field office in each of New York City's five boroughs.

When an ACS field office receives a report from SCR, an applications worker forwards it to a Supervisor II ("Supervisor"). The Supervisor assigns a Caseworker to investigate. A Child Protective Manager ("CPM") oversees the Supervisor–Caseworker team and approves major decisions such as removing a child or prosecuting a mother.

ACS is responsible for completing its investigations of complaints referred by SCR within sixty days. *Id.* §§ 424(6), 424(7). When the investigation is completed, ACS must determine whether there is "credible evidence" to support the allegations. If ACS concludes there is such evidence, it declares the report "indicated." Otherwise, it declares the report "unfounded." N.Y. Soc. Serv. Law §§ 412(5), 412(6), 424(7) (Consol.2001). ACS transmits its conclusions and supporting reasons to SCR. *Id.* § 424(3). Neither the SCR nor any other State department independently assesses the ACS conclusion.

If ACS determines that a complaint is unfounded, SCR seals all information in its files regarding the report. If ACS determines that there is some credible evidence to support the charges, SCR retains all information in its database until the family's youngest child reaches the age of

twenty-eight. *Id.* § 422(6). There is no formal hearing at which the parents have the right to be heard before this report is filed.

A report of "indicated" can have severe consequences. While SCR is required to keep report records confidential, many individuals and organizations are statutorily authorized to access the records. *Id.* § 422(4)(A). For example, when a person seeks a job that involves working with children, the employer must inquire of SCR (and SCR must respond) whether the parent is the subject of an indicated report. *Id.* § 422(4)(A). Such an employer may not hire an applicant who is the subject of an indicated report unless it sub-· mits a written statement explaining why they are hiring a person who has reportedly neglected her own children to work with other people's children. *Id.* § 424–a(2)(a); Tr. 1056 (ACS employee testifying that being the subject of an indicated report will make obtaining employment in certain capacities more difficult); Ex. 189.

2. Child Protective Proceedings

ACS has discretion to commence child protective proceedings against the parents in Family Court during the investigation, or after the investigation if the report is determined indicated. N.Y. Fam. Ct. Act § 1032(a) (Consol.2001); N.Y. Soc. Serv. Law §§ 397(2)(b), 424(11) (Consol.2001). As the petitioner, ACS prosecutes actions brought in Family Court. N.Y. Fam. Ct. Act § 1032(a) (Consol.2001). ACS also has discretion to refer cases to the District Attorney for investigation and possible criminal prosecution. N.Y. Soc. Serv. Law § 424(11) (Consol.2001). ACS commences an action by filing a petition under Article 10 of the Family Court Act. Its own attorneys draw up the petition after consulting agency personnel.

Once ACS has filed a petition, the Family Court is required to hold a preliminary hearing "as soon as practicable" to determine whether the child's interests require protection pending a final order of disposition. N.Y. Fam. Ct. Act § 1027(a) (Consol. 2001). The court has the power to order removal of the child if that is necessary to avoid imminent danger to the child's life or health. *Id.* § 1027(b)(i). Among other factors, the court is to consider whether ACS made appropriate and reasonable efforts to prevent or eliminate the need for removal. *Id.* § 1027(b)(i). The court also determines preliminarily whether imminent risk would be eliminated by a temporary order of protection directing the removal of a person or persons from the child's residence; it is authorized to grant such orders by section 1029 of the Family Court Act.

If it determines that there is not enough time to file a petition and hold a preliminary hearing, ACS is authorized to seek, and the Family Court to issue, a preliminary order of removal. *Id.* § 1022. The court considers available protective services, including the removal of offending persons from the residence, in deciding whether to issue such an order. *Id.*

Only if ACS decides that there is not even time to obtain this expedited preliminary order may it remove a child from parents without a court order. *Id.* § 1024, N.Y. Soc. Serv. Law § 417 (Consol.2001). *See also Tenenbaum v. Williams*, 193 F.3d 581, 594 (2d Cir.1999). The test for emergency removal is characterized as an objective one, not one based on appearances. *See* N.Y. Fam. Ct. Act § 1024(i)(a) (Consol. 2001); *see also* N.Y. Fam. Ct. Act § 1024, cmt. (practice commentary) (McKinney 1999) ("This section places a further restriction on removal without prior court order by establishing a factual, objective test rather than one based on state of

mind."). If the ACS removes a child without a court order it must file a petition "forthwith," which is generally taken to mean within twenty-four hours and no more than three business days. *See id.* § 1026(c) & cmt. (practice commentary).

If a child is removed prior to a court order issued after a hearing where the parents were present and had the opportunity to be represented by counsel, the parents have the right to apply for a court hearing to secure the child's return. *Id.* § 1028. This hearing is required to take place within three days of the application. *Id.* The court must consider the same factors, including services and orders of protection, as it does at a removal hearing under sections 1022 or 1027. *Id.*

Instead of returning full custody of a removed child to a parent, the Family Court may parole the child to the parent pending the outcome of the proceedings. Parole is common. A paroled child returns to live with the parent, but ACS is usually given broad supervisory powers, including the right to make unannounced home visits and to insist that the parents participate in certain services. Tr. 351.

After provisional arrangements for the child have been addressed, the court proceedings move to the fact-finding stage. Often, several months will pass before a fact-finding trial is commenced. The hearing itself may take months because of lengthy adjournments. Tr. 334, 366. If, after this fact-finding trial, the court makes a finding of neglect, a dispositional hearing follows. Commonly, the entire process is very lengthy. As ACS Commissioner Nicholas Scoppetta confirmed; "Once you are in the Family Court, you are in it very often for many months before you can get to the substance of the case. . . ." Tr. 2505.

Many cases never reach the dispositional phase. ACS often engages in settlement negotiations with parents. A settlement may involve the parents admitting to allegations in the petition. It may include an adjournment in contemplation of dismissal (ACD), adjourning court proceedings with the understanding that ACS will agree to a dismissal of the petition after a period of time, usually six to twelve months, during which the parents must cooperate with ACS supervision and fulfill conditions. Tr. 332–33.

### B. Plaintiff Families

A few instances will illustrate how the ACS system results in the forcible and unjustified separation of abused mothers and their children.

#### 1. Nicholson

##### a. Background

Sharwline Nicholson is a thirty-two year old working mother of two. For the past two years, Ms. Nicholson has both worked full-time as a cashier at Home Depot and taken classes full-time at Mercy College, where she is pursuing a degree in Behavioral Sciences. While she manages this busy schedule, Ms. Nicholson has made arrangements for her children to be cared for. When she is working, her son is in school and her daughter is at day care. When she is at school, she takes her son with her and leaves her daughter with a baby-sitter. Ms. Nicholson has lived at the same address in Brooklyn for the past seven years.

This plaintiff has always been a single mother. Ms. Nicholson's son, Kendell Coles, is eight years old. His father has never been a part of his life. Ms. Nicholson's daughter, Destinee Barnett, is three years old. Destinee's father, Mr. Barnett, never lived with Ms. Nicholson but traveled from his home in South Carolina to

visit with Ms. Nicholson and Destinee on a monthly basis for the first nine months of Destinee's life.

Prior to an attack by Mr. Barnett on Ms. Nicholson in 1999, ACS had only had contact with Ms. Nicholson once before. There was a report that Mr. Barnett had struck Kendell in the face as a result of a bad report from school; Kendell suffered a "sore mouth" and had "slight marks on the lips." Ex. 190 at 101012. ACS investigated the case and decided the report was indicated as to Mr. Barnett, but was not indicated as to Ms. Nicholson. Ex. 190 at 101015. ACS noted that "[Ms. Nicholson] seems very attentive to child's needs . . . . He is receiving occupational therapy, speech therapy, and counseling in school. [Ms. Nicholson] feels that these services are adequate, and that outside intervention is not necessary." Ex. 190 at 101013.

### b. Domestic Violence Against Ms. Nicholson

Early in 1999, during one of his visits, Ms. Nicholson told Mr. Barnett that she was breaking off their relationship because they lived so far apart. Mr. Barnett, who had never previously assaulted or threatened Ms. Nicholson, flew into a rage. He punched her, kicked her, and threw objects at her. When he left, her head was bleeding profusely.

Throughout the assault, Destinee was in her crib in another room. Kendell was at school. After the attack, Mr. Barnett left the apartment. Her head bleeding, Ms. Nicholson called 911. Before the ambulance arrived, Ms. Nicholson asked her neighbor, Anna Thomas, a baby-sitter who Ms. Nicholson had relied on in the past, to care for her children while she was away at the hospital. Anna agreed to pick up Kendell at his bus stop when he returned from school.

At the Kings County emergency room, CAT scans and X-rays revealed that Ms. Nicholson had suffered a broken arm, fractured ribs, and head injuries. That evening, three police officers came to visit her at the hospital. The officers told Ms. Nicholson that, since she would be staying the night at the hospital, it would be better if her children could stay with a family member than with the babysitter. The officers asked Ms. Nicholson for the names and phone numbers of any family members that might be able to care for the children. Ms. Nicholson complied, providing the officers with the numbers for two of her cousins, Marcia Roseboro and Michelle Brown, and of Destinee's godmother, Marleen Hickman. The officers also asked about Mr. Barnett. Ms. Nicholson identified him from a photograph and provided information.

### c. Removal

On January 27, the same evening as the assault, the evening branch of ACS (ECS) directed the 70th Precinct to take Ms. Nicholson's children from the babysitter and to transport them to ECS. Tr. 849. The children stayed that night in the nursery at ECS. Tr. 850. The following day, January 28, an ACS worker called Ms. Nicholson at the hospital. The worker informed Ms. Nicholson that ACS had possession of her children and that if she wanted to see them she had to appear in court the following week. The worker refused to tell Ms. Nicholson where her children were. Ms. Nicholson testified that this news left her "very upset . . . [and] devastated." Tr. 733. Ms. Nicholson demanded that the hospital discharge her immediately so that she could get more information about her children. She was discharged, but the hospital informed her that the police had left word that she was not to return to her apartment. Ms. Ni-

cholson made arrangements to stay with a cousin, Glynis Hall.

CPM Williams was assigned to oversee the Nicholson case. Tr. 847. CPM Williams was concerned by the notation in the report ACS received from the State Central Register that Mr. Barnett had threatened Ms. Nicholson with a gun. Tr. 863. Although CPM Williams testified that such allegations require independent investigation by ACS workers, Tr. 864, he never inquired of Ms. Nicholson whether Mr. Barnett had in fact brandished a firearm during the assault. Tr. 863. Ms. Nicholson testified that she did not know whether Mr. Barnett beat her with or had a gun during the assault, but that she told police it was possible. Tr. 759. CPM Williams testified that he believed that the children were in "imminent risk if they remained in the care of Ms. Nicholson because she was not, at that time, able to protect herself nor her children because Mr. Barnett had viciously beaten her." Tr. 864.

CPM Williams testified that, under ACS policy, victims of domestic violence are permitted to make decisions about who will care for their children, and that these decisions do not require court approval. Tr. 856. He nevertheless rejected Ms. Nicholson's proposals for relatives who could care for the children. Ms. Nicholson first requested that her children be allowed to stay with her cousin, Michelle Brown, in New Jersey. Mr. Williams testified, "I rejected that because she lived in another state. I offered her as alternative, you can give me relatives who live within the Metropolitan area." Tr. 857. Williams testified that he imposed this condition because he believed that in order to put children in the care of an out-of-state relative he needed to obtain a court order, but he did not try to obtain such an order. Tr. 860. Ms. Nicholson proceeded to offer a cousin who

lived in the Bronx as a potential caretaker. Tr. 861. Williams did not allow the children to go to the cousin's care either. Tr. 861. Instead, he decided to place the children in foster care with strangers. Tr. 850.

d. Court Proceedings

Although the children were placed in foster care by ACS on January 28, a Thursday, no petition was filed in court until February 2, the following Tuesday. Ex. 186; Tr. 852. Williams conceded that, as of January 28, he knew that the children were in ACS's care without legal authorization. Tr. 851. He explained that he was hoping Ms. Nicholson would cooperate with his demands in order to avoid going to court. Tr. 855.

CPM Williams gave conflicting testimony regarding how quickly ACS is required to file a petition with the court once children are taken into foster care. In his testimony before this court, he affirmed that ACS is "required" to go to court the next business day after placing a child in foster care, Tr. 853, that ACS "should try" to do so, Tr. 853, and that in domestic violence cases, it is common to wait a few days before going to court in order to "try to work things out with the mother." Tr. 852. In his deposition, with which he was confronted in court, Tr. 853–54, Williams stated that he had "been told in training" that ACS has "several days" after a child is removed before it is required to go to court to get approval. Williams Depo. 93. He conceded that it is common in domestic violence cases for ACS to wait a few days before going to court after removing a child because, after a few days of the children being in foster care, the mother will usually agree to ACS's conditions for their return without the matter ever going to court. Tr. 852–53. Set out below is

some of his understanding of ACS practice as revealed in his testimony:

Q: Mr. Williams, in ACS, if you removed a child, you had three or four days to go to Court when it was without the permission of the parent; is that correct?

A: We have several days. That is correct.

Q: What is your basis for saying that? Is there something in writing, is that something that you have been told?

A: Been told in training

When the petition was filed with the Family Court on February 2—five days after ACS had seized the children—it was filed as a neglect petition against Ms. Nicholson as well as Mr. Barrett. Ex. 186. CPM Williams testified that, as of the filing of the petition, he did not believe that Ms. Nicholson was actually neglectful; he hoped that "once she got before the Judge, that the Judge would order her to cooperate with realistic services to protect herself and the two children. . . ." Tr. 868. It was CPM Williams' belief that Ms. Nicholson was an inadequate guardian, because she was "refusing to deal with the reality of the situation," that he could not allow the children to stay with the relative in New Jersey, and that it would be unsafe for her to return to her Brooklyn residence with her children. Tr. 868–69. Had he made inquiry, he would have learned that Mr. Barnett, the abuser, had never lived at the Brooklyn apartment with Ms. Nicholson, that he did not have a key to the apartment, and that he lived in South Carolina. Tr. 726. Another basis for CPM Williams' attempted justification was that Ms. Nicholson had failed to follow ACS's instruction that she obtain an order of protection from a local police precinct. Tr. 871–72. Ms. Nicholson had in fact attempted to do so, but had been denied an order because Mr. Barnett lived out of

state and she did not know his address. Ex. 191. She had informed CPM Williams of this fact. Tr. 871.

The petition of neglect filed by ACS against Ms. Nicholson and Mr. Barnett included three allegations of neglect. The first count, directed solely against Mr. Barnett, alleged excessive corporal punishment. The second count, directed against both parents, alleged that "[r]espondents engage in acts of domestic violence in the presence of the subject child, Destinee. As a result of one such fight, on or about January 27, 1999, the respondent mother suffered a broken left arm and a head injury caused when the father struck her with a gun." Ex. 4a at 106335. This count made no distinction between the culpability of batterer and victim. The final count was directed solely against Ms. Nicholson, and alleged simply that she "fails to cooperate with offered services designed to insure the safety of the children." *Id.* There were no specific indications of what services she had failed to cooperate with, or how any failure constituted neglect.

As she had been directed to do by ACS, Ms. Nicholson appeared at Family Court in Brooklyn on Tuesday, February 2. She did not have, and was not provided with, legal representation for this hearing. ACS was, of course, represented by one of its lawyers. The Family Court ordered the children remanded to the custody of ACS pending an order of final disposition. Ms. Nicholson testified that she was not even aware that this order was issued. Tr. 743. Only after the hearing was completed and the order issued was this mother contacted by her appointed 18–B lawyer. Tr. 743.

On February 4, after she had been separated from the children for a full week, Ms. Nicholson appeared in Family Court a second time, now represented by 18–B counsel. Tr. 744. The Family Court ordered that Ms. Nicholson's children be pa-

roled to her, on the condition that she and the children not return to Ms. Nicholson's address in Brooklyn, but instead live with her Bronx cousin. Tr. 744.

On February 5, eight days since she had last been permitted to see or speak with her children, Ms. Nicholson was at last permitted by ACS to visit with them. The supervised visit occurred at the ACS foster agency in Queens. Tr. 745. Ms. Nicholson was able to locate her daughter within the building by following the sounds of her crying. Tr. 746. When Ms. Nicholson found her daughter she was "sitting on a chair by herself with tears running down." Tr. 746. Destinee had a rash on her face, yellow pus running from her nose, and she appeared to have scratched herself. Tr. 746. Her son had a swollen eye. Ms. Nicholson demanded use of a phone to call the police, but she was refused. She called from a pay phone across the street. Tr. 747–48. When the police arrived, Ms. Nicholson filed a report on behalf of her son, who told her that his eye was swollen because the foster mother had slapped his face. Tr. 747. Following Ms. Nicholson's report, ACS arranged for a different foster mother to have Ms. Nicholson's children. Tr. 747. When the new foster mother arrived at the agency to take Ms. Nicholson's children at the end of the visit, her boy, Kendell, asked the new foster mother, "You are not going to hit me, are you?" Tr. 748.

On February 9, twelve days after the forced separation, Kendell had his sixth birthday. Ms. Nicholson was not allowed to see or speak with him on that day. Tr. 748.

On February 18, twenty-one days after the separation and fourteen days after the Family Court had paroled Ms. Nicholson's children to her, ACS returned her children to her. Tr. 750. The reason ACS gave for this delay, Ms. Nicholson testified without contradiction, was that after the court paroled the children to her, an ACS caseworker decided that the children would not have adequate bedding at the cousin's house in the Bronx that Ms. Nicholson was to stay at. ACS provided no assistance to Ms. Nicholson in moving the children's bedding from her Brooklyn residence— which she had been ordered not to enter because of potential danger to her—to the cousin's Bronx apartment.

e. Subsequent Case History

Following the return of Ms. Nicholson's children, ACS claimed to have difficulty visiting with her and her children at her cousin's Bronx residence. There is conflicting testimony on this issue. Ms. Nicholson testified that ACS made an unannounced attempt to visit her once at the cousin's house when she was not there, that she subsequently called to schedule a new appointment, and then had to cancel this appointment because of a snowstorm. Tr. 751–52. CPM Williams testified that, from February 18 until April 21, the caseworker made "six or seven" attempts to visit Ms. Nicholson and the children, that some of these visits were unannounced, and that Ms. Nicholson called the ACS offices "several different times." Tr. 879–81. A warrant application filed by ACS on March 15 stated that the ACS caseworker had made several attempts to visit Ms. Nicholson at both her cousin's Bronx address and her original Brooklyn address, and that Ms. Nicholson had not returned the caseworker's messages. Ex. 188.

The warrant ACS requested was granted. Afraid that ACS would take her children, Ms. Nicholson sent them to stay temporarily with her father in Jamaica. Tr. 754. Meanwhile, Ms. Nicholson made several attempts to contact her 18–B attorney. These calls were not returned. Tr. 755.

On April 7, as she was at the Post Office collecting her mail, two police officers arrested Ms. Nicholson, handcuffing her and taking her to the Family Court in Brooklyn. When Ms. Nicholson came before the Family Court that afternoon, she was represented by an 18–B attorney different from the one who had represented her before. She explained to the court that her children were in Jamaica. She was ordered to return to court on April 24. She did so, and on that date, the court permitted Ms. Nicholson to return to her own apartment in Brooklyn with the children. It required her to cooperate with supervision and services offered by ACS. After this hearing, ACS caseworkers visited Ms. Nicholson bi-weekly until August, when the petition against Ms. Nicholson was dismissed. Tr. 758.

ACS communicated to the State Central Register that the neglect report stemming from the domestic violence incident was indicated against both Mr. Barnett and Ms. Nicholson. Ex. 189 at 101042. Ms. Nicholson appealed this ruling. Tr. 766–67. She received confirmation that OCFS would conduct an administrative review of ACS's finding and notify her of the results. Ex. 189 at 101029. She has not yet heard from OCFS, so she remains on the State's records as a neglecting parent. Tr. 767.

2. Rodriguez

a. Background

April Rodriguez is the biological mother of two children, Elijah, age three, and Kayla, age two, and the step-mother of Jasmine, age seven. Tr. 379–80. She has cared for Jasmine since the girl was eighteen months old. Tr. 380. From 1995 until August 2000, Ms. Rodriguez had a relatively stable living arrangement with Michael Gamble, the father of the three children. Tr. 381–82, 525. During that period, the children were being properly taken care of and Mr. Gamble was never violent towards Ms. Rodriguez or the children. Tr. 382, 525–26. Prior to her involvement with ACS, Ms. Rodriguez was employed as an assistant manager at a video rental store. Tr. 382.

b. Domestic Violence Against Ms. Rodriguez

On August 29, 2000, while the children were in their bedrooms, a verbal dispute in the hall of their apartment escalated and Mr. Gamble pushed Ms. Rodriguez onto the floor, scraping her mouth. Tr. 382–83. Although she was injured, Ms. Rodriguez did not believe the children were in any danger. Tr. 384. Mr. Gamble had never been abusive toward the children. Tr. 486. She reported the incident to the police the next day and Mr. Gamble was arrested. Tr. 384, 527.

After this incident, Ms. Rodriguez no longer felt safe living with Mr. Gamble at their Brooklyn home. Tr. 385. She fled with Elijah and Kayla first to her aunt's house, where she stayed for two weeks, and then to her grandmother's house. Tr. 386–87. Jasmine had been picked up at the police station by Mr. Gamble's sister, and then went to live with the paternal grandmother. Tr. 386. Ms. Rodriguez decided not to go to a domestic violence shelter because she was informed by domestic violence hotline counselors that she would have to quit her job in order to qualify. Tr. 387.

c. Intervention by ACS and Removal

Within a week or two of the assault, an ACS caseworker, Ms. Williams, telephoned Ms. Rodriguez. Tr. 388. She informed Ms. Rodriguez that she needed to see the children because ACS was filing a petition against the father. Tr. 388. Ms. Rodriguez was also told that she was not a target of investigation. Tr. 388. Ms.

Williams then visited Ms. Rodriguez at her grandmother's house, and told Ms. Rodriguez it would be appropriate for her and her children to live at the grandmother's house until Ms. Rodriguez had made enough money to afford her own apartment. Tr. 389. Ms. Williams also asked Ms. Rodriguez whether she wanted to go to a domestic violence shelter. Ms. Rodriguez told Ms. Williams that she preferred to stay at her grandmother's house in order to keep her job. Tr. 423.

Shortly after this meeting, Ms. Rodriguez was served notice that Mr. Gamble was seeking legal custody of the children. Tr. 389. Ms. Rodriguez began receiving telephone calls at work from various ACS staff. Tr. 389–90. On one occasion Ms. Rodriguez returned to the Brooklyn home where Mr. Gamble was residing to meet with Ms. Williams and Mr. Gamble to discuss the custody situation. Tr. 390.

On October 10, Ms. Rodriguez received a call at work from ACS demanding that she leave work and visit their offices immediately. Tr. 391. Ms. Rodriguez complied, and when she arrived at ACS, Ms. Williams and her supervisor, Mr. Bentil, told Ms. Rodriguez that she had been violating an order of protection. Tr. 391. What, if any, order of protection the ACS personnel were referring to has never been established. Both Ms. Rodriguez and James Stewart, the CPM later assigned to the case, testified they had never seen any such order of protection. Tr. 391, 456–57.

On October 11, Ms. Rodriguez was again called by ACS to a conference with Mr. Bentil, Ms. Williams, Mr. Gamble, Elijah and Kayla. Tr. 392. At that conference, Ms. Rodriguez signed an agreement transferring custody of the children to Mr. Gamble for six months, or until Ms. Rodriguez obtained an apartment of her own and day care for the children, whichever came earlier. Tr. 393, Ex. 92.

There was conflicting testimony as to how this agreement developed. Ms. Rodriguez testified that Mr. Bentil told her "that we needed to come up with an agreement between me and Mr. Gamble about my children, or [ACS] would go to court." Tr. 392. Ms. Rodriguez further testified that Mr. Bentil suggested the children should stay with Mr. Gamble, and that "[Mr. Bentil] kept getting by the door and telling me that he was going to go to court, and I kept asking, but why, if I have not done anything wrong? Then they finally came up with an agreement that [Ms. Williams] wrote up on ACS paper, stating that I would give my children to Mr. Gamble for six months, and had me sign the bottom of it . . . ." Tr. 393. By contrast, CPM Stewart testified that Ms. Rodriguez proposed the idea of allowing the children to stay with Mr. Gamble in order to avoid their being placed in foster care. Tr. 486–87.

The court credits Ms. Rodriguez's testimony. CPM Stewart had not yet been assigned to this case when the meeting in question took place and was not present. His account is secondhand.

It is undisputed that the children went to stay with Mr. Gamble after the agreement was signed. Tr. 393–94. At this point, Ms. Rodriguez had not yet gone to court. She had no attorney. Tr. 474.

At some point, ACS became aware that there had been a past allegation of sexual abuse against Mr. Gamble investigated by ACS. Ms. Rodriguez testified that she learned this for the first time from ACS at meetings on October 10 and 11. This information so concerned her that following the October 11 meeting she called someone at ACS about the issue. Tr. 397. Ms. Rodriguez testified that she then received a call from Mr. Gamble who told her "You

really did it this time. . . . They are going to take the kids away." Tr. 398. Ms. Rodriguez then received a call from Mr. Bentil, who told her that she "had gotten them into trouble." Tr. 398. CPM Stewart testified that, on August 30, ACS only knew that Mr. Gamble had a case previously indicated with SCR, and that ACS did not learn that the prior case was for sexual abuse until October 13. Tr. 438, 448. Although it would have been simple to determine the nature of the indicated case by checking with the SCR, and it was apparently ACS policy to do so, CPM Stewart testified that nobody at ACS tried to do this. Tr. 446–47. CPM Stewart began taking an active role in the case on October 12, after the ACS central office called him and asked him to "look into the case and see what the situation was." Tr. 434. The evidence suggests that ACS did know of Mr. Gamble's prior indicated sexual offense early in the investigation, but that it nevertheless coerced Ms. Rodriguez into turning over custody of the children to her abuser.

On October 12, ACS visited the paternal grandmother, who was caring for the children on behalf of Mr. Gamble. Tr. 449. ACS asked the grandmother to "keep the children there" until they learned more about the father's status. Tr. 450. CPM Stewart directed Ms. Williams to tell both the mother and father that they could not take the children from the grandmother's house. Tr. 449.

ACS had not yet filed a petition or obtained a judicial order authorizing removal. CPM Stewart testified that "I didn't have enough information to go into court, but I did have enough to put the children into some type of secure environment outside of the father's home." The sole reason that Stewart gave for preventing the mother, Ms. Rodriguez, from having the

children was because she lacked adequate housing. Tr. 453–54

d. Court Proceedings and Further Removal

On October 16, more than a month and a half after the assault on Ms. Rodriguez, ACS filed petitions alleging neglect against both Ms. Rodriguez and Mr. Gamble. Tr. 455. Although CPM Stewart testified that on October 12, he did not believe Ms. Rodriguez to be a neglectful mother, he apparently changed his mind prior to the filing of the petitions. Tr. 483. He explained that he changed his opinion because on October 13, he discovered that Ms. Rodriguez had been given an order of protection preventing Mr. Gamble from having custody of the children, and that she had failed to enforce this order by allowing Mr. Gamble to have custody of Jasmine Gamble. Tr. 456. CPM Stewart admitted that he had not seen this order when he made his decision, still had not seen it as of the hearing, did not know if it was in effect on October 13, and did not know the terms of this phantom order. Tr. 456–57. It also bears recollecting that five days before the petitions were filed, ACS had coerced Ms. Rodriguez into accepting an arrangement by which she was required to temporarily transfer custody of all three children to Mr. Gamble.

The neglect petitions did not mention any failure to enforce an order of protection on the part of Ms. Rodriguez. Instead, they alleged that she and Mr. Gamble "engage in serious domestic violence in the home and in front of subject children." Ex. 91a, 91b, 91c.

After the petitions were filed in Family Court, the court remanded custody to ACS pending disposition. Ex. 182a, 182b, 182c. Two caseworkers, accompanied by police officers, went to the grandmother's house and removed the children to foster care.

Tr. 401. On October 19, Ms. Rodriguez appeared in Family Court. The court ordered ACS to parole the children to her. Tr. 404–05; Ex. L.

Despite the court order, the children were not immediately returned to Ms. Rodriguez, who was then living at her grandmother's home. Tr. 406. After her appearance before the Family Court, Ms. Rodriguez testified, ACS told her she would have to enter a domestic violence shelter before ACS would permit the children to be returned to her. Tr. 410. Additionally, ACS informed her that reunification would be delayed because the foster care mother had to be apprized and the children had to have a medical examination prior to their discharge. Tr. 408.

### e. Subsequent Case History

On October 25, because ACS had told her that they would not return her children to her unless she entered a shelter, Ms. Rodriguez entered the Emergency Assistance Unit (EAU). This is a temporary shelter where homeless people stay while they search for permanent shelter. Tr. 411. Late that day, Ms. Rodriguez's children were returned to her. Tr. 411. The children were in poor health. Ms. Rodriguez testified that the children "were not the same kids I gave [ACS]." Tr. 412. She recounted that:

> [Her] daughter's hair was all breaking . . . . Her shirt was filthy, and her diaper was disgusting. The seven-year-old had bags under her eyes. She looked disgusting. And at the time, he was two years old, Elijah, he had all this (sic) bruises and pus and blood coming out of his lip. I didn't know what it was.

Tr. 412.

The children had been discharged from foster care at approximately 6:00 p.m., but by 1:00 a.m., their mother was so alarmed by their physical condition that she took them to the nearby hospital emergency room. Upon their arrival at the hospital, all were regurgitating and both of the youngest children had ear infections. They were treated and antibiotics prescribed, with the youngest child also being given a cream for a festering facial infection. Tr. 412–13.

For the next week, Ms. Rodriguez and her children were shuttled back and forth every day between the EAU offices and a temporary evening shelter. Tr. 414. She and the three children were then placed in a shelter in the Bronx. Tr. 415. This shelter was not a domestic violence shelter. Its location was not confidential and there were no services for domestic violence victims or their children. Tr. 415. The space provided to Ms. Rodriguez and her children was one room with a bathroom. Tr. 415. The family stayed at this shelter until February, when she and the children were moved to a more permanent "Tier-2" facility. Tr. 416. Ms. Rodriguez was forced to quit her job because the strict curfew at the Tier-2 facility conflicted with the hours she was required to work. Tr. 417. Ms. Rodriguez, who had never before had to resort to welfare, now must rely on public assistance. Tr. 417.

CPM Stewart testified that neither Mr. Bentil, the case supervisor, nor Ms. Williams, the caseworker, did anything wrong in their handling of the Rodriguez case. Tr. 435–36. It was, in their opinion, in conformance with regular practice.

### 3. Udoh

### a. Background

Ekaete Udoh is a forty-three year old working mother of five. She was born and raised in Nigeria. Tr. 959. In 1977, Ms. Udoh's family arranged to have her married to Eddey Udoh. Tr. 960. Ms. Udoh had never met him before; she was given

no choice. Tr. 960. Following her marriage, Ms. Udoh came to the United States, where Mr. Udoh lived. Tr. 969. The couple had five daughters, ages twenty-three, nineteen, seventeen, fifteen, and thirteen. Ex. 192.

Ms. Udoh has worked for the Board of Education as a paraprofessional and teacher's assistant for eight years, assigned primarily to high school special education students. Tr. 958. She supports her four youngest daughters solely on the $23,000 salary that she earns. Tr. 958. Her oldest daughter, Edu, currently attends Binghamton University, and her second-oldest daughter, Ima, is attending Old Westbury College. Tr. 959.

### b. Domestic Abuse Against Ms. Udoh

Shortly after Ms. Udoh moved to the United States and joined Mr. Udoh in Kentucky, she became pregnant with her first daughter. The child was born prematurely in 1978, weighing only two pounds. Tr. 969. The premature birth was triggered by Mr. Udoh's beating her; Ms. Udoh testified that "Eddey was upset with me that I was pregnant with the first child. He wasn't ready for babies, and then it was just a little argument in the house that he beat me up." Tr. 970. From 1977 to 1982, while the couple lived in Kentucky, Ms. Udoh testified that Mr. Udoh "beat me up as many times as possible.... There were too many times. I can't recall all of them." Tr. 971.

Despite being unfamiliar with the American justice system when she arrived, Ms. Udoh soon became acquainted with it. Tr. 970. She called the police "many" times to report incidents of abuse by Mr. Udoh, but the police never arrested her husband. Tr. 971. The police did take her to a shelter once, when a neighbor called the police after witnessing Mr. Udoh chase Ms. Udoh, who was naked and bruised, out of their house, beating her. Tr. 971. The police left her children with Mr. Udoh, and Ms. Udoh returned to the family home three weeks later. Tr. 973.

The Udoh family moved to New York in 1984 after spending two years in Philadelphia where Mr. Udoh earned a graduate degree. Tr. 973. Mr. Udoh continued to beat Ms. Udoh regularly. In 1985, after another beating, Ms. Udoh again called the police. The police came, but did not arrest Mr. Udoh and did nothing to assist Ms. Udoh or her children in leaving the house. Tr. 975. Besides beating his wife, Mr. Udoh also beat the children with his hands or a belt. Ms. Udoh would try to intervene, talking with him to calm him down or, if that failed, calling the police. Tr. 975. The police never arrested Mr. Udoh. Tr. 977.

In 1995, Ms. Udoh went to court and obtained an order of protection ordering Mr. Udoh not to assault her. Ex. 199. Ms. Udoh did this without a lawyer's assistance. Tr. 979. The order did not require Mr. Udoh to move out of the house. Tr. 979. In 1996, Ms. Udoh went to court again and obtained a new order of protection. Ex. 200.

The father claimed the inherent right to beat his wife and children. An ACS investigation conducted in relation to Ms. Udoh's complaints included the following observations:

> The father has continued to insist that he has the right to discipline his children as he sees fit, and claims that he even has the right to beat his children 'with a rod, or switch, if he so pleases.' He called the caseworker's attention to the fact that he is very proud of his Nigerian heritage, and that under Nigerian cultural upbringing, he was allowed to engage in corporal punishment as a means of controlling. the 'so-called unruly behavior of his children, and that

this even extends to the disciplining of his wife's behavior.' He claims that he is verbally and physically abusive for the cardinal reason of maintaining order and good behavior among his family members. . . . He is upset over the fact that his wife has not given birth to a son, and claims that, one of his rights as a Nigerian male is to seek a second wife, who can provide him with this longed for son.

Ex. 112 at 000083. Despite this report ACS did not help Ms. Udoh leave or attempt to remove Mr. Udoh from the household, or limit his contact with his wife or children.

In 1997, Ms. Udoh took the children and moved out of the home in Queens to a new residence in Brooklyn. Tr. 985. Mr. Udoh would not let her take her possessions, and Ms. Udoh obtained a court order authorizing her to collect her belongings with police protection. Ex. 202 at 003226. In 1998, Ms. Udoh filed a complaint that Mr. Udoh was violating an order of protection by making threatening calls to her. Mr. Udoh was arrested and spent one day in jail. Tr. 990. In 1999, due to financial difficulties, Ms. Udoh and her children moved back to the Queens residence with Mr. Udoh. Tr. 996. From January of 1999, when Ms. Udoh returned to live with Mr. Udoh, until May 1, 1999, Ms. Udoh testified that Mr. Udoh did not hit her or her children. Tr. 997.

### c. Abuse Triggering Removal

In early May, after Ms. Udoh had fallen asleep, she was awakened by the sound of Asuno, her daughter, screaming. Tr. 960. Ms. Udoh found her daughter crying in the bathroom; Asuno explained that her father had hit her in the eye because she was not able to fit all of the dirty dishes in the dishwasher. Tr. 961. Ms. Udoh tended to Asuno's eye with an ice pack and stayed up with Asuno the rest of the night. Tr. 961.

Ms. Udoh wanted to take Asuno to the doctor to get her eye examined, but she had to go to work first to get permission to take the day off, because she had already used all of her available sick days. Tr. 962. After receiving permission from her supervisor, Ms. Udoh went to the school. Tr. 962. School officials asked what had happened to Asuno, and Ms. Udoh explained that Asuno's father had hit her. Tr. 962. Ms. Udoh then took her daughter to the doctor. Tr. 962. The school guidance counselor called ACS to report the incident. Tr. 962.

### d. Removal

After Ms. Udoh returned from the doctor, two ACS caseworkers visited the Udoh household and interviewed Mr. and Ms. Udoh, Asuno, and another daughter, Edu. Tr. 963. A caseworker informed Mr. Udoh that she would call the police if he continued to live at the Queens address. Tr. 964. Ms. Udoh and the children accompanied the caseworker to the ACS office. She and the children then filed a report with the police. Tr. 965. When Ms. Udoh returned home with her daughters, Mr. Udoh had left. Tr. 965. His clothes were gone. Mr. Udoh never returned to the home. In March of 2000, Mr. Udoh returned to Nigeria. Tr. 965, 1003–04, 1008–09.

While at the ACS offices, the ACS caseworker told Ms. Udoh to appear in Family Court the following day, May 6, at 2:00 P.M. Tr. 966. CPM Delamothe, who was assigned to the Udoh case, testified that on May 5, ACS did not consider the children to be in imminent danger if they remained with the mother. Tr. 1020. It was for this reason that it allowed Ms. Udoh to return home with her children. Tr. 966.

On the morning of May 6, CPM Delamothe directed the caseworker to meet with the legal department preparatory to filing a petition against Mr. Udoh. Tr. 1023. The legal department then called Delamothe and advised her that a legal basis existed to name Ms. Udoh as a respondent on the neglect petition as well on the basis that she had "engaged" in domestic violence. Tr. 1023; Ex. 160 A–C. CPM Delamothe decided to take this step. Tr. 1023. CPM Delamothe also authorized the immediate removal of Ms. Udoh's children on May 6, without a court order. Tr. 1012. She testified that the children were in "imminent danger" because Mr. and Ms. Udoh might "be in [Family] court at the return of the children from school and [the children] wouldn't have parents to come home to ...." Tr. 1026. Although the four children at home were ages twelve, thirteen, sixteen, and seventeen, CPM Delamothe was, she said, concerned they might not have keys to enter the house. Tr. 1026, 1027. CPM Delamothe could not recall whether the caseworker asked the children whether they had keys to the house when they were picked up by ACS, or whether the caseworker offered to wait with the children until Ms. Udoh returned from court. Tr. 1027.

Before Ms. Udoh left work to go to her scheduled court appearance, ACS called her to tell her not to come to court, and that her children had been removed from school and put in foster care. Tr. 967. CPM Delamothe testified that the removal of the Udoh children was in accord with ACS's stated policy of resolving any ambiguity regarding the safety of the child in favor of removing the child. Tr. 1034.

When the children were picked up from school by ACS, they were interviewed by a caseworker. Edu Udoh, then seventeen, told the caseworker that "I felt very comfortable staying with [my mother]. I am

safe .... I told her I didn't think it was necessary to be removed, and I felt a great suffering if I was removed from my house." Tr. 894–95.

### e. Court Proceedings

On May 7, ACS filed neglect petitions against Ms. Udoh and her husband, alleging that, for approximately twenty years, she had "engaged in domestic violence" with him in the presence of the children. Tr. 968, 1030, 1033; Ex. 160 A–C. The petition also alleged, incorrectly, that the mother had never obtained an order of protection against Mr. Udoh as to the children. Ex. 160 A–C at 4. CPM Delamothe could not recall why this allegation was included; she conceded that she was aware that several orders of protections had been obtained. Tr. 1045–46. On page two of the petitions, there are only blank spaces where answers are required for why insufficient time was available to obtain a court order prior to removal and why removal of the children was necessary. Ex. 160 A–C.

Later that day, the matter was heard by the Family Court. It was adjourned so that ACS could investigate to determine whether the children could safely return home. Tr. 1046. On May 20, ACS agreed that it was safe for the children to return home; the Family Court then ordered the children paroled to the mother. Tr. 998, 1048. Yet it took eight days for ACS to notify the foster care agency with which the children had been placed that the court had ordered them paroled to Ms. Udoh. Tr. 1049–51; Ex. 79; Ex. 196. The delay prompted the Juvenile Rights Division of the Legal Aid Society, which was representing the children, to file on May 27 an application seeking the immediate release of the children from ACS custody. Ex. 195. In this application, the children's attorney noted that the delay in returning the children to their mother was harming

the children, among other reasons, because "[t]hey have been missing classes because their foster mother is unable to get them to school on time" and, ironically, "the foster mother has refused to provide house keys to the children and they have been locked out of their foster home repeatedly." Ex 195; Tr. 901–02.

#### f. Subsequent Case History

Edu Udo, one of the daughters, described her time at the foster home as "very uncomfortable;" the foster mother "treated us like we were criminals." Tr. 899. The Udoh children were locked in the house without access to the telephone when the foster mother would leave. Tr. 899–900. The forced stay in foster care was particularly hard on Edu because she was college-bound and in the midst of studying for her regents examinations. ACS refused to let her return home to retrieve her study materials. Tr. 898.

Following the return of her children, ACS contemplated withdrawing the petition as to Ms. Udoh. Ex. 197. Ms. Udoh was informed that, if she would testify against her husband, ACS would withdraw the charges against her. Tr. 999. Ms. Udoh met with ACS and prepared to testify against Mr. Udoh, but the petition was never withdrawn as to her. Tr. 1003. On October 13, 1999, the Family Court ordered the case adjourned in contemplation of dismissal. Tr. 198. ACS continued to visit Ms. Udoh for almost a year. Tr. 1004. When the caseworker would visit Ms. Udoh's house, she would "go though my refrigerator to look for food and she would go through the whole house to inspect it." Tr. 1004. Ms. Udoh was also required to provide the children's school and medical records to the caseworker during these visits. Tr. 1004. The abuser was during all this time in Nigeria.

#### 4. Tillett

##### a. Background

Sharlene Tillett has two children, Winston and Uganda. In 1995, Ms. Tillett moved from Belize to New York to join her husband, Winston Denton Sr., who was already living there. Ex. 77 at 22. She had been married to Winston Denton Sr. for four years. During that time there had been sporadic incidents of domestic violence but no child abuse. Ex. 77 at 22. Shortly after arriving in the United States, Ms. Tillett and her husband separated.

Ms. Tillett moved to California. There, she began a three-year relationship with Jamie Gray. The couple eventually moved back to New York. During this period, there were "isolated episodes" of domestic violence against Ms. Tillett sparked by Mr. Gray's jealousy over Ms. Tillett's estranged husband. In 1999, two months before the birth of Uganda, Ms. Tillett arranged to have her son Winston live with relatives in California because she did not want Winston to witness her being battered by Mr. Gray. Tr. 1061.

##### b. Domestic Violence Against Ms. Tillett

On August 19, 1999, Ms. Tillett visited a hospital and informed the staff that Mr. Gray had choked her; at this time, Ms. Tillett was expecting the birth of her second child, Uganda. Ex. 77 at 4. She was sent home. Two days later, on August 21, she returned to the hospital in labor, and delivered Uganda that afternoon. Tr. 1057; Ex. 77 at 4. While at the hospital, Ms. Tillett informed the staff that there was a history of domestic violence against her by Mr. Gray. Ex. 77 at 4. After she and her newborn were cleared to be released, Mr. Gray arrived at the hospital and drove Ms. Tillett and Uganda home. Ex. 77 at 7. According to Ms. Tillett, she accepted a ride with him because she did

not want to cause a commotion at the hospital; he did not come into her apartment after he dropped her off. Ex. 77 at 7.

On August 23, the hospital made a report to State Central Register, which transmitted it to ACS for investigation. CPM Delamothe was assigned to oversee the case. Tr. 1060. The following day, a caseworker visited Ms. Tillett at her home. The caseworker found the baby to be "very healthy... clean and neat," with clothing and pampers. Tr. 1061. The caseworker did not remove the child. Tr. 1062–63.

c. Removal

The caseworker returned to the office and reported to her supervisor, who in turn reported to CPM Delamothe. Tr. 1063. CPM Delamothe, who had not herself spoken with or interviewed Ms. Tillet, directed that the caseworker return and remove Uganda from her mother. Tr. 1063. CPM Delamothe decided that Uganda was in "imminent danger" because the apartment that Ms. Tillet was living in was being paid for by Mr. Gray (even though Ms. Tillett had told the caseworker that Mr. Gray had moved out on August 19), and because Ms. Tillett was unemployed and dependent on Mr. Gray for financial support (even though Ms. Tillett had told the caseworker that she was expecting support from her family in California). Tr. 1063–64; Ex. 77 at 7.

ACS proceeded to remove Uganda without a court order, and before offering Ms. Tillett any services. Tr. 1064–68, 1082. At trial, CPM Delamothe admitted that, given that Ms. Tillett was breast-feeding Uganda and had a ready supply of pampers and clothes for the child, the child was not in immediate danger due to Ms. Tillett's financial situation. Tr. 1064. The ACS case record prepared during the in-vestigation states: "Infant was removed from his home because there was on-going domestic violence in the home." Ex. 77 at 14.

d. Court Proceedings

The following day ACS filed a neglect petition against Ms. Tillett as well as against Mr. Gray alleging that she "engage[d] in acts of domestic violence in the presence of the subject child." Ex. 161. Of course Uganda was not yet born at the time that Ms. Tillett reported being choked by Mr. Gray and during the trial CPM Delamothe conceded that, as an unborn baby, Uganda could not "witness" the violence. Tr. 1062.

ACS also charged Ms. Tillett with child neglect because she did not have a crib or "means for supporting or caring for" the baby. Ex. 161. CPM Delamothe admitted that Ms. Tillett's sleeping arrangement for her child, namely sleeping with Uganda in the same bed, was not neglectful per se. Tr. 1078. She could not explain why Ms. Tillett should not be permitted to sleep with Uganda when ACS does not consider it to be neglectful when other mothers do so. Tr. 1078–79.

On September 3, 1999, the Family Court remanded Uganda to ACS with privilege to parole. This meant that ACS could return Uganda to Ms. Tillett if the residence was inspected and found to be safe. Tr. 1087; Ex. 77 at 13.

e. Subsequent Proceedings

Ms. Tillett had obtained a new residence in her own name. Ex. 77 at 13. The apartment was clean, and Ms. Tillett had acceded to ACS's demand that she purchase a bassinet for Uganda to sleep in. Ex. 77 at 13. ACS visited the new home and determined it to be "suitable for her and her son." Ex. 77 at 18. Ms. Tillett

had obtained employment and now supported herself. Ex. 77 at 13; Tr. 1085. She also began regularly attending domestic violence classes, parenting skills classes, and one-on-one counseling. Ex. 77 at 13. Her counselor reported to ACS that she was "very receptive" to these services. Ex. 77 at 13.

Nevertheless, at CPM Delamothe's insistence, Uganda was not returned to Ms. Tillett until October 20, 1999, a month and a half later. CPM Delamothe's reason for refusing to parole Uganda to Ms. Tillett was she thought Ms. Tillett should undergo a psychological evaluation, Ex. 77 at 15, 16, because Ms. Tillett had been in two abusive relationships in her lifetime. Tr. 1086, 1088–1089, 1090. CPM Delamothe testified that "I have learned that in domestic violence cases there exists sometimes a syndrome with the mothers, and they will replace one batterer for another." Tr. 1088. CPM Delamothe conceded that Ms. Tillett could not be expected to predict whether a person would be violent towards her before entering a relationship with the person. Tr. 1090. There had been no mention in the September 3 order of the Family Court that ACS should require a psychological evaluation of Ms. Tillett before returning Uganda to her.

Ms. Tillett objected to being required to undergo a psychological evaluation; she told ACS that her attorney had advised her that ACS could not condition the return of Uganda on her doing so. Ex. 77 at 14. Ms. Tillett then was asked to attend a conference with ACS caseworkers to discuss her family history and plans. Ms. Tillett brought her attorney with her, but CPM Delamothe refused to allow Ms. Tillett's attorney to attend the conference. Tr. 1093. CPM Delamothe testified that ACS policy was not to permit mothers to bring any legal representation to such conferences, Tr. 1097–98, even though every-

thing the mother says is recorded and she might, among other things, incriminate herself. Tr. 1099.

When ACS finally determined that the infant could safely be returned to Ms. Tillett on October 20, two months after separation on August 24, Ms. Tillett had not undergone any psychological evaluation. CPM Delamothe admitted that a psychological evaluation "wasn't necessary" for the child to be returned. Tr. 1091.

ACS reported to the SCR that the report against Ms. Tillett was "indicated." Ex. 77 at 18. The report apparently has not been corrected.

5. Garcia

a. Background

Michele Garcia is the mother of three children, Benjamin, Giselle, and Jordan. She works as a dental assistant. In January of 1999, after a seven-year relationship, Ms. Garcia separated from Benjamin's father, Mr. Hunter. Ex. 89 at B100109. There were verbal disputes over visitation between the two, which Ms. Garcia reported to her local police precinct, but the father never assaulted Ms. Garcia. Ex. 89 at 100111–100112.

b. Domestic Violence Against Ms. Garcia

On July 6, 1999, Mr. Hunter was returning Benjamin to Ms. Garcia after a visit. At this time, Mr. Hunter was not living with Ms. Garcia. Tr. 1349. Ms. Garcia was visiting with a male friend when Mr. Hunter arrived. Mr. Hunter flew into a rage, attacking them both. His attack on Ms. Garcia's friend with a meat cleaver resulted in a wound that required twenty-four stitches. Ex. 89 at 100101. He kicked Ms. Garcia in the stomach so hard that Ms. Garcia suffered a pancreatic contusion, and required hospitalization for

a week and a half. Ex. 89 at 100101. The record does not indicate where the children were during their mother's hospitalization. Although Mr. Hunter was charged with assault, he was not subsequently arrested. Ex. 89 at 100101. After she was discharged from the hospital, Ms. Garcia and the children moved in with her aunt while she sought a new apartment. Ex. 89 at 100109. On July 27, 1999, Ms. Garcia obtained an order of protection against Mr. Hunter. Tr. 1382–83.

### c. Intervention by ACS

On July 19, 1999, Ms. Garcia's counselor at Victim's Services Agency reported to the State Central Register that Mr. Hunter had mistreated the children by assaulting Ms. Garcia. Ex. 89 at 1001010. On July 26, an ACS representative first spoke with Ms. Garcia to schedule interviews with her and her children. Ex. 89 at 100102. Ms. Garcia told ACS that she did not feel comfortable having strangers interview the children, and was concerned that such interviews would only aggravate the children's trauma. Ex. 89 at 100102. Ms. Garcia agreed to meet with ACS on July 30; ACS had demanded that she meet earlier, but Ms. Garcia indicated that her work schedule and hospital visits would make any earlier visit impossible. Ex. 89 at 100103.

The caseworker consulted with ACS's legal counsel about the possibility of forcing Ms. Garcia to meet prior to July 30; counsel advised the caseworker that there were no legal grounds to force an earlier meeting. Ex. 100103. Legal counsel also advised the caseworker that, "Since [Ms. Garcia] already has an order of protection against [Mr. Hunter], and she has already left her previous home to stay with her Aunt, then she is at least safeguarding the safety of herself and her children." Ex. 89 at 100103. Counsel advised the caseworker to continue to engage Ms. Garcia and her family "in order to come to a compromise on an agreement." Ex. 89 at 100103.

Nevertheless, the ACS caseworker attempted to visit Ms. Garcia every day for the next three days in order to make an assessment of the children's safety. Ex. 89 at 100104. On July 29 Ms. Garcia contacted ACS; she was angry that ACS had been attempting to make unannounced visits to her home while she was away, and when there was already an agreed-upon interview date scheduled for July 30. Ex. 89 at 100104. Ms. Garcia again voiced serious concern that the interviews ACS intended to conduct with her children would be harmful to them, a concern that was not assuaged by the fact that ACS refused to tell Ms. Garcia what kind of questions would be asked during the interview. Ex. 89 at 100103, 100104. At trial, plaintiffs' expert Dr. Evan Stark testified that Ms. Garcia's concern that ACS might re-traumatize her children by conducting insensitive and uninformed interviews was supported by good clinical evidence. Tr. 1582.

On August 2, ACS's domestic violence specialist Cheryl Meyers interviewed all three children and the mother. Tr. 1234–45; Ex. 89 at 100104, 100108. The notes from the interview indicated that the children had no physical injuries, they had not been hurt during the attack on Ms. Garcia, their basic needs were being attended to, they were clean and neat, and they exhibited no symptoms of developmental disabilities. Ex. 89 at 100108. Ms. Garcia was cooperative with ACS during the interview, providing extensive information about her relationship with Mr. Hunter, prior disputes she had reported, the attack that took place, and her subsequent efforts to help the police locate Mr. Hunter and to otherwise protect herself and her children. Ex. 89 at 100103. Ms. Meyers concluded

that Ms. Garcia was a strong woman who would do anything to protect her children, and that removal of her children was not necessary. Tr. 1234.

After the interview, ACS contacted the police to verify the information Ms. Garcia had given about the existence of prior disputes. The record of reports involving Ms. Garcia consisted of eight incidents, which are summarized below:

March 17, 1992: Mr. Reyes, father of one of Ms. Garcia's children, punched Ms. Garcia in the nose during a verbal altercation, then fled the scene.

March 18, 1992: Mr. Reyes again entered the home and struck Ms. Garcia in the face, causing no injuries.

November 5, 1995: Mr. Hunter and Ms. Garcia had a dispute. No physical violence was reported.

April 27, 1997: Mr. Reyes had a verbal dispute with Ms. Garcia about picking up the children, and threatened Ms. Garcia and her children. No physical violence was reported.

August 31, 1997: Mr. Hunter took their son, Benjamin, overnight and failed to promptly return him. No physical violence was reported.

September 21, 1997: Mr. Hunter banged on Ms. Garcia's door. Ms. Garcia obtained a six week restraining order against him. No physical violence reported.

February 28, 1999: Ms. Garcia called and reported that she didn't want to live with Mr. Hunter anymore. No physical violence reported.

July 6, 1999: Mr. Hunter physically attacked Ms. Garcia and her friend.

Ex. 89 at 100112.

Of the seven reports made prior to the attack on Ms. Garcia that prompted ACS review, only two involved physical violence; both occurred in a two-day period seven years prior to Mr. Hunter's attack on Ms. Garcia, and both involved Mr. Reyes, a former partner, whose contact with Ms. Garcia after these incidents, from what can be determined in the case report, appears to have been limited to child visitation. None of the reports involving Mr. Hunter prior to July 6, 1999, suggested violence or a threat of violence against Ms. Garcia or any of the children.

d. Removal

Nevertheless, based on these reports, ACS determined that there was a "long history of domestic violence" in the household, and that the case should be indicated against Ms. Garcia because, "although she took the necessary precautions of protecting her children by filing complaints at the local precincts," she had let the batterers back into her life and did not "see herself as a victim of domestic violence." Ex. 89 at 100113.

This somewhat abrupt decision by ACS to target Ms. Garcia as a subject of the investigation, charge her with neglect, and remove her children, may be illuminated by the notes in the case record that, two days before the remand was requested, CPM Lowell met with the case supervisor and caseworker, and ordered the caseworker to file the case and ask for a remand "based on the fact that [Ms. Garcia] has blatantly refused to cooperate with ACS." Ex. 89 at 100117. A similar refrain emerged from the testimony of Giselle Reyes, one of Ms. Garcia's children who was removed. When she asked the caseworker why she and her siblings were being taken away from their mother, the caseworker replied "[o]ver a phone call, if your mom would have called, you would not have been removed." Tr. 1341.

At trial, CPM Lowell testified that she decided to seek the removal of the children because she thought they were in immi-

nent danger; the reason that she believed the children were in "imminent danger" was that the children were not receiving counseling and "ACS had no idea what was going on." Tr. 1353–55. CPM Lowell did not consult with Ms. Meyers, the domestic violence specialist, who, it will be recalled, found no reason for separation. Tr. 1356–57.

e. Court Proceedings

On August 27, 1999, more than a month and a half after the precipitating incident and long after the children and their mother had settled down peacefully, the Family Court granted ACS's petition to remove the children. The children were placed with Mr. Hunter's aunt.

f. Subsequent History

Although the source of the "imminent danger" that CPM Lowell testified about was the lack of counseling the children received while in Ms. Garcia's custody, the children apparently never received counseling while in foster care under the control of ACS. Tr. 1343. CPM Lowell could not recall ACS making any efforts to provide them with such services. Tr. 1355–57. Following the removal of her children by ACS, the ACS case record indicates that "[Ms. Garcia] is very receptive to services and is willing to do whatever it takes for her to get her children back." Ex. 89 at 100118. The children were, of course, hostages to compliance.

6. Norris

a. Background

Michelle Norris is a twenty-four year old mother of one. Her son, Justin, is two years old. She is employed at JFK Airport in Queens. Tr. 1181. Her first encounter with ACS occurred in March, 2000, when a caseworker from ACS visited the home to investigate a report of possible domestic violence and drug use in the household. Tr. 1185. At that time, Ms. Norris was in a relationship and living with Justin's father, Angel Figueroa. Ms. Norris asked the caseworker if she was there to take Justin away, and the caseworker responded that "we only take away kids if there's domestic violence or if you're on drugs." Tr. 1185. The caseworker examined Justin, assessed the living quarters, and told Ms. Norris that everything looked fine and that she should have nothing to worry about. Tr. 1185.

b. Domestic Violence Against Ms. Norris

Later that month, Ms. Norris decided to break the relationship and depart from the apartment of Mr. Figueroa. Tr. 1186. Mr. Figueroa did not approve. As Ms. Norris was collecting her things, he attacked her. She testified that "[Mr. Figueroa] dragged me by my hair, threw me into a wall, hit me in the face." Tr. 1186. Ms. Norris could not get to a phone, but the landlord was able to summon the police. Ms. Norris showed the police her injuries and asked them to arrest her batterer. Tr. 1187. She filed a police report against Mr. Figueroa, and was granted an order of protection. Tr. 1188–89.

The apartment in which she had lived with Mr. Figueroa was rented in her, not his, name. Nevertheless, after the attack, Ms. Norris and Justin temporarily moved in with a friend to ensure their safety. Tr. 1189. Many of her belongings were still at her apartment, and on April 5 Ms. Norris returned to collect them. Tr. 1190, Ex.222. Mr. Figueroa was not present when Ms. Norris arrived, and Ms. Norris did not believe he would be there. Tr. 1190; 1215. Mr. Figueroa, however, returned to the apartment while Ms. Norris was still there, and attacked her again,

breaking her phone and hitting her in the face. Tr. 1190.

The police were called, and when they appeared Mr. Figueroa took the baby to the bathroom and locked the door. Tr. 1190. The police informed Ms. Norris that, because of the order of protection, either she or Mr. Figueroa would have to leave the apartment or both would be placed under arrest. Tr. 1190. Ms. Norris explained to the police that she was trying to leave, but that she wanted her son back first. Tr. 1190. Mr. Figueroa refused to leave the bathroom, and the police escorted Ms. Norris out of the apartment without helping her take her son back from Mr. Figueroa. Tr. 1190–91.

The next day, Mr. Figueroa left Justin with a baby-sitter, and Ms. Norris returned to take the child. Tr. 1192. Since Justin was running a fever, Ms. Norris immediately took him to a hospital emergency room. Tr. 1192.

### c. Removal

On the way to the hospital, Ms. Norris received a call from an ACS caseworker. The caseworker told Ms. Norris that she had neglected Justin by "engaging in domestic violence" and "leaving him with an abusive man." Tr. 1193. Ms. Norris told the caseworker that she had been forced to leave her son by the police; the caseworker answered that was "irrelevant." Tr. 1193. The caseworker informed Ms. Norris that she had twenty-four hours to surrender Justin to ACS custody. Tr. 1192–93. When Ms. Norris told the caseworker that Justin was in the hospital with pneumonia, the caseworker responded that "as far as we're concerned, your son belongs to the state right now." Tr. 1193. Ms. Norris protested that she had done nothing wrong, and that a judge would surely return custody of the child to her; the

caseworker's reply was that "the judge is always on ACS's side." Tr. 1194.

As she had been instructed to do, Ms. Norris brought Justin to the ACS office the next day. Ms. Norris testified, "it was the worst part of my life. I mean, I didn't know what was going to happen from there. I didn't know where he was going to go. I had no rights, . . . [ACS] told me, he wasn't my son anymore." Tr. 1194.

### d. Court Proceedings

That day, ACS filed a neglect petition against both parents. The petition alleged that both "engaged in domestic violence." Ex. 222. The only allegation not directly related to domestic abuse was an allegation "based on information and belief" that both parents used drugs. There is nothing in the record indicating any evidence supported the report of drugs. ACS did not test Ms. Norris for drugs before filing the petition. Ms. Norris on her own initiative sought drug testing to exonerate herself. On April 26, almost three weeks after the petition was filed, ACS filed an investigation summary finding that the allegations of drug use were unfounded, and noting the only reason that Justin was removed was because of "ongoing domestic violence in the home." Tr. 216. Even though ACS never determined that there was a basis for the allegation of drug use, the Family Court neglect petition against Ms. Norris was never amended to eliminate this unfounded charge. Tr. 1197.

The Family Court adjourned the case until June, granting custody of the child to ACS. Tr. 1197; Ex. 222. Ms. Norris was not permitted to speak before the remand to ACS was granted. Tr. 1197. She was assigned 18–B counsel at the hearing, but counsel did not speak on her behalf that day. Nor did the assigned counsel inform Ms. Norris that she could demand a "1028 hearing" for the return of her son. Tr.

1197–98. When next Ms. Norris appeared before the Family Court, a different 18–B attorney represented her. Tr. 1198. Eventually Ms. Norris retained her own counsel, because she "[didn't] believe that the [18–B] attorney was trying to help me in any way. He wasn't returning my phone calls." Tr. 1198.

The Family Court determined that, in order to obtain the parole of her son, Ms. Norris was required to attend individual counseling for domestic violence, complete a parenting skills class, and undergo drug testing. Tr. 1198. Beyond these court-imposed requirements, ACS unilaterally required Ms. Norris to maintain a job and a two-bedroom apartment. Tr. 1199. While ACS assigned an agency to assist Ms. Norris in reaching the goals, the agency did not give Ms. Norris any assistance. Tr. 1200–02.

Fortunately, Ms. Norris's private attorney was able to help her locate and attend the requisite parenting classes and domestic violence counseling. Tr. 1203–04. She was also able to locate a two-bedroom rental apartment, although it was very difficult to afford because Ms. Norris was also required to pay for the classes she was required to attend, and had to support her child with virtually no assistance from Mr. Figueroa. Tr. 1204. Neither ACS or the agency assigned by ACS to assist Ms. Norris helped her pay for the apartment or for the classes. Tr. 1204.

On September 19, the day before Ms. Norris was scheduled to appear in Family Court, the ACS caseworker visited her. The caseworker told Ms. Norris that the new apartment looked good and that if she "went into court and made an admission to domestic violence" the next day, she would probably get her baby back right away; if she didn't make an admission, the return would take weeks. Tr. 1206. Ms. Norris refused to make the untrue admission. Tr. 1207.

On September 20, the Family Court ordered that Justin be returned to Ms. Norris. Days later, nearly five and a half-months after he had been removed, Justin was returned to Ms. Norris. Tr. 1208.

e. Subsequent History

Predictably, the forced and unnecessary removal adversely affected Justin's behavior. Ms. Norris testified that now:

> He's very attached to me. He screams [whenever] I even walk in the other room. He thinks that I am leaving. Every time the doorbell rings he gets hysterical. Especially when we go to my mother's house, he latches on to me. He won't leave my sight and he says I don't want to stay here. I want to go home with Mommy. I think he's very afraid to be away from me ever again.

Tr. 1209.

As of the time of trial, the neglect petition against Ms. Norris had yet to be dismissed. Tr. 1210.

7. Rhodes

a. Background

Crystal Rhodes is the mother of two children, Alfonso, age five, and Alazia, age three. Ms. Rhodes had been battered by the children's father, Alfonso Washington, and had obtained orders of protection against him in March of 1999 and October of 2000. Ex. 102. On October 30, 2000, ACS received a referral from the State Central Register concerning Ms. Rhodes and Mr. Washington. Tr. 216. The referral indicated that Ms. Rhodes had not appeared at a court hearing scheduled on October 30 to extend an order of protec-

tion she had received earlier that month. Tr. 208.

### b. Intervention by ACS

On the evening of October 31, an ACS caseworker visited Ms. Rhode's apartment. The caseworker rang the buzzer for the apartment, and was answered by a male voice. When the caseworker identified herself and asked to speak with Ms. Rhodes, there was no response. The caseworker got into the building, went to the apartment, and knocked on the door. There was no answer. Ex. 171A at 8. The caseworker then proceeded to the home of the maternal grandmother, who said that Ms. Rhodes and the children were out "trick or treating." Ex. 171B at 35.

The next day, November 1, CPM Chamorro met with the caseworker and supervisor assigned to the Rhodes case. CPM Chamorro directed the caseworker to remove the children. Tr. 217. CPM Chamorro based the decision to remove the children on the grounds that Ms. Rhodes had not appeared in court on October 30 to further pursue the order of protection and that a male voice had answered at Ms. Rhodes apartment. Tr. 207. CPM Chamorro conceded that the caseworker did not know whose voice it was that she heard. Tr. 207. CPM Chamorro also considered the children to be in imminent danger because the father had assaulted and threatened to kill Ms. Rhodes in October 2000, and may have had access to a gun because in 1998 he had been arrested for gun possession. Tr. 204–05.

### c. Removal

A removal decision was made before anyone from ACS had talked with Ms. Rhodes. Tr. 204. There was no court order. Ex. 171B at 29.

When the ACS caseworker and police met Ms. Rhodes to carry out the removal, Ms. Rhodes explained to the caseworker that she had not been at home the previous evening; she had been staying with friends because she was concerned that Mr. Washington might have access to the apartment; she told the caseworker that the police had not taken his apartment keys when they served him with the order of protection. Tr. 209–10. She further explained that the reason she had not attended the court hearing on October 30 was that the papers she needed for court were at the apartment and she did not want to return because she was afraid Mr. Washington might be there. Tr. 210. Although CPM Chamorro testified that there were less severe alternatives to removal that might have satisfied ACS's concerns, such as changing the locks to Ms. Rhode's apartment, none were offered. Tr. 212.

### d. Court Proceedings

On November 2, 2000, ACS filed a neglect petition against Ms. Rhodes and Mr. Washington. It alleged that both had "engaged in an ongoing pattern of domestic violence . . . ." Ex. 102.

### e. Subsequent History

On November 9, after a Section 1028 hearing, the Family Court ordered the return of the children to the mother and ordered ACS to assist her in entering a domestic violence shelter. Ex. 171B at 43–49. The court found that Ms. Rhodes had "made diligent and valiant efforts" to protect her children from any harm arising from the domestic violence she had suffered. Ex. 171B at 43. Nonetheless, as of trial ACS was still prosecuting Ms. Rhodes for neglect on the grounds that she "engages in domestic violence." Tr. 223–24; Ex. 251.

## 8. Berisha

### a. Background

Shiqipe Berisha is the mother of a two year old child, Ismael. On January 1,

2001, Ismael's father grabbed the mother by her hair and dragged her across the apartment while she held her son. Ex. 88. The police arrested Ms. Berisha along with her batterer. Ex. 229.

b. Removal

Shortly after the arrest, the District Attorney declined to prosecute Ms. Berisha, and she was released. Ex. 229. Nevertheless, on January 2, 2001, ACS took Ismael from her into custody without a court order. Tr. 1358; Ex. 88.

c. Court Proceedings

On January 4, 2001, at the direction of CPM Lowell, Tr. 1358, ACS filed a petition alleging that the parents had both been arrested for "endangering the welfare of their child." Ex. 88. ACS also alleged, incorrectly, that Ms. Berisha had been charged with assault in the third degree. Tr. 1362; Ex. 88; Ex. 229. Even after the District Attorney confirmed by letter to ACS that no charges had been filed against Ms. Berisha, ACS did not amend the petition against Ms. Berisha to correct the misstatement. Tr. 1363. CPM Lowell never consulted with the available ACS domestic violence specialist on the Berisha matter. Tr. 1358.

The only other allegation against Ms. Berisha contained in the neglect petition was that she misused drugs. The only basis for this allegation, CPM Lowell testified, was that Ms. Berisha had taken Valium without a prescription on one occasion six months prior to the filing of the petition. Tr. 1360–61. CPM Lowell admitted that, taken alone, that behavior would not constitute neglect. Tr. 1361.

After the petition was filed, the Family Court held a short hearing approving the remand of the child to ACS. Ms. Berisha did not have counsel.

At a Family Court hearing on January 16, two weeks after the child had been removed, Ms. Berisha still had not been assigned an attorney. After the hearing had gone on for some time, with ACS representatives and the court discussing the whereabouts of the batterer and the appropriate foster care location for the children, Ms. Berisha spoke for the first time:

Ms. Berisha: May I say something?

The Court: Yes.

Ms. Berisha: They—The ACS worker has spoken to my program. I have all clean urines. My child was not neglected. And she did all that. I signed a release with my program, and I don't have—You know, I don't have any problem.

. . .

The Court: And if you feel the child should be returned to your care and you want a 1028, that's a hearing for the return of the child, you can request that also. What is it you want right now?

Ms. Berisha: Yes. I would like to have my child back with me.

The Court: You're requesting a 1028. There are no attorneys available. You can see if you can get legal services from some other source. Do you have that list? I don't know if this was given to you last time. Did you get this list?

Ms. Berisha: No.

The Court: You may want to call some of those places, see if they can assign you an attorney. Since the 18B's are not picking up, so you can look at those other sources.

Plaintiff's post trial submission of January 22, 2002, at 8–10.

There was no further discussion of Ms. Berisha's request at that hearing, and the matter was continued until January 21,

about a month after the court's remand to ACS. *Id.* at 10–12.

#### d. Subsequent History

Eventually, Ismael was returned to Ms. Berisha. Tr. 1363–64. The record does not indicate when this occurred. As of trial, ACS was still prosecuting Ms. Berisha in the Family Court for child neglect. Tr. 1364.

### 9. Jane Doe

#### a. Background

Jane Doe is one of the mothers whose cases were reviewed by the State Office of Children and Family Services for its "ASFA Domestic Violence Study / New York City Results." Ex. J; Ex. 180. Her case record was also assessed by plaintiffs' expert Laura Fernandez in her supplemental report. Ex. 137a.

At the relevant times Jane Doe was the mother of one child born June 1, 1993. Ex. 180. On September 10, 1999, while he was intoxicated, her husband tried to pick up the child at school. *Id.* at S01647. The school guidance counselor reported the incident to the State Central Register. *Id.* at S01676. The report also alleged that the father had smashed dishes in front of Ms. Doe. *Id.* at S01646.

#### b. Investigation by ACS

When ACS investigated, it found that Ms. Doe was a responsible and involved caretaker, *id.* at S01668–69, but that she was a victim of domestic violence by Mr. Doe. *Id.* at S01647, S01676, S01689. There was no evidence that she had ever harmed the child. Nevertheless, the Case Supervisor's 48–hour review findings focused almost entirely on the responsibilities of Ms. Doe:

This is a Domestic Violence Case. The Mother must be an active participant in trying to help herself and her [child]. She needs to get her husband help. In the meantime she must remove herself from the situation. She can do this by going to a domestic violence shelter or calling the police. In any event if she shows us that she is not willing to take an active role in protecting her [child] we will deem this neglect on her part. Interview all parties and offer substance abuse counseling to the father . . . If this situation persists, with neither parent taking corrective action, then we will take action by removing the [child].

*Id.* No mention was made of offering or requiring domestic violence counseling for the father.

Despite Mr. Doe's identification as a perpetrator of domestic violence, ACS referred both the Does for family counseling. *Id.* at S01684. While offering services to keep the family together, ACS demanded exactly the opposite from Ms. Doe: she had to "take an active role in protecting her ch[ild]" by going to a shelter or calling police, otherwise "we will deem this neglect on her part." *Id.* at S01689. ACS clung to its contradictory approach when Ms. Doe expressed a fear of recurring domestic violence, *id.* at S10670, and even after she telephoned ACS on November 9, 1999, to tell the caseworker that Mr. Doe had begun drinking again. *Id.* at S01671. ACS did nothing in response to Ms. Doe's telephone call. On November 17, 1999, ACS closed the case, because it was determined that the "[mother] has acted appropriately. She appears to be able to protect the [child]." *Id.* at S01691. No mention was made of whether the father had utilized any services or had shown any ability to control his own behavior.

#### c. Domestic Violence Against Jane Doe

On November 24, 1999, the school reported that the child said that Mr. Doe had

threatened to kill Ms. Doe the day before. *Id.* at S01651. The child told a guidance counselor that her father's drunken outbursts against her mother scared her. There was no indication in the report that the father had physically harmed, threatened, or verbally assaulted the child. There was no evidence that Ms. Doe had harmed the child.

d. Removal

Upon the direction of CPM Williams, ACS removed Ms. Doe's child without a court order. *Id.* at S01651. ACS did not interview Ms. Doe or explore other options before removing the child. *Id.* at S01651. On November 26, 1999, after her child had been in the care of strangers for two days, Ms. Doe agreed to sign a "Voluntary Placement Agreement" under the condition that her child could live with an out-of-state relative. Contrary to the condition, the child remained in foster care with strangers until December 2, 1999. *Id.* at S01651–52.

On December 29, 1999, Ms. Doe called ACS to say that she wanted her child back. *Id.* at Z6060. Despite Ms. Doe's withdrawal of her "consent" to placement, ACS kept the child in the relative's custody and did not file a Family Court petition until March 21, 2000. *Id.* at Z5860–63.

e. Court Proceedings

ACS charged Ms. Doe and her husband with a "history of engaging in domestic violence in front of the child" and with refusing to cooperate with referrals. *Id.* at Z5863. It is unclear what "referrals" could have meant, since the child had been removed before ACS spoke with either parent. *Id.* at S01651. In the "Services" section of the case record, where ACS is supposed to fully describe what services are being offered to the parents and how they responded, the record indicates only that the family had been referred for "Counseling and Detox. for the father, family counseling, and parenting skills." *Id.* at 35. No mention was made of domestic violence counseling, or of any services to help the mother. ACS did not describe anywhere in its case record any failure by Ms. Doe to participate in services. *Id.* at S01661. Its sole complaint with Ms. Doe was that she had failed to press charges against her husband—a fact determined only after the removal had occurred. *Id.* at S01652–53.

f. Subsequent History

On March 21, 2000, the same day the petition was filed, the Family Court heard the petition and paroled the child to the maternal uncle, with whom the child had been staying since December 2, 1999. This did not constitute judicial approval of ACS's unauthorized removal, as there was no fact-finding and the remand simply maintained the status quo. *Id.* at Z6102. Ms. Doe was permitted only weekly, supervised visitation with her child at the ACS field office. *Id.* at Z5879. The hearing was then adjourned until June 8, 2000. *Id.* at Z5857. At that hearing, the court ordered ACS to return the child to Ms. Doe. *Id.* at Z5858. The child was not returned to Ms. Doe until June, 2000, more than half a year after forcible removal without a court order. *Id.* at Z5874, Z5858.

In Family Court, the case was disposed of by issuance of a one-year adjournment in contemplation of dismissal as to both parents, with ACS's supervision to expire on August 2, 2001. *Id.* at Z5941. One condition of the adjournment was that the parents would not "engage in any domestic violence" in the house. *Id.* at Z5857. Mr. Doe, who had threatened to kill Ms. Doe with a knife among other acts of violence, received the same disposition as Ms. Doe,

who was not alleged to have committed any acts of child neglect other than being victimized by her husband. Yet ACS informed the SCR that the neglect charge against Ms. Doe was "indicated." *Id.* at S01650, S01653. The record does not reflect a change in that adverse characterization of her conduct.

Plaintiffs' expert Laura M. Fernandez prepared a lengthy opinion based on her review of the ACS case record. Ex. 137–a. She found many of the comments by ACS caseworkers and supervisors to be "dramatic example[s] of bad practice," such as one supervisor's comment that "This is a domestic violence case.... [Ms. Doe] needs to get her husband help." Ex. 137–a at 1. Ms. Fernandez concluded that "the sole reason Jane Doe's child was removed [from the mother] was because the child witnessed her father threaten her mother." Ex. 137–a.

### 10. Xiomara C.

#### a. Background

Representatives of subclass B, J.A. and G.A., are four and five years old, respectively. They both live with their mother, Xiomara C., and father, Justin C. In March 2000, ACS was involved with the family because of reports of domestic violence in the household. ACS referred both parents for domestic violence counseling and preventative services, but neither participated. Ex. B–18 at 5.

#### b. Domestic Violence Against Ms. C

On March 10, 2000, Justin violently attacked Xiomara. He punched her head, shoulders, and both eyes. He "took two knives, put them against her eyes and told her that if she moved, he would kill her." *Id.* at 4. Then he pushed her to the ground. When she tried to get up, he pushed her down again. He dragged her into the bathroom and forced her into a bathtub full of ice cold water until her skin was numb. Then he used the shower nozzle to hose her with scalding water. *Id.* at 4.

After he was finished battering the mother, he kicked her out of the bathroom. He then locked himself and his son in the bathroom. The mother called the police, and when the police arrived they had to break down the bathroom door. The son had suffered bruises and cuts to his face while he had been in locked in the bathroom with the father. *Id.* at 4–5.

#### c. Removal

Early the next day, ACS removed both children from the house without a court order. ACS proceeded to interview the mother, who told ACS that she had been subject to verbal and physical abuse by the father for the past six years.

#### d. Court Proceedings Against Ms. C

Based on these facts alone, ACS filed an Article 10 petition in Family Court accusing both Xiomara and her abusive partner with neglect. *Id.* The petition was filed on March 13, two days after the removal. It leveled the exact same allegations against both parents. The petition had no indication that the mother had ever done anything except suffer at the hands of her partner. No allegations were made that Xiomara committed or threatened to commit any violence against Justin or her son.

### 11. Other Cases

In many other cases, petitions in Family Court allege neglect and domestic violence against the mother even when she has herself committed no violence and is separated from the batterer, and is caring for her child with no evidence of harm to the child. *See, e.g.,* Olga Urena, Ex. 244; Jessica Valentin, Exs. 107a and 119a; "Ms.

E", Ex. 180 (case from "ASFA Domestic Violence Study / New York City Results"). *See also* Ex. 119 at 6 (admission by a lawyer for ACS that she had "done *cases like this* for many years" on behalf of ACS. The lawyer was referring to a case in which a battered woman was accused of neglect for "engaging in domestic violence") (emphasis added); Subclass A post-trial memorandum of law, p. 100. While the court has not relied upon any of the cases described in *People United for Children, Inc. v. City of New York,* 108 F.Supp.2d 275 (S.D.N.Y.2000), the pattern revealed there of ACS blaming the mother is not dissimilar from the one demonstrated in this court.

### C. Modern Perspectives on Domestic Violence and Child Welfare

1. Historical Background

a. Domestic Violence

Although some suggest that society is experiencing more domestic violence today than ever before, domestic violence is not new; it has been repeatedly described in documents going as far back as the Roman Empire. Ex. 163 at 839. *See also, e.g.,* UNICEF, *Domestic Violence Against Women and Girls* (2000), http://www.uni-cef-icdc.org/ publications/pdf/digest6e.pdf ("[W]hen the violation takes place within the home, as is very often the case, the abuse is effectively condoned by the tacit silence and the passivity displayed by the state and the law-enforcing machinery."). Rather, the high levels of domestic violence today observed by the law appear to be a product of increased societal concern. Ex. 163 at 839.

In the mid–1970s, battered women in the United States increasingly began to come forward with their stories and to seek protection from the men who were assaulting them. Ex. 165 at 73. With the aid of grassroots women's groups, hundreds of small, community-based shelters and support groups for abused women emerged throughout the 1970s and 1980s. Ex. 165 at 73. It is now recognized that domestic violence occurs at all class levels, across all ethnic, racial, and religious lines, in all groups, among all educational backgrounds and sexual orientations, and in both rural and urban areas. *See* Margaret Martin, *Battered Women, in The Violent Family: Victimization of Women, Children, and Elders* 70 (Nancy Hutchings ed., 1988).

In 1984, plaintiffs' expert Dr. Evan Stark and others conducted studies at Yale New Haven Hospital to assess the medical dimensions and consequences of domestic violence on women. They concluded: First, domestic violence was the leading cause for which women sought medical attention, more common than auto accidents, mugging, and rapes combined. Tr. 1540. Second, battered women often suffer from behavioral and psychological problems that differentiate them quite sharply from non-battered women. Third, the behavior of social workers and health service providers was a direct, albeit inadvertent, contributor to women's sense of being trapped in abusive relationships. Tr. 1540. The result of this study and subsequent confirming investigations was a widespread and dramatic change in the national medical community's awareness of, and responses to, domestic violence.

Cultural differences can influence the behavior and beliefs of abusers and battered women. In some cultures, calling the police is considered a betrayal of community values. Tr. 1642. Some condone a level of child abuse or spouse abuse. Tr. 1642–43. While these cultural differences do not lessen our society's resolve to protect victimized women and children, an understanding of them is necessary to de-

velop appropriate interventions. Tr. 1641–43.

When the issue of domestic violence rose to national attention many assumed that separation from the abusive partner was the only safe option for the vast majority of women. Tr. 1647. As the problem was more fully understood, experts realized that there are situations in which the victim wants the violence to stop, but may reasonably desire to accomplish this without ending the relationship. Tr. 1647. And even where reconciliation is not possible, experts realized that the process of extrication from a violent relationship often takes time, through a series of separations and seeming reconciliations. Tr. 1646–47.

Even if a woman wishes to free herself from an abusive relationship immediately, that is not always a viable option. The most dangerous time for a woman and a child appears to be immediately after she leaves the batterer; his threats will usually make her aware of this jeopardy. Ex. 106 at 16. The severe shortage of appropriate domestic violence shelter space in New York and elsewhere forces many women who decide to flee abusive relationships into homeless shelters; many women who return to abusive relationships do so because they are unable to find permanent housing arrangements elsewhere. Ex. 106 at 17. The criminal justice system often offers only limited protection to battered women. Ex. 106 at 19.

In 1994, the Federal Government adopted the Violence Against Women Act (VAWA) which, among other things, greatly increased funding to battered women's service programs, specifically making grant awards to states, tribes, and territories to expand shelter and support services to victims and their children. *See* Violence Against Women Act, Pub.L. 103–322, 108 Stat. 1796, Title IV, §§ 40121, 40211, 40241 (1994).

The New York State Legislature made arrest mandatory in 1994 in cases where police have probable cause to believe that a crime of domestic abuse had occurred. N.Y.Crim. Proc. Law § 140.10(4) (Consol. 2001). The law requires police to determine who was the primary aggressor in cases where there are cross-complaints. *Id.* In 1996, the New York State Legislature amended the Domestic Relations Law to provide that, where domestic violence is proven, it must be considered by courts in making custody and visitation orders. N.Y. Dom. Rel. Law § 240(1)(a) (Consol. 2001). Many other states have passed similar laws.

b. Child Welfare

Historically, child maltreatment was not considered a problem warranting public attention. *See* Lois A. Weithorn, *Protecting Children from Exposure to Domestic Violence: The Use and Abuse of Child Maltreatment Statutes,* 53 Hastings L.J. 1, 41 (2001) (early in the United States' history severe corporal punishment was routine and parents were encouraged to use their discretion in promoting their children's obedience). The first widespread official attempts to protect children from parental abuse began less than 200 years ago. *Dependent and Neglected Children: White House Conference On Child Health and Protection* 381 (Robert H. Bremner, ed., 1974). In the United States, much of the pioneering in the field of child protection has occurred in New York.

Private charitable organizations were responsible for early attempts to protect children. In 1824, the first "house of refuge" was established in New York to serve juvenile delinquents and neglected children. Weithorn, *supra,* at 46. This "institutional" approach grew out of and closely resembled the English and colonial orphanage system. Other cities soon copied

New York's model. *Id.* Increasing institutionalization of children attracted criticism, and alternative methods of protection were proposed.

A New York City minister, Charles Loring Brace, founded the Children's Aid Society in 1853. It used "orphan trains" to send over 150,000 poor and homeless children from the streets of New York to live with families in the Midwest. *See id.;* The Orphan Train Movement, http://www.childrensaidsociety.org/about/train/ (last visited March 11, 2002). These charitable approaches were better suited to protecting abandoned children than abused children since they lacked legal power to remove children from abusive parents who wished to retain custody.

Ironically, the first attempts to utilize the legal system to protect children relied on laws prohibiting cruelty to animals. In 1874, Mary Connolly was convicted of assault and battery against her ten-year-old daughter, Mary Ellen Wilson, whom she assaulted with scissors and repeatedly beat with a rawhide whip. Weithorn, *supra*, at 48. Mary Ellen was removed from her abusive mother's custody under laws enacted for the protection of animals. Bremner, *supra*, at 382. Shortly thereafter the New York Legislature chartered the New York Society for the Prevention of Cruelty to Children ("SPCC"). This organization was to assist the police force and the courts in enforcing newly enacted legislation that would protect abused and neglected children. It was apparently the first organization in the world specifically devoted to preventing child abuse. Other states and countries followed New York's lead.

The SPCC started by reacting to situations where children were living under brutal conditions. *Id.* at 383. In 1910 the Massachusetts SPCC began to pursue a proactive program of discovering and eliminating the causes of child abuse and neglect with the goal of maintaining family integrity. *Id.* at 384. Under this new vision, prosecution and removal would be a last resort to be considered only in cases where education failed and where the welfare of the child required removal. *Id.*

Government assistance was vital to the success of this preventative approach. In 1935 the Social Security Act established the Aid to Dependent Children program. Weithorn, *supra*, at 54. By providing financial assistance to impoverished families, the Act was designed to ensure that dependent children would not need to be removed from the home. *Id.* The Act reflected a growing acknowledgment by child protective agencies that children were better off being raised by their own families than by institutions, and that government intervention should seek first to strengthen the parent-child relationship. *Id.*

Government involvement in protecting children increased in other ways as well. In the mid-twentieth century, government child welfare agencies assumed the functions of the SPCC. *Id.* at 55. These government institutions were the precursors of modern public agencies such as the ACS.

By 1962, national awareness of child abuse had increased dramatically with the revelation of the "battered child syndrome." Dr. C. Henry Kempe reported hundreds of cases where injured children had been brought to hospitals with the parents' explanations inconsistent with clinical diagnoses. C. Henry Kemp, et al., *The Battered Child Syndrome*, 181 J. Am. Med. Ass'n 17 (1962). The study provided guidance to physicians on how to recognize abused children, encouraging physicians to intervene. *Id.* Reports of child abuse and neglect increased rapidly as awareness of the problem spread. *See* Julia Hamilton,

*Child Abuse and Violence in the Family, in The Violent Family: Victimization of Women, Children, and Elders* 90 (Nancy Hutchings ed., 1988).

In response to Dr. Kempe's study states began passing statutes requiring physicians and other professionals working with children to report suspected child abuse. Currently the District of Columbia and every state but Maryland and Michigan have criminal statutes prohibiting abusiveness that could be characterized as child neglect. Each state and the District of Columbia have criminal statutes prohibiting child abuse and civil statutes that provides the state with the authority to remove a child from a parent's care if the child is neglected, abused or otherwise maltreated. *See* National Clearing House on Child Abuse and Neglect Information, *Child Abuse and Neglect State Statutes Elements: Child Witnesses to Domestic Violence—State Statutes,* http://www.calib.com/nccanch/statutes/index.cfm (last updated Nov. 19, 2001).

As already noted, Congress enacted the Child Abuse Prevention and Treatment Act of 1974 (CAPTA). It provided funding for state efforts to protect children from abuse and neglect. Weithorn, *supra,* at 57.

While the legal system has gradually provided more protection for children from parental abuse, it has also had to intervene from time to time to protect children from abuse at the hands of protective agencies. In 1972, 90 percent of the foster care system in New York City was controlled by private agencies. Nina Bernstein, *The Lost Children of Wilder* 4 (2001). New York then relied heavily upon religiously-affiliated charities. The most developed of these institutions were Catholic and Jewish, which generally preferentially admitted children of the same religion. An increasing number of Protestant African–American children were left without adequate foster care. *Id.* In 1973 a class action lawsuit was filed in the Southern District of New York against City, State, and private officials challenging this sectarian system, contending that it violated the First, Eighth, and Fourteenth Amendments of the United States Constitution. *See Wilder v. Sugarman,* 385 F.Supp. 1013 (S.D.N.Y.1974). A consent decree establishing a secular "first-come, first-served" rule for admittance was mandated for private institutions supported at least in part with public monies. *Wilder v. Bernstein,* 645 F.Supp. 1292, 1354 (S.D.N.Y.1986); *see also Bernstein, supra* (detailing the history of the *Wilder* litigation).

Implementation of the *Wilder* decree proved difficult. City officials complained that the plan was obsolete due to changes in demographics and increases in poverty, drugs, and AIDS. These new challenges caused the total number of children in the system to triple. *Id.* at 372. Despite the consent decree, a 1989 study revealed that ethnicity continued to be a criterion utilized in placing children by the Child Welfare Administration's Office of Direct Care Services as well as by private agencies. *Id.* at 373. By 1990, it was widely acknowledged that the child protective system in New York City was failing. Weithorn, *supra,* at 58.

In 1995 another class action suit was filed on behalf of a class represented by "Marisol," a child who had almost starved to death in a closet while the City allegedly ignored evidence of her maltreatment. *See Marisol v. Giuliani,* 929 F.Supp. 662 (S.D.N.Y.1996). In response to this and other embarrassing failures, such as the death of Elisa Izquierdo, New York City created the ACS. The *Marisol* case was settled in 1999 with the establishment of an advisory panel of child welfare experts that would oversee ACS's reform efforts.

*Marisol ex rel. Forbes v. Giuliani,* 185 F.R.D. 152 (S.D.N.Y.1999), *aff'd* 218 F.3d 132 (2d Cir.2000).

2. Views of Experts

a. Effects of Domestic Violence on Children

At trial substantial expert evidence was presented on the subject of how children are affected by the presence of domestic violence in the home. Two general topics were addressed in detail: the effect that witnessing domestic violence has on children, and the connection between domestic violence in the household and direct abuse against the children.

The consensus of the experts was that the children can be—but are not necessarily—negatively affected by witnessing domestic violence. Exs. 137, 139, 141(b), 143, 149, 151, 240, Z, BB. The experts agreed that children who witness domestic violence exhibit a broad range of responses. City defendants' expert Linda Spears testified that "the impact [of domestic violence on children] ranges from none to serious." Tr. 1998. Dr. Jeffrey Edleson cited three recent studies which concluded that at least half of the child participants who witnessed domestic violence had "few or no problems evident" when compared with children who were not experiencing domestic violence, and that there was "a great deal of variability in children's experiences and the impact of those experiences." Ex. 170 at 3–4. Subclass B's expert Betsy McAlister Groves concluded that the existing body of research, "while documenting the seriousness of domestic violence for many children, also make[s] the point that children are affected in a wide range of ways." Tr. 2758.

The experts cited a number of factors which may influence how an individual child responds to being exposed to domestic violence. Dr. Edleson reported that these elements include the level of violence in families, the degree of the child's exposure to the violence, the child's exposure to other stressors, and the child's individual coping skills. Ex. 170 at 3–4. Ms. Groves testified that the degree to which a child may be affected by domestic violence is related to the child's age (younger children are more vulnerable), the frequency and content of what the child saw or heard, the child's proximity to the event, the victim's relationship to the child, and the presence of a parent or a caregiver to mediate the intensity of the event. Tr. 2735–38, 2746, 2755.

The experts also agreed that how children manifest the effects of exposure to domestic violence varies widely. Ms. Groves explained that short-term effects include post-traumatic stress disorder, sleep disturbances, separation anxiety, more aggressive behavior, passivity or withdrawal, greater distractibility, concentration problems, hypervigilance, and desensitization to other violent events. Tr. 2739–40, 2751–54. Dr. David Pelcovitz, a child and adolescent psychologist, offered similar testimony:

[A] certain percentage of children exposed to domestic violence suffer from a variety of behavior and emotional difficulties. On the emotional level they tend to be at increased risk for depression and anxiety and disruptive behavior disorders, such as conduct problems, and other issues with ... compliance with authority. On the behavioral level also there is a higher level of aggression. On the academic level there is a higher rate of academic difficulties ... [although] [s]ome children ... actually appear to be resilient and show no obvious kinds of outcomes.

Tr. 52–53.

There was some disagreement among the experts about the likelihood and seri-

ousness of the long-term effects experienced by children who witness domestic violence. Ms. Groves testified that the long-term effects can include a propensity to use violence in future relationships and to hold a pessimistic view of the world. Tr. 2742–43. Dr. Evan Stark, however, offered a lengthy and well-substantiated opinion that children rarely experience long-term effects from witnessing domestic violence. He testified that "one of the most dramatic experiences that advocates in the domestic violence movement have had is watching problems that seem to be quite profound and clinically significant abate after a relatively short period of safety ... and security was provided." Tr. 1556. He cited studies which demonstrated that, among children exposed to the most severe domestic violence, well over 80 percent, and sometimes over 90 percent, tested psychologically normal, were self-confident, had positive images of themselves, and were emotionally well off. Furthermore, while children exposed to the most severe forms of domestic violence are more likely to become violent adults or delinquents, 95 to 97 percent of the children in these situations do not become delinquent, do not develop alcohol or drug problems, and about 90 percent do not become violent adults. Tr. 1557–59.

On the question of the relationship between the presence of domestic violence in a household and direct maltreatment of children, the experts generally agreed that there is some correlation between the two. One report cited by Dr. Edleson reviewed thirty different studies on the link between adult domestic violence and physical child abuse, and determined that there was a 40% median co-occurrence in the samples studied. Ex. 170 at 7.

Dr. Stark's research at Yale New Haven Hospital revealed that "in the vast majority of cases" where a mother was battered and a child was maltreated in a home, the man who battered the mother was also the source of child abuse or neglect. Tr. 1546. In other words, the "man hits wife, wife hits child" scenario is rare; abuse tends to flow from a single source. Tr. 1546–47.

In a 1999 study by Jeffrey L. Edleson surveying existing research on how children respond to witnessing domestic violence, he addressed how this evidence should influence decisions about child maltreatment. In his conclusion Edleson warned against automatically defining a child's witnessing battery of the mother as maltreatment by her; he observed that there is

great concern [regarding] how increased awareness of children's exposure [to domestic violence] and associated problems is being used. Concerned about the risk adult domestic violence poses for children, some child protection agencies in the United States appear to be defining exposure to domestic violence as a form of child maltreatment.... Defining witnessing as maltreatment is a mistake. Doing so ignores the fact that large numbers of children in these studies showed no negative development problems and some showed evidence of strong coping abilities. Automatically defining witnessing as maltreatment may also ignore battered mothers' efforts to develop safe environments for their children and themselves. A careful assessment of the risks and protective factors in every family is necessary before drawing conclusions about the risks and harm to children.

Ex. 163 at 866.

b. Effects of Removals on Children

Several expert witnesses, including Dr. Peter Wolf, plaintiffs' expert, testified about the primacy of the parent-child bond and the effect on a child if he or she is

separated from a parent. He averred that the attachment between parent and child forms the basis of who we are as humans and the continuity of that attachment is essential to a child's natural development. Tr. 565–67. *See also,* Joseph Goldstein, *Medical Care for the Child at Risk: On State Supervision of Parental Autonomy,* 86 Yale L.J. 645, 649–50 (1977) ("No other animal is for so long after birth in so helpless a state that its survival depends on continuous nurture by an adult. Although breaking or weakening the ties to the responsible and responsive adults may have different consequences for children of different ages, there is little doubt that such breach in the familial bond will be detrimental to the child's well-being.").

Dr. Wolf testified that disruptions in the parent-child relationship may provoke fear and anxiety in a child and diminish his or her sense of stability and self. Tr. 565–67. He described the typical response of a child separated from his parent:

> When a young child is separated from a parent unwillingly, he or she shows distress.... At first, the child is very anxious and protests vigorously and angrily. Then he falls into a sense of despair, though still hypervigilant, looking, waiting, and hoping for her return ....

*Id.* A child's sense of time factors into the extent to which a separation impacts his or her emotional well-being. Thus, for younger children whose sense of time is less keenly developed, short periods of parental absence may seem longer than for older children. Tr. 565–65. *See also* Ex. 141b.

Similarly, plaintiffs' expert Dr. Stark noted the importance of a consistent relationship with a primary caretaker to a child's health development. Tr. 1562. For those children who are in homes where there is domestic violence, disruption of that bond can be even more traumatic than situations where there is no domestic vio-lence. Dr. Stark asserted that if a child is placed in foster care as a result of domestic violence in the home, then he or she may view such removal as "a traumatic act of punishment... and [think] that something [the mother] has done or failed to do has caused this separation." Tr. 1562–63. Ms. Groves testified that when a child is separated from a mother because of domestic violence, the separation is even more traumatic because the child "is terrified that a parent might not be OK, may be injured, may be vulnerable.... They feel that they should somehow be responsible for the parent and if they are not with the parent, then it's their fault." Tr. 2772.

Plaintiffs' expert Dr. David Pelcovitz concluded that removal heightens the child's sense of self-blame, and that children exposed to domestic violence are at a significantly above-normal risk of suffering separation anxiety disorder if separated from their mother. Ex. 139. Dr. Pelcovitz stated that "taking a child whose greatest fear is separation from his or her mother and in the name of 'protecting' that child [by] forcing on them, what is in effect, their worst nightmare, ... is tantamount to pouring salt on an open wound." Ex. 139 at 5.

Another serious implication of removal is that it introduces children to the foster care system which can be much more dangerous and debilitating than the home situation. Dr. Stark testified that foster homes are rarely screened for the presence of domestic violence, and that the incidence of abuse and child fatality in foster homes in New York City is double that in the general population. Tr. 1596; Ex. 122 at 3–4. Children in foster care often fail to receive adequate medical care. Ex. 122 at 6. Foster care placements can disrupt the child's contact with community, school, and siblings. Ex. 122 at 8.

### 3. Best Practices

Failure to follow best practices is not unconstitutional. It does bear, however, on the justifications of ACS that its punitive attitude towards battered women is required by social service standards and that it serves children's best interests. The court's understanding of best practices for dealing with the intersection of child maltreatment and domestic violence has been greatly aided by the opinions and reports of plaintiffs' and defendants' experts, all of whom are highly qualified in their fields. It gives particular weight to findings of the National Council of Juvenile & Family Court Judges Family Violence Department as set out in a comprehensive 1999 report entitled *Effective Intervention in Domestic Violence & Child Maltreatment Cases: Guidelines for Policy and Practice.* Ex. 165 ("National Council Guidelines"). The Advisory Committee which drafted these guidelines consisted of a diverse group of professionals from child welfare and domestic violence services, members of the academic community, judges, and federal agency representatives. *Id.* at 4. Support for the project came from the United States Department of Health and Human Services, United States Department of Justice, and other governmental and private entities. *Id.* at 4. The report examined and addressed the issues which give rise to the present suit.

### a. Mothers Should Not Be Accused of Neglect For Being Victims of Domestic Violence

The National Council Guidelines suggest that child welfare services sometimes blame victimized mothers for "failure to protect" children because of the "system's inability to hold the actual perpetrator of violence accountable." *Id.* at 66. The Guidelines recognize that battered mothers, like non-battered mothers, may themselves abuse or neglect their children and should be held accountable if they do so. They, however, recommend that "[c]hild protection services should avoid strategies that blame a non-abusive parent for the violence committed by others." *Id.* (Recommendation 22). They explain that

> [b]laming a battered mother for being abused, for not leaving the domestic violence perpetrator, or for not stopping his violence is simply counterproductive. The battered woman cannot change or stop the perpetrator's violence by herself. If she does not have adequate support, resources, and protection, leaving him may simply make it worse for the children.

*Id.* at 19.

The National Council's conclusions state that "the petitioner in child protection proceedings should allege in petitions or pleadings any domestic violence that has caused harm to a child." *Id.* (Recommendation 58). Its guidelines also elucidate that when an organization such as ACS files a petition, it should allege and be able to support the contention that the child has suffered harm and that the mother can not adequately protect the child with assistance from ACS:

> Juvenile court jurisdiction should be established on the sole basis that the children have witnessed domestic violence only if the evidence demonstrates that they suffered significant emotional harm from that witnessing and that the caretaker or non-abusing parent is unable to protect them from that emotional abuse even with the assistance of social and child protection services.

*Id.* (Recommendation 59).

The limiting factor on what a battered mother does to protect herself or her children from the batterer is usually a lack of viable options, not a lack of desire. Dr

Richard Gelles, the City defendants' expert witness, has written, "[t]he typical battered wife is hardly passive. She actively seeks to prevent further victimization and is handicapped, not by her own psychological limitations, but by the *lack of concrete and effective remedies available from agencies of social control or other institutions.*" Tr. 2425 (emphasis added). Usually the mother is doing everything she believes is possible to protect herself and her children. The problem is that often her options are severely limited.

Accusing battered mothers of neglect aggravates the problem because it blames the mother for failing to control a situation which is defined by the batterer's efforts to deprive her of control. *See* Enos, V. Pualani, *Prosecuting Battered Mothers: State Laws' Failure to Protect Battered Women and Abused Children*, 19 Harv. Women's L.J. 229, 233 (1996) ("There is a common assumption that domestic violence is an involuntary response to anger provoked by the victim's improper behavior. . . . However, researchers have found that the violent actions of batterers and ways in which they choose to exhibit them are selective. . . . [T]he decision to commit spousal abuse is a conscious choice made by the batterer for a particular purpose. . . . [namely,] domination and control . . . ."). Ms. Groves noted that accusing a battered mother of neglect "implies that somehow she could control the actions of the batterer or take responsibility for him in a way that's completely unrealistic. . . . [I]t's an ill-conceived way to think about this issue of neglect and it further victimizes women who are victims of domestic violence." Tr. 2774. Counterproductively, one of the outcomes of accusing the battered woman of neglect is that the power of the batterer in the household may be reinforced. *See, e.g.*, Brief of Amicus Ohio Domestic Violence Network at 3.

Even ACS has at times indicated an understanding that accusing a battered woman of neglect is bad policy. A draft of the Division of Child Protection Domestic Violence Evaluation, dated September 14, 2001, suggests that while it may be desirable to hold batterers accountable by charging them with neglect when children witness domestic violence, charging the battered mother "further victimizes the non-offending parent." The report also observes that there is a "growing consensus that helping the non-offending parent protect herself and her children and holding the offender accountable is the preferred strategy for obtaining child safety and reducing future risk." Ex. 17 at 9.

b. Batterers Should Be Held Accountable

The National Council Guidelines reflect the growing consensus that child welfare services play an important role in holding abusers accountable for their actions. The First Principle of the National Council Guidelines, which it describes as an "overriding one," includes the tenet that violent perpetrators must be held responsible for their abusive behavior. Ex. 165 (Principle 1). Child welfare agencies should

record domestic violence information, including any specific harm to the child, on agency forms (e.g., case findings and affidavits) in a way that clearly holds the perpetrator of domestic violence responsible for harm and identifies the resulting safety concerns and continued risk that the perpetrator creates for family members.

*Id.* at 61. It is also important that child welfare services engage batterers directly, develop service plans for them, and monitor their compliance. *Id.* at 64–65.

Dr. Stark testified that best practices establish that the batterer should be held accountable for his actions, and that the

victim is in a particularly bad position to perform this task. Thus, every state now requires that police arrest batterers, rather than making the victim responsible for deciding whether the arrest should occur. Tr. 1600. *See also* Ex. 106 at 25–26; New York Commission on Domestic Violence Fatalities, *Report to the Governor* at 40 (1997) (Charging victims of domestic violence with neglect "implicitly places responsibility for stopping the violence on the victim, rather than on the violent partner who is committing the acts.").

c. Children Should Be Protected by Offering Battered Mothers Appropriate Services and Protection

The National Council Guidelines stress the importance of providing a collaborative, dynamic, and responsive array of services to ensure the safety of battered mothers and their children. Ex. 165 at 57–89. "Many women take strong steps toward developing safe environments only to be defeated by the lack of community support structures and the inadequate response to repeatedly violent men." *Id.* at 57.

Child welfare agencies typically create service plans that are designed to reduce the risk of child maltreatment and strengthen parenting ability. In the domestic violence context, service planning also requires "focusing actively on the safety of the adult victim and the responsibility of the perpetrator to stop abusive behavior in order to keep the child safe." *Id.* at 63. These plans should focus on, among other things, "securing safe housing—in the adult and child victim's own residence whenever possible or with her family or friends, in subsidized housing, in shelter, or in transitional or permanent housing [and] providing voluntary advocacy services for battered women within the child protection system." *Id.* at 63.

The Guidelines warn that the "one-size-fits-all" approach that some child welfare agencies take towards maltreatment cases is especially inappropriate in domestic violence cases. Some services that are appropriate for neglectful parents do little for non-neglectful victims of domestic violence. City defendants' expert Dr. Gelles testified that requiring battered mothers to attend parenting classes, for example, is "not likely to produce much in the way of a beneficial outcome for the mother . . . or enhance the safety and well-being of [her] children." Tr. 2426. The National Council Guidelines note that many services, such as couple's counseling, which are appropriate in neglect or abuse cases where domestic violence is absent can be inappropriate and potentially dangerous where domestic violence is present. Ex. 165 at 66 (Recommendation 23). Sometimes a battered woman's decision not to accept a particular agency service recommendation may well be a strategic life-saving decision. *See* Amicus Brief of Ohio Domestic Violence Network at 3. Danger is particularly likely when an agency imposes rigid plans, without significant input from the victim, or assigns workers who have inadequate training regarding domestic violence.

The Guidelines recognize that diversity in cases involving domestic violence demands that child welfare agencies "design a differential response to the diverse range of families experiencing domestic violence and child maltreatment." Ex 165 (Recommendation 4). There are a wide variety of services from which to choose in New York City. *See, e.g.,* Mayor's Commission to Combat Family Violence, *The City of New York Resource Directory of Domestic Violence Services* (2001) (listing over 150 organizations in New York City that may be of assistance to a domestic violence victim). It is crucial to choosing the right services and crafting effective plans that the adult

victim be given a central voice in safety planning for herself and her children. Ex. 165 at 22. The Guidelines recommend against reflexively requiring victims to take particular actions, such as obtaining an order of protection or moving into a shelter because there are cases in which these actions are neither helpful nor appropriate. *Id.* at 22.

Highlighted by the Guidelines is the importance of making battered mothers and children aware of their legal rights and options during the planning process. Specifically, the battered women should have access to counsel during the planning process. *Id.* at 64 ("Battered women's advocates should be included in developing and implementing the service plans, when possible, to ensure the safety of adult victims."). Child welfare services should also play a role in making family members aware of their rights and options. *Id.* ("When child protection workers investigate reports of child maltreatment, they routinely should leave written domestic violence referrals and legal rights information for family members when it is safe to do so.").

d. Separation of Battered Mothers and Children Should Be The Alternative of Last Resort

One of the core recommendations of the National Council Guidelines is that, "[a]s a way to ensure stability and permanency for children, child welfare administrators and juvenile court personnel should try to keep children affected by maltreatment and violence in the care of their non-offending parent (or parents), whenever possible." *Id.* at 19. The Guidelines explain that this recommendation promotes the best interests of the child because, in most cases, "trying to make mothers safe does make children safer and offers children their best hope for stability." *Id.* at 19.

Expounding on this central recommendation, the Guidelines state that "The juvenile court should prioritize removing any abuser before removing a child from a battered mother." *Id.* (Recommendation 60). The guidelines declare that

the court should remove a child from a non-abusive parent's care only if it is proven by clear and convincing evidence that the caretaking parent is unable to protect the child, even with the assistance of social and child protection services. To this end, the court must be prepared to insist that services such as safe housing be available for the victim-parent and the children.

*Id.* at 109. Generally the Guidelines assume that the court makes removal decisions. The recommendations are taken to apply with equal force to the decisions of a child welfare agency that makes removal decisions without first obtaining judicial authorization.

According to Ms. Groves children should be removed from mothers because of domestic violence only as a "last resort and . . . only in situations when there is a very real risk to the safety of the children." Tr. 2774. Because of the psychological and emotional injury incurred by the children and the battered parent as a result of removal, Ms. Groves believed that it is imperative that appropriate services be offered to parents and children before removal is considered. Tr. 2775. Preventing offering of such essential services, she noted, are critical shortages in shelter space and counseling services. Tr. 2775–76. *See also* Amended Amicus Curiae Brief of National Network to End Domestic Violence and National Network to End Domestic Violence Fund at 5 ("In the absence of a support network to assist battered women and their children, a protective order or other remedy may be of no use against an angered abuser. Providing

support networks to empower a mother-child unit to leave the abusive environment will be exceedingly more successful than removing a child from the mother's custody.").

Dr. Stark testified that removing the child from the mother may be more damaging to the child than doing nothing at all and that the "general opinion in the field and the best practice recognizes that the single most effective strategy in protecting children in homes where there is domestic violence is removal and sanctioning of the offending party." Tr. 1564. Batterers often try to separate the mother from the child, and services should focus on "strengthening the bonds between mother and child," rather than exacerbating the damage. Tr. 1566. Dr. Stark reported that while removal must remain an option available to ACS in domestic violence cases, it is justified to prevent risk to the child only when three conditions have been met:

■ ACS has engaged in joint safety planning with the victim that includes an offer of services geared to the dynamics and risks identified in a specific case.

■ Criminal Justice intervention has been aggressively pursued. At a minimum, this would include support for the victim in obtaining a protective order, arrest of the batterer where appropriate, and an offer of services to the offender, including education.

■ There is a demonstrable safety risk to the child that outweighs the risks associated with foster placement.

Ex. 143a at 18.

When agencies remove children from battered mothers, they put the mothers in a terrible dilemma. Dr. Stark testified that when a mother believes that if she reports domestic violence her children's well-being will be endangered because they will be removed from the home and put in foster care, then she is unlikely to report the violence until it reaches an extreme level where public notice is unavoidable. As a result agencies that remove children from battered women aggravate the occurrence of domestic violence by discouraging women from reporting it at early stages. Tr. 1569–71. "Knowing that they may be investigated by child protective services, or charged with neglect, and that they may lose their children to foster care, battered mothers are more likely to remain in the abusive home, isolated and afraid, so that they can remain with their children." Ex. 106 at 15; see also Ex. 106 at 14 ("In Massachusetts, for example, the Department of Social Services found that its practice of identifying domestic violence as an indicator of child abuse without any corresponding training or clinical support resulted in both an increase in child abuse reports and a decrease in battered women seeking services."); Ex. 165 at 21 ("Many battered women who have not abused their children are terrified to admit that they are victims of violence, or that their children have witnessed it, for fear of losing custody of their children."); Amended Amicus Brief of National Network to End Domestic Violence and National Network to End Domestic Violence Fund at 5 (Knowing of the possibility for removal, "[a] mother will often stay in an abusive relationship in order to avoid losing custody of her children.").

Where a child would be safer if separated from the mother for a short time, it is much less traumatic for the child if the placement occurs as the result of a safety plan developed in partnership between the agency and the non-offending parent (and the child, if the child is old enough). Tr. 1639–40. Dr. Stark testified that where this joint decision-making process is employed, mothers often understand short-term placement as an important safety

option. Furthermore, if the child is old enough, he or she may appreciate that the placement is the mother's way of keeping both of them safe. Tr. 1699.

### e. Child Welfare Employees Should Be Adequately Trained to Deal with Domestic Violence

The National Council Guidelines recognize that caseworkers and supervisors must be sufficiently trained in order to properly identify and respond to issues of domestic violence. Ex. 165 (Recommendation 18). Ms. Groves testified that performing the necessary risk assessment for a household in which domestic violence is present is a "complex endeavor," and that even the best policies and protocols will be ineffective unless caseworkers and supervisors are given high-quality, on-going training. Ex. 2785.

### f. Agency Policy Should Provide Clear Guidelines to Caseworkers

The Guidelines conclude that "Agency policy must state clearly the criteria under which children can remain safely with non-abusing parents experiencing domestic violence; the assessment required to determine safety; and the safety planning, services, support, and monitoring that will be required in those cases." Ex. 165 (Recommendation 19).

### D. ACS Policy and Practice

### 1. Historical Background

Much of the actual policies as applied by ACS are driven by fear of an untoward incident of child abuse that will result in criticism of the agency and some of its employees. The concern over institutional self-protection, rather than children's best interests, explains a good deal of ACS's predisposition toward counterproductive separation of abused mothers and their children.

On November 22, 1995, Elisa Izquierdo was tortured to death by her deranged mother despite the fact that her case had repeatedly come to the attention of New York City's Child Welfare Administration (CWA), the predecessor of ACS, before she was murdered. Elisa's murder galvanized public awareness of the need to reform child welfare services in New York. In early 1996 CWA was disbanded and replaced with a new agency, the Administration for Children's Services. ACS reported directly to the Mayor and was charged with "first, last, and always" protecting the children of New York. Ex. 35 at 6.

The person chosen to serve as ACS Commissioner was Nicholas Scoppetta, a lawyer with a distinguished public service career who had himself lived in foster care for several years when he was young. Id. at 7. Commissioner Scoppetta immediately set out to identify the weaknesses of the existing institutional framework and to develop a transformative plan of action to address these problems. Id. at 7. These efforts culminated in the publication of a report entitled "Protecting the Children of New York: A Plan of Action for the Administration of Children's Services." Ex. 35. The report exposed deeply rooted defects including organizational weakness, crippling staff turnover, underfunding, problematic case practice, and mission confusion. Id.; Tr. 2232–35; 2493–95. It concluded by bluntly stating that "[t]he child welfare system is, in fact, not a system at all, but a conglomeration of fragmented responses." Ex. 35 at 26. Despite substantial improvements, this damaging admission still explains much of the unnecessary and abusive separation of mothers and children at ACS insistence.

Under Commissioner Scoppetta's guidance, ACS embarked on institutional im-

provement. Professional standards for caseworkers and supervisors were increased through the application of more rigorous job qualifications, enhanced training, improved compensation, and other incentives. ACS hired more caseworkers and field managers, reducing average caseloads. Tr. 2235–36; Ex. GGG. General training for supervisors and caseworkers was improved and expanded. Tr. 2502; Ex. GGG. A scholarship program was implemented that would allow 200 ACS employees to attend a local school of social work each year with full tuition paid by ACS. Tr. 2515. The foster care population has declined even as reports of abuse and neglect were increasing; this decline can largely be attributed to ACS's increased use of preventative services. Tr. 2154–56.

The scope of ACS's achievements has been widely recognized. In its Final Report, the Special Child Welfare Advisory Panel ("*Marisol* Panel"), created pursuant to the settlement in *Marisol v. Giuliani*, 929 F.Supp. 662 (S.D.N.Y.1996), wrote that ACS has

> engaged over the past several years in a sustained intelligent effort to change a complicated and difficult system .... The scope and pace of ACS's reform effort compare favorably to similar efforts we have seen elsewhere in the country, addressing such wildly different challenges as civil service reform, training, improved management controls, evaluation of contract providers, neighborhood based service, family care conferencing, and the addition of substantial new resources.

Ex. QQQ at 19. *See also* Ex. N.

2. Previous Domestic Violence Initiatives

Senior officials in the City's administration have long recognized blatant inadequacies in its program separating children from abused mothers. One initiative to begin addressing these inadequacies was its "Zone C Pilot" program, which began in 1993 as a collaborative effort between Child Welfare Administration (the precursor to ACS), the Urban Justice Center, and Columbia University. For administrative purposes, ACS divides each borough in the City of New York into zones. Zone C is one of the zones in Manhattan. From April until October, 1994, all cases within the Zone C pilot area were screened for the presence of domestic violence; the objective was to determine whether universal screening would lead to the identification of higher rates of domestic violence among families referred to child protective services, and whether this knowledge would lead to better assessments of the need to separate children from their mothers and more useful service planning. Tr.1917; Ex. 18 at 4; Ex. EEE. A study of the data obtained from this pilot program concluded that using a domestic violence questionnaire in all cases helped workers identify substantially more households where women were being abused without increasing the statistical likelihood of removal. DX–EEE. After proving its efficacy, the Zone C program was ended, not generalized to the system as a whole.

ACS's next effort to address the link between potential child maltreatment and domestic violence took the form of a six month partnership with the New York Police Department and the Urban Justice Center. Ex. 17. This project, entitled the "Zone A Domestic Violence Instant Response Pilot", was carried out at a Manhattan Field Office of ACS between July 1, 1999, and December 31, 1999. *Id.* The guiding document for the program was the "Domestic Violence Coordinated Response Pilot Interim Protocol." Ex. 13. The objectives of this project were to improve information sharing between ACS and the New York Police Department so that the

two agencies would be able to jointly investigate allegations of domestic violence. *Id.* at 2. The Protocol made a sharp distinction between offending and non-offending parents. The three enumerated outcomes the pilot sought to obtain were "promot[ing] the safety and well being of the Domestic Violence Victims and Children," "[p]reventing the unnecessary separation of the victim from the children," and "holding the alleged offender accountable." *Id.* at 4.

Besides increasing coordination between ACS and the NYPD and focusing attention on the need to treat victims and offenders differently, the Zone A Pilot also sought to ensure that participating ACS caseworkers would have access to better information about domestic violence. The Urban Justice Center conducted four two-day training sessions for Zone A caseworkers. Ex. 18 at 6. In addition, the Pilot program assigned a Domestic Violence Specialist to assist Zone A caseworkers. *Id.* at 7. The Protocol emphasized the importance of obtaining input from a domestic violence expert before making referrals, requiring that "[w]hen service needs are identified on an on-going [domestic violence] case, the unit staff and [Domestic Violence] Specialist should consult to confirm the appropriateness of the referral." Ex. 13 at 7.

The results of the Zone A Pilot were extremely promising. The batterer was arrested in 50 percent of the cases—a considerable increase—and an order of protection was provided to the victim in 42 percent of cases—also a large relative increase. The need for removals dropped dramatically; protective removals occurred in only 3 percent of cases—a substantial decrease. Ex. 17 at 2; *see also* Ex. 18 at 10 ("It was agreed at management meetings that this was a very low rate of removal."); *compare* Ex. 17 at 2 (finding a 3 percent removal rate of chil-

dren from homes with domestic violence in Zone A) *with* Ex. J at Table 30 (finding an 11.8 percent removal rate of children from homes with domestic violence throughout New York City). 74 percent of Zone A caseworkers sought the assistance of the Domestic Violence Specialist; all but one of those caseworkers reported this assistance to be helpful. Ex. 18 at 7. The evaluation study of the Zone A Pilot observed that in a survey of a group of caseworkers outside of Zone A, who did not have the benefit of a full-time Domestic Violence Specialist, 86 percent reported that they desired such assistance. *Id.* Among other things, the report concluded that "[i]t is clear there is a need for additional staff training in the area of domestic violence." *Id.* at 12.

This project too, instead of being expanded, was abandoned, although plans for a new citywide approach based on the Zone A and Zone C experiences was planned, but had not been executed when the trial ended. Nor have the first two monthly reports from ACS required by the preliminary injunction indicated that it has been put into operation. *See* Second Monthly Report to the Court from ACS (March 1, 2002); First Monthly Report to the Court from ACS (Feb. 1, 2002).

### 3. Present Policy and Practice

#### a. ACS Regularly Alleges and Indicates Neglect Against Battered Mothers

One reason it is difficult to quantify how many cases involve domestic violence allegations is that the State does not have a specific allegation code pertaining to domestic violence in its database, even though SCR sometimes mentions allegations of domestic violence in the transfer of information from its hotline in Albany to a field office. Ex. I at 1; Tr. 278, 1130. Thus, there is no way to count the number

of cases transferred by SCR to ACS for investigation that mention the presence of domestic violence. Tr. 278, 1131. Information about domestic violence cases is not available from the State's automated system, nor does the State collect that data. Tr. 241, 1471.

The New York State Office of Children and Family Services conducted a statistical study to determine how the presence of domestic violence, or its allegations, affects the handling and outcomes of investigations carried out by ACS. Ex. J. As suggested below, reasonable extrapolations from this study show that battered women are accused of neglect and separated from their children in a large number of cases and that in many of these instances the mother's only fault is that she has been battered.

Using appropriate sampling techniques, the researchers selected 375 cases from the New York City area for examination. Ex. I. at 2. This sample is representative of the universe of reports that ACS investigates annually, which has ranged between 53,000 and 58,000 during the past five years. Ex. I, *ACS Monthly Update: Fiscal Year 2001 End of Year Summary Report,* http://www.ci.nyc.ny.us/html/acs/pdf/update_annual.pdf at 4. For Fiscal Year 2001, ACS received and investigated 57,224 reports. *ACS Monthly Update: Fiscal Year 2001 End of Year Summary Report,* http://www.ci.nyc.ny.us/html/acs/pdf/update_annual.pdf at 2. The universe considered by City defendants' expert at trial during her testimony was 53,000. Tr. 280–81. Extrapolations below are based on the conservative assumption that ACS will handle 53,000 reports a year, although the actual number for last year is higher.

Set out below are some calculations based upon available incomplete data. The court's conclusions supporting its preliminary injunction do not rely on these precise figures, but they do, in general, tend to support the conclusion based upon credible testimony and documents that ACS regularly accuses battered mothers of neglect.

Caseworkers identify the presence of domestic violence in 16.2 percent of all of the reports that ACS receives. Ex. J at Table 4. Thus, it can be calculated that there are approximately 8,586 reports investigated by ACS each year in which domestic violence is identified. It is helpful to keep this number in mind, since it represents the cases in which ACS must make a decision on how to respond to the presence of domestic violence. It is also useful to remember that the range of activities which qualify as domestic violence is quite broad, ranging from the batterer "frequently argu[ing] with victim" or being "possessive or extremely jealous" to "attacking the victim with weapons." Obviously, some reports are more serious than others. As a very crude indicator of the relative severity of these reports, the victim suffers physical injury in 46.4 percent of the reports of domestic violence, or 3,983 cases. *Id.* at Table 8.

Considering only cases in which there is a report of domestic violence, ACS cites domestic violence as a reason for a preliminary finding that the child is unsafe in 23.5 percent of cases, and as a reason for an Investigation Conclusion determination that the child is unsafe in 20.4 percent of cases. *Id.* at Table 21. Thus, it can be calculated that ACS concludes at the end of its investigation that a child is unsafe based at least in part on the presence of domestic violence in the home in approximately 1,752 cases per year.

Of the cases involving domestic violence, 49.9 percent are "indicated" by ACS (meaning, as the reader will recall, that ACS reports to the State that neglect or abuse of a child exists). *Id.* at Table 22.

Of the cases that do not involve domestic violence, 34.1 percent are indicated by ACS. *Id.* Based on these figures, cases that involve domestic violence are 46 percent more likely to be indicated than those that do not. *See id.* Of cases that involve domestic violence and that are indicated, it can be concluded that domestic violence is cited as a reason for indication in 58 percent of cases. *See id.*

In the cases in which domestic violence was present and given as a reason for indication, the case was indicated against the victim of the domestic violence in 43.8 percent of cases. *Id.* at Table 24. Based upon these figures, it can be assumed that ACS indicates approximately 722 victims of domestic violence each year based at least in part on the fact that they are victims of domestic violence. *See id.*

ACS files a petition of neglect or abuse pursuant to Article 10 in 11.8 percent of cases involving domestic violence, *Id.* at Table 25. Of these cases, the petition is filed *solely against the victim of domestic violence* in 53.8 percent of cases, and against both the victim and the perpetrator in 38.5 percent of cases. *Id.* at Table 26. Thus, of the cases involving domestic violence where a petition is filed, the victim is one of the respondents, if not the sole respondent, in 92.3 percent of the cases. The batterer is not listed at all in 46.2 percent of the cases. It can be estimated from available data that ACS prosecutes the victim of domestic violence for neglect in Family Court in approximately 935 cases each year.

In cases involving domestic violence where ACS files an Article 10 petition, the petition explicitly charges the victim with having failed to protect the child from witnessing domestic violence in 23.1 percent of cases. The abusive partner, by contrast, is charged with causing harm to the child by engaging in domestic violence

in only 15.4 percent of cases. From this set of data it appears that ACS explicitly charges victims of domestic violence with neglect for having failed to protect children from witnessing domestic violence in approximately 234 cases each year.

The State's Domestic Violence Evaluation study evaluated cases alleging domestic violence that had been investigated by the Brooklyn Field Office over a two month period of time. Of the 78 domestic violence reports that the Brooklyn Field Office investigated during this period, 47 were indicated against at least one of the parents. Of these, 38 percent were indicated against the mother. The report stated that

> Previous history is a key factor in assessing immediate danger, making a removal, referring to Family Court and making a determination. The legal premise is that the non-offending parent, despite her knowledge of the offender's violent nature, engaged in acts of domestic violence in front of the child, thereby placing the child at risk or in danger. As a result, both the offending and non-offending parent [are] charged with "Failure to Protect." ... [The mother] is held responsible for protecting the child.

Ex. 17 at 8. Strangely, despite positing awareness of the prior history of domestic violence as the source of the non-offending parent's culpability, the report showed that nearly half of the cases where allegations were indicated against the mother did not involve a prior history of domestic abuse. *Id.* ("In the cases where the allegations were substantiated against the mother, 53% reported previous history of domestic violence.").

Elizabeth Roberts, ACS's Director for Domestic Violence Policy and Planning, testified that the language used by ACS in neglect petitions against battered mothers

which alleges that the mothers "engaged in domestic violence" constitutes a "misrepresentation of the dynamics of domestic violence [in] that it doesn't hold batterers accountable." Tr. 1861. When asked why the Division of Legal Services had not been instructed to stop using such language, she answered that "we would need to tell them what would be appropriate language instead." Tr. 1861.

ACS adopted a change designed to minimize unfairness of the existing system to battered mothers and their children while hearings on the preliminary injunction were well underway. On August 14, 2001, Deputy ACS Commissioner William Bell and General Counsel Joseph Cardieri issued a memorandum addressing the policy of charging battered women with neglect. It stated:

> Historically, the phrase 'engaging in domestic violence' has been used to describe a variety of circumstances in which violence has occurred between family members. Sometimes, this language has been used in reference to someone—most often a battered woman—who has been a victim of domestic violence and has not herself engaged in or initiated an act of violence. Because this usage misstates the nature of the victim's role in the violence and relieves the primary aggressor of his/her responsibility for the violence, the phrase 'engaging in domestic violence' should never be utilized in reference to a client who has simply been a victim of domestic violence.

Ex. MMM.

The memorandum only addressed phraseology. It entirely avoided the broader question of whether a woman who has been abused should be charged with inadequate guardianship or other neglect on the grounds that she has somehow permitted her children to witness the violence inflicted upon her. Conspicuously absent is any indication that ACS staff have been instructed in unqualified and clear terms to abstain from prosecuting such women on the grounds that they are battered mothers. Vague representations about "discussions" of the use of the specific phrase "engaging in domestic violence" are insufficient in view of the history of ACS. There has been no proof that the pattern of charging petitions or the practice of abusive separation by ACS of battered mothers and their children has yet been substantially modified in practice.

### b. ACS Rarely Holds Abusers Accountable

The practice and policies of ACS often lead to the abuser being left unaccountable because it is administratively easier to punish the mother by separating her from her children. *See* Tr. 436 (testimony of CPM Stewart that ACS always lists cases under the name of the mother). There is no evidence that this defect in ACS practice has changed.

Dr. Stark testified that there is "an absolute divorce" between ACS guidelines and ACS practice regarding holding abusers accountable. Tr. 1601. This is particularly unfortunate, given that the Zone A and Zone C pilot projects that were implemented by ACS demonstrated dramatic drops in removal rates and subsequent abuse and neglect allegations where ACS and the criminal justice resources were cooperating effectively and abusers were being regularly arrested. Tr. 1600–01.

Ms. Roberts, the ACS Director of Domestic Violence Policy and Planning, testified that while the new domestic violence protocol emphasizes holding batterers accountable, there was little existing guidance to caseworkers on how to implement this goal or to coordinate with police, and that future training was necessary to address the issue. Tr. 1838–89.

Plaintiffs' expert Laura M. Fernandez opined that part of the reason ACS targets mothers who are victims of domestic violence is that the system is "set up to view mothers as the focal point." Ex. 137. Historically, fathers have not been given much attention and were not expected to participate in referral services. Ex. 137.

> The battered mother ... may easily be engaged and seen as the parent who is more willing and interested in complying with services to prevent removal of her children or to get them returned from foster care. This creates a situation in which a child welfare case is opened due to the father's beating of the mother in the presence of the children, and she is sent for domestic violence education, parenting classes, individual counseling, and drug testing, among other possible referrals. In addition, she may be told she must go into shelter—while, meanwhile, the father is sent to either an anger management class or, perhaps parenting [classes] and nothing further. This unequal treatment sends a message that the mother is more responsible for getting help and is more "sick" for being in an abusive relationship than the actual person who committed the violence. As part of their mental abuse, many fathers will tell a woman that if she seeks help to escape the home, the system will turn against her, that she will be blamed for the break up of the family, that she will lose everything and that the abuser will get away with everything because he is in control—the system often perpetuates this belief and reinforces to women that they are powerless and will be punished, no matter what they do.

*Id.*

There is no indication that ACS effectively and systematically pursues removal of the abuser before seeking removal of the battered victim's child. ACS has the power to petition the Family Court for an order that removes the perpetrator of abuse or neglect from a household if that would enable the children to remain with or return to the non-offending parent. N.Y. Fam. Ct. Act §§ 1027(b)(iv), 1028(f) (Consol.2001). The individual cases and testimony of ACS witnesses demonstrate that ACS rarely pursues this option. The promulgation of the Domestic Violence Guidelines issued in 2001 by ACS may presage a future change of attitude, since they include an admonition that "[i]f preventative services cannot effectively curtail domestic violence within the household, the abusive partner should be removed from the home by the police, or the non-abusive parent should be assisted in entering emergency shelter or another safe living situation with her child." Ex. 26 at 2. This guideline is rarely followed by ACS in practice. ACS written policies currently in force do not mention this option, let alone highlight it as an option that is preferable to removal.

c. ACS Fails to Offer Adequate Services to Mothers Before Prosecuting Them or Removing Their Children

Preventative services are supportive services that can be provided directly by ACS or contractually through a not-for-profit agency to families to avoid removals and foster care placement and to protect against future abuse and maltreatment. Tr. 1479, 2225, 2259–60, 2318, 2354, 2588–90. They are not utilized as a substitute for removal in many instances when they could be accepted by mothers to avoid separation from their children.

Services encompass a wide variety of aid, including individual or family counseling and therapy, parenting skills programs, home-making training, employment referrals, housing assistance, and case

management. Tr. 1479, 2354, 2588–90. As referrals for preventative services increase, fewer removals take place. Tr. 2238–39, 2506, 2589, 2596–97. ACS has made significant strides in improving the general availability of preventative services, opening seventeen new preventative service programs in community districts that have been underserved. Tr. 2155–56, 2187. ACS has provided more options to families in those communities. Tr. 2187.

The full potential of this services model is far from being reached. Often the paradigmatic mother-child separation is preferred by ACS employees.

ACS approaches safety planning as a prescriptive process in which ACS offers services that the mother is expected to accept. Refusal to accede without objection is often interpreted by ACS as the mother's refusal to protect her children. In fact the mother often refuses because the plan or an element of the plan is unnecessary, fails to address the family's problem realistically, or actually increases the danger. "Refusal to go along with a particular service plan is interpreted as a refusal of services rather than as part of the negotiation which we all do to develop effective safety plan[s] . . . ." Tr. 1598. Safety planning, as it is practiced by ACS, amounts to "the old contracting method that this was supposed to have replaced where the issue is what is effectively an ultimatum and then you use a priority of threat and intervention, including placement . . . as a way of coercing adherence to a plan . . . ." Tr. 1599.

Of all of the cases in which domestic violence was identified, ACS referred the victim to "services intended to address the domestic violence" in 43.7 percent of cases. ACS referred the abusive partner to such services in only 21.1 percent of cases. Id. at Table 33. By far the most common service to which ACS directed battered

mothers was domestic violence counseling. Id. at Table 35 (61.3 percent of victims referred to domestic violence counseling, with the next most common referral being victim's services at 29 percent).

One service that is critical to the best interests of battered women and their children and to avoiding unnecessary removals is the domestic violence shelter. A domestic violence shelter is a place where a woman and her children can seek safe haven from an abuser. These shelters are typically dormitory-like and provide services such as counseling and vocational training. Tr. 944. For safety reasons, the location of a domestic violence shelter is confidential. Tr. 945.

There is a critical lack of space in existing City shelters. In fiscal year 2001, there were an average of 40.4 unduplicated shelter requests per day, whereas the average daily shelter availability was 14.8. Ex. B–14. Similar disparities existed for the prior three fiscal years. Id. Director Roberts admitted that it was "pretty well established" that there are currently not enough domestic violence shelters in New York City to meet the demands of battered mothers seeking shelter, and that some removals of children into foster care could be avoided if the mother and child were able to be placed in a shelter. Tr. 1862.

d. ACS Regularly Separates Battered Mothers and Children Unnecessarily

The statistics, individual cases, expert testimony, and admissions of ACS employees demonstrate that many more separations of abused mothers and their children are made by ACS than are necessary for protection of the children. Of the cases in the OCFS study involving domestic violence where ACS filed a petition in Family Court, placement of the children of abused

mothers appears to have occurred in every case. *Compare id.* Tables 27 and 28 (ACS filed an Article 10 petition in seven of the sample cases involving domestic violence) *with* Table 31 (placement occurred in seven of the sample cases involving domestic violence). Of the cases in which placement occurred, domestic violence was cited as one of the reasons for placement in 46.2 percent of cases, and as the only reason for placement in 7.7 percent of cases. Susan Mitchell–Herzfeld, who authored the study, estimated that about eighty children were removed by ACS in 1999 based solely on the presence of domestic violence. Tr. 279–83, 295–97; Ex. 181.

This estimate is almost certainly low. Ms. Mitchell–Herzfeld testified at trial that the methodology used to identify cases where domestic violence was the sole reason for removal would fail to capture certain types of cases. Tr. 291–95. One problem is that language used in petitions to indicate domestic violence varies and may often not be specific as to whom the allegation is against. For example, the removal in Ms. Doe's case, *see supra* at Part III.B.9, was not considered by the OCFS study to be a removal based solely on domestic violence. Tr. 2698–99. In that case, the father would drink and become abusive towards the wife. Because the father drank, the petition against him included an allegation of substance abuse. There was no suggestion that the mother drank, or that the mother had any problem other than being battered. While the case was a "mixed" case against the father, the case against the mother was undisputedly founded entirely on her being a victim of domestic violence. Nevertheless, the fact that the father was an alcoholic batterer (as opposed to the sober variety) excluded the case from being "solely based" on domestic violence for the purposes of this study. If this case had been counted as

being solely based on domestic violence, the OCFS study would have led to the conclusion that the number of cases each year in which domestic violence was the sole reason for removal was in the order of 160.

Some petitions include allegations of neglect unrelated to domestic violence, but caseworkers either have no evidence at all supporting the unrelated allegations or the caseworkers do not consider the unrelated allegations to merit a finding of neglect. *See* Udoh case, *supra* Part III.B.3; Tillett case, *supra* Part III.B.4; Norris case, *supra* Part III.B.6; Berisha case, *supra* Part III.B.8; *see also* Ex. 147 (report of Phillip Segal, a former Family Court judge, that "[i]n some cases, ACS would allege domestic violence plus some other form of alleged neglect. However, the other allegations often were not sufficient on their own to form the basis of child protective proceedings, and therefore did not otherwise affect the outcome of the case."). While these petitions, and any attendant removals, are entirely motivated by the allegation of "exposure to domestic violence," they facially appear otherwise, and thus depress the number of cases reported in any study as being "solely" based on claims of domestic violence.

Dr. Stark testified that based on his review of ACS's documents as well as those in multiple domestic violence case files, removals were "directly precipitated simply by evidence of domestic violence and no substantial additional factors." Tr. 1597. This is in part explained by ACS's mission statement that all doubt must be resolved in favor of removing the child. Tr. 1604–07. CPM Delamothe testified that she was carrying out ACS's program of resolving all ambiguity in favor of removing the child when she ordered the removal of Ms. Udoh's children. Tr. 1034. A report on ACS policy conducted by the

Public Advocate for the City of New York illuminates how this policy of resolving all doubt in favor of removal unsurprisingly leads to unnecessary removals:

Nationally about 16% of reports of child maltreatment that are substantiated after investigation result in removal. New York City, however, removes children in about 28% of substantiated cases. But nearly one-quarter of the New York City children removed and placed in foster care are subsequently returned home within three months. An executive staff member from a large foster care agency reported ... that of approximately 30 children who enter his foster care program every month, about half return to their families within 60 days. He stated that he believed most of those were children who did not need to be removed from their parents.

Report of Mark Green, Public Advocate for the City of New York, and C–PLAN: Child Planning and Advocacy Now, *Children Still at Risk: Comments on the Five Year Anniversary of the Administration for Children's Services* 15 (2001) (Ex. 122).

In a large number of instances ACS removes children first and then seeks court approval. Many such non-court ordered separations are unnecessary and result in long periods of anguish for both mother and child before the courts can reinstate the mother-child relationship. The Casework Practice Guide tells caseworkers that, "whenever possible, an Article X petition should be filed prior to the removal. However, if the circumstances of the case require immediate removal, *file the court petition [after removal]* within the next business day." Ex. 30 at 8 (emphasis added).

Philip Segal served as a judge on the New York State Family Court for the City of New York for ten years until April 2001 and presided over hundreds of child protective proceedings brought by ACS and, before it, the CWA. Ex. 147. He reported that in many instances the abused mother was separated from her children merely because she was abused.

Many of the child protective cases I presided over involved allegations of domestic violence, including allegations that the parents had 'engaged in domestic violence.' At the trial ('fact-finding hearing'), I would often learn that the mother had not actively participated in the domestic violence, but instead had been a victim of it. Unfortunately, because of the crowded Family Court calenders, many months would often pass before these hearings took place. I also observed that ACS would remove many children from battered mothers in cases in which the mothers had not posed any danger to the children. Often, ACS would remove the children as a first resort, rather than providing services such as the removal or arrest of the batterers, obtaining orders of protection for the mothers or children, or placing the families in domestic violence shelters.

Ex. 147 at 1.

Judge Segal also testified that "[i]n ten years on the bench, my best recollection is that there were no more than ten instances where [ACS petitioned the court for permission to remove a child before doing so]. If the City wanted custody of the children, they would seize them unilaterally and ask the court to confirm or ratify that action after the fact." Tr. 124; Ex. 147. This former Family Court Judge stated that the Second Circuit court of appeals holding in *Tenenbaum v. Williams,* 193 F.3d at 594, warning about the unconstitutionality of hair-trigger non-court ordered removals, did not cause "any perceptible change" in ACS's practice of removing children without court order. Ex. 147. *See also* Re-

port of Mark Green, Public Advocate for the City of New York, and C–PLAN: Child Planning and Advocacy Now, *Justice Denied: The Crisis in Legal Representation of Birth Parents in Child Protective Proceedings* 4 (2000) [hereinafter *Justice Denied*] (Despite the Second Circuit's holding in *Tenenbaum,* "in practice ACS often removes children prior to filing a petition or getting court approval for removal, even where the case is one of alleged neglect rather than abuse.") (Ex. 122). Internal ACS documents issued subsequent to the *Tenenbaum* decision reinforces this conclusion. Staff Memorandum of November 18, 1999 from Gerald Harris and William Bell ("all ACS staff should go about their normal jobs as they always have . . . .") (Ex. FFF).

Testimony of ACS personnel demonstrates an agency-wide practice of removing children from their mother without evidence of a mother's neglect and without seeking prior judicial approval. Director Roberts testified that there were instances where it might be appropriate to remove a child to "motivate" the mother to cooperate with services offered by ACS. Tr. 1866. CPM Stewart acknowledged that when an agency employee believes children's safety is at risk, ACS removes the children first and then seeks judicial approval. Tr. 453. CPM Williams testified that common practice in domestic violence cases is to remove a child without seeking or obtaining judicial approval, and to delay seeking judicial approval for a few days to "work things out with the mother." Tr. 852. CPM Williams admitted that some of these removals are never brought before a court because mothers will usually agree to attend whatever services ACS demands once their children have been in foster care for a few days. Tr. 852. Although her testimony was inconsistent on the issue, CPM Delamothe testified at one point that ACS could remove a child based merely on a

"suspicion" of future harm to the child. Tr. 1083–84. CPM Chamorro testified that ACS caseworkers sometimes decide to remove a child based solely on the information contained in the initial report received from SCR before doing any independent investigation. Tr. 100–01.

Other evidence supports the conclusion that ACS makes a significant number of unnecessary removals based only on domestic violence against mothers. During part of 2000, a single Family Court judge was assigned all cases arising in the Bronx where ACS had "removed children from their homes because, in essence, one of their parents has been the victim of domestic abuse." Ex. 109. This pilot program, called the Domestic Violence and Child Maltreatment Project, was initiated by the New York State Office of Court Administration, in coordination with the Legal Aid Society's Juvenile Rights Division, to "handle cases where charges of child maltreatment have been filed against parents who are the victims of domestic violence" with the goal of "provid[ing] intensive and expedited services to the children and the victims of domestic violence and eliminat[ing] the necessity of removal of children from the non-offending parent . . . ." Ex. 111 at 5. Over a period of six months, approximately forty cases were directed to the judge, and in almost all ACS had removed the child; the judge returned the children home to the mother in the overwhelming majority of the cases. Ex. 109.

The Child Welfare Committee of the New York City Inter-agency Task Force Against Domestic Violence formed a working group and published a report based upon its experiences as advocates "assisting battered mothers who are losing their children to foster care and who are being charged with abuse or neglect for failing to protect their children from witnessing

domestic violence." Ex. 106 at 35. It supports the conclusion that forced ACS separations of children from mothers were often based on the mothers having been abused. *See also* Supreme Court of the State of New York, Appellate Division, First Department, *Laywer's Manual on Domestic Violence: Representing the Victim* 199 (Julie A. Domonkos & Jill Laurie Goodman eds., 3rd ed. 2000) (There has been an "unfortunate ... increase in the number of children who are placed in foster care as a result of domestic violence in the home—and battered women who are forced to deal with an often coercive and punitive system").

ACS unnecessarily protracts the return of separated children to abused mothers even after the Family Court has ordered that they be reunited. In many instances, the delays are due to administrative inefficiency. In many others, it is due to pique of the ACS employee or to the employee using bureaucratic power to punish the mother and child until the mother becomes pliant to ACS orders—even though the ACS demands may not be necessary to protect the children.

CPM Delamothe testified that although ACS places children in the keeping of a foster care agency, ACS remains legal custodian of the children. Tr. 1055. Although ACS guidelines state that "child care agencies *must not* delay discharge solely for the purpose of conducting an additional medical examination", Ex. 210 at 8 (emphasis in original), CPM Delamothe testified that ACS had trained her that all children must undergo a discharge medical examination before being released from foster care. Tr. 1053. She testified that obtaining this medical examination often delays the court-ordered return of a child for days. Tr. 1053. Testimony demonstrated that children are required to be examined before ACS complies with a court-ordered discharge, and that this often delays the return of a child. Tr. 221–22.

The case histories demonstrate long and unnecessary delays in returning children to the mother. The adverse effect of these delays is often disastrous to the physical and emotional well-being of the children unnecessarily separated from their abused mothers.

e. ACS Fails to Adequately Train Its Employees Regarding Domestic Violence

Newly hired ACS workers receive two days of domestic violence training. Tr. 1776. In late 1999 or early 2000, ACS conducted mandatory training for existing staff on ACS's case practice guide and template that were then in effect. Tr. 1776–77. In early 2001, caseworkers for the first time began to receive training on trauma reduction guidelines for children, concerning dangers that children may suffer when separated from their parents. Tr. 1781–83. Cheryl Meyers, ACS's domestic violence coordinator, has conducted one to two hour non-mandatory training sessions in the Manhattan and Brooklyn field offices. Tr. 1254–55, 1260, 1264–66, 1271–72. This training does not include a comprehensive discussion of what constitutes imminent risk to children who witness domestic violence. Tr. 1267.

The few ACS employees with significant domestic violence training are largely ignored. Based on his examinations of individual case records, ACS's organizational structure, and other data, plaintiffs' expert Dr. Evan Stark concluded that those with domestic violence expertise in the agency have little or no influence over high-level policy decisions or caseworker-level practice. Tr. 1607. Caseworkers rarely enlisted the help of ACS's domestic violence coordinator, Cheryl Meyers. When they

did so it was often to resolve an "administrative dilemma." Her substantive advice was often "completely discounted," by the caseworker, Dr. Stark testified, giving Ms. Garcia's case as one example. Tr. 1608; *see also supra* at Part III.B.5.c. & d.

Elizabeth Roberts, ACS Director of Domestic Violence Planning and Policy, believed that the training of new attorneys included a "brief discussion of domestic violence," but she had never seen anything in writing about it and did not know how long it had been in place. Tr. 1859. Zeinab Chahine, ACS Associate Commissioner for the Division of Child Protection, was unaware of what training ACS Family Court attorneys received concerning domestic violence and did not know whether the Division of Legal Services (DLS) received any training on the new domestic violence protocols and guidelines. Tr. 1729–30, 1773–74. She also testified that the director of training position in the legal department had been vacant for several months and she was unaware of any plans to fill it. Tr. 1774. Cheryl Meyers, the ACS domestic violence coordinator, has never been asked to provide, and has never provided, any training to DLS attorneys. Tr. 1273. ACS supposedly has plans to train new and current DLS attorneys on domestic violence in the next few months or the coming year, but there is no evidence that such training has begun. Tr. 1807, 1859–60, 2596.

No one in authority doubts that more training is necessary to prevent injustices by ACS to battered women and their children. The *Marisol* Panel conducted an extensive evaluation of all aspects of ACS practice. In a report issued March 9, 2000, the Panel concluded that "front line workers appeared to lack knowledge and practice experience with regard to issues that are critical to the clients they serve.... [The] understanding of domestic

violence and of how to work with its victims is quite limited.... Many agencies have provided at least some training on this issue, and ACS plans to do systemwide work on it, but adequate knowledge of domestic violence does not yet inform most of the practice we observed." Special Child Welfare Advisory Panel, *Advisory Report on Front Line and Supervisory Practice* 12 (2000) (Ex. 124).

Not only must more training be provided by ACS, but it must be improved. Dr. Stark testified that caseworkers' training at ACS does not adequately equip them to recognize or address the essential dynamics of domestic violence. Tr. 1574–75. In particular, his analysis of case records, ACS testimony, and ACS training materials convinced him that ACS training reinforces the outmoded and discounted theory that battered mothers suffer from "learned helplessness." ACS caseworkers assume that when a woman hesitates to accept a particular offer of services, it is because she is ambivalent or helpless; the caseworkers believe they must use punitive means, such as threats or separation of the mother and child, to get the victim to "make up her mind." Tr. 1576–77. Because ACS workers assume that the battered mother is weak and helpless, "the caseworker is denied the single most important tool [that] a child protection service worker has when going into the home, [that is] the mother's strength [and] knowledge ...." Tr. 1578.

Some aspects of the training program are ineffective not because they teach the wrong lessons, but because they teach incomplete lessons. For instance, Dr. Stark praised the "ecological map" device which is the basis of much ACS domestic violence training. This map is a way of linking information about work, family, school, and other systems, allowing a caseworker to better appreciate the complexities of a giv-

en case. Tr. 1578. Because the training does not give caseworkers sufficient guidance on how to apply this method, the training does little to change their attitudes. Tr. 1579. City defendants' expert Dr. Richard Gelles also criticized ACS's current training. He maintained that the training "doesn't seem to have much of a conceptual framework around which to train workers how to see cases." Tr. 2430.

According to Sherry Frohman, the executive director of the New York State Coalition Against Domestic Violence, ACS's training on issues related to domestic violence is inadequate; this results in inappropriate removals of children from households in which there is domestic violence. Tr. 1279–80, Ex. 149. Ms. Frohman was particularly critical of the domestic violence training curricula that ACS provides to new caseworkers. Tr. 1306–08, 1311–13. While Ms. Frohman's agency has worked extensively with many State and City agencies, ACS has never taken advantage of its free training and consultation services. Tr. 1278–85. ACS caseworkers have contacted Ms. Frohman's organization on their own initiative, outside the line of internal authority, out of frustration because they did not believe they had the appropriate training to handle their domestic violence cases adequately. Tr. 1285, 1287.

In recognition of the need to improve training in the area of domestic violence, in January of 2001 ACS hired Ms. Elizabeth Roberts in the role of Director of Domestic Violence Policy and Planning. Tr. 1790–1802. She testified that ACS was in the process of "completely revamping the training for new workers." Tr. 1802. The new training model will be more skill-focused and should have three phases—a common core, a specialty core, and ongoing training, which will, she reported, include handling cases and returning to

ACS's training academy for two or three days of domestic violence training. Tr. 1805. ACS is also reportedly in the process of devising a plan to train current supervisory staff and caseworkers on new domestic violence guidelines. Tr. 1724. Accomplishing the formal training of all child protective caseworkers on the revised protocols and other documents will "take a long time," according to Associate ACS Commissioner Zeinab Chahine, who testified that "it takes months for [ACS] to be able to put a training program together and to train everybody." Tr. 33.

Some preliminary and insufficient steps have been taken. As the trial was in progress, ACS hosted a one-day retreat on July 27, 2001, for 120 to 130 directors, deputy directors, and front line child protection managers. Tr. 1689, 1729, 1800; Ex. SS. Half of activities at the retreat dealt with domestic violence; there was a panel presentation, a small group discussion, and a question-and-answer period concerning the domestic violence guiding principles and the revised domestic violence protocol. Tr. 1689–91, 1800, 1835. On August 3 the ACS Director of Domestic Violence Policy and Planning, Ms. Elizabeth Roberts, testified that ACS would release the revised domestic violence protocol and the new casework practice guide "in the next month or two," but that no date for training had been scheduled for either managers or trainers let alone front line workers. Tr. 1836–38. The promise of more and effective training has not yet been fulfilled.

f. ACS Written Policies Provide Insufficient and Inappropriate Guidance to Employees.

The ACS Mission Statement declares that

Any ambiguity regarding the safety of the child will be resolved in favor of

removing the child from harm's way. Only when families demonstrate to the satisfaction of ACS that their homes are safe and secure, will the children be permitted to remain or be returned to the home, where the child and family can be both supported and monitored. Ex. 37.

In February of 2001, as this case was pending, ACS promulgated a new set of Domestic Violence Guiding Principles. Although these principles had neither the force nor the specificity of a written policy, a memorandum from ACS Commissioner Nicholas Scoppetta accompanying the Principles stated that they were "distributed to help direct policy, formulate practice guidelines and protocols, and provide a framework for staff training." Ex. 26 at 1.

One new principle reflects a recognition that abused mothers and their children are separated too frequently. It reads:

> When domestic violence creates an immediate danger of serious physical harm or serious emotional impairment to a child, every effort should be made to provide for safety without separating the non-abusive parent and child. If preventative services cannot effectively curtail domestic violence within the household, the abusive partner should be removed from the home by the police, or the non-abusive parent should be assisted in entering emergency shelter or another safe living situation with her child.

Ex. 26 at 2. Another principle states that "Abusive partners must be held accountable for their actions .... Non-abusive parents must not be held accountable for the violence committed by others." Ex. 26 at 3. These principles are intended to guide policy-making, but do not constitute actual policies that caseworkers are supposed to implement. The evidence does not indicate that these principles have had the

effect in the field of reducing improper separations of abused mothers and children.

ACS written policies specifically relating to domestic violence are located in the Case Practice Guide, which includes the Child Protective Services (CPS) Domestic Violence Protocol and the Case Recording Template. See Ex. 30 (Case Practice Guide); Ex. 30 Appendix A (Case Recording Template); Ex. 30 Appendix F (Domestic Violence Protocol). The Case Practice Guide is primarily a "compilation of various case practice standards" which caseworkers are supposed to use as a guidebook. It is "a summary of various standards for conducting investigations, assessments, service planning and guidance around supervision ...." Tr. 1675. The CPS Domestic Violence Protocol is included in the Case Practice Guide and is the assessment guide for staff in domestic violence investigations. The Recording Template is a template used by caseworkers to record their investigations and assessments on the computer system. Tr. 1678.

ACS Child Protective Services Policy Coordinator Andrea Reid testified on July 19, 2001, that the then current Case Practice Guide, CPS Domestic Violence Protocol, and Case Recording Template were being revised. Tr. 822, 1676. Subsequently, Associate Commissioner Chahine revealed that these documents were in fact amended as of July 20, 2001. As of August, 2001, the amended documents had not yet been widely distributed to caseworkers or front line supervisors. Tr. 1722. The evidence does not indicate that these written ACS statements have reduced improper separation of abused mothers and their children.

ACS policy states that every case must be assessed for domestic violence, and that the Domestic Violence Protocol must be

completed by the caseworker whenever there are allegations of domestic violence reported to ACS or whenever the caseworker comes to suspect domestic violence during the course of an investigation. *Id.* The protocol states that "intervention should focus on safety planning for the victim and the children and holding the offenders accountable." Ex. 11. Nevertheless, a full escape valve for the worker ordering separation in an attempt to protect against criticism and to follow ACS tradition is provided: "If the non-offending parent is not ready or able to accept services and the offender's behavior renders services insufficient to protect children *from immediate danger,* [caseworkers must] take the necessary protective measures." *Id.* (emphasis in original). Supervisors are to "consult with the ACS Domestic Violence Coordinator and the Division of Legal Services for additional guidance." *Id.* The evidence does not show any general practice by caseworkers or supervisors of seeking such consultations before deciding to separate battered mothers and their children.

Significantly, neither the existing ACS written policies nor any proposed changes proffered to the court include a clear set of standards and guidelines to aid a caseworker in determining when the danger from domestic violence in a household reaches the point of creating imminent danger. In the absence of such guidelines, plaintiffs' expert Karen Schimke reported, caseworkers fall back on ACS's mission statement of resolving all ambiguity in favor of removing the child and perform many unnecessary removals. Ex. 151. The court finds Ms. Schimke's analysis accurate.

Dr. Stark also reported that ACS written policies offer little if any useful guidance to ACS employees regarding domestic violence cases:

Domestic violence poses a significant risk to child safety in some cases and a potential risk in many others. However, this risk is neither understood nor accurately represented in ACS training materials, guidelines, or policies. As a result, ACS procedures for identifying, assessing, and responding to the needs of families where domestic violence occurs are ill-conceived and almost certainly aggravate the predicaments posed to battered women and their children by offending partners.

Ex. 143–a at 18.

The conclusion of Dr. Gelles, the City defendants' own expert witness, was even more devastating. He testified that the documents ACS has produced related to assessing domestic violence do not earn a "passing grade." Tr. 2428.

ACS frequently fails to adhere to the principles supporting the unity of abused mothers and children that it professes. Dr. Stark opined that, based on his examination of case records, ACS does not follow its own guiding principles on domestic violence "in spirit or in letter." Tr. 1597. In a hearing held on October 22, 1999, before the New York City Council on ACS policy regarding domestic violence cases, councilperson DiBrienza also noted this disconnect between ACS policy statements and ACS's actual policies. He stated:

[S]omething is wrong. Something is dramatically wrong. We cannot spend two and a half hours here listening to witness after witness, advocate after advocate, client after client, attorney after attorney with documented cases, including numerous wins in court, describe a system as they have described it and then listen to ten pages of [testimony by ACS Associate Commissioners] describe

a completely different system without believing that something is wrong.

Ex. 105 at 139–40.

4. Future Plans of ACS

Plans for future changes to prevent abuse by ACS of battered mothers and their children through unnecessary separation from each other are being considered by ACS. They have not yet been formalized or effectuated. *See* Second Monthly Report to the Court from ACS (March 1, 2002); First Monthly Report to Court from ACS (Feb. 1, 2002). Without the preliminary injunction it is unlikely that they will change ACS's present unconstitutional conduct toward abused mothers and their children.

During trial ACS witnesses testified about a number of future projects which ACS hopes will improve the way it handles domestic violence cases. For instance, ACS is seeking funding for twelve clinical consultation teams that will each include a domestic violence specialist so that each field office will have access to the kind of domestic violence expertise that Zone A project caseworkers found so helpful. Tr. 1693–94, 1810–12, 2156–57. Director Roberts' office is developing plans to improve domestic violence training for caseworkers, supervisors, and ACS attorneys. Tr. 1802–07.

Dr. Stark's opinion of ACS's present domestic violence initiatives and future plans was that they remain unlikely to change the present unsatisfactory situation. He noted that,

> although they represent an important change and, more importantly, an important source for dramatic improvement in the future, the domestic violence initiatives taken by ACS remain ad hoc and marginal to the mission and main thrust of the organization. Expertise within the agency is isolated and

without substantive authority and indicated cases are managed in ways that emphasize placement rather than joint safety planning, accountability, or empowerment.... Despite current plans for reform, this situation is likely to persist unless and until ACS broadens its mission to include the safety of all victimized household members, shifts the emphasis in safety planning from placement to support and preservation, and reflects this broadened mission by fully incorporating domestic violence expertise into line authority to which field and supervisory staff are accountable.

Ex. 143a at 18.

*E. Judicial Oversight of ACS Action*

1. Family Court

The availability of Family Court review for removals that have already occurred often fails to provide mothers and children with an effective avenue for timely relief from ACS mistakes. Family Court judges as well as attorneys practicing in Family Court agree. The Special Child Welfare Advisory Panel created pursuant to the settlement in *Marisol,* 929 F.Supp. 662, reported that the wide group of Family Court judges it interviewed

> were nearly unanimous in their opinion that the system does not work, yet they feel powerless to change it.... The judges had much to say about their frustration with ACS for cases in which it lacks adequate preparation or fails to present a solid evidentiary case of abuse and neglect. Yet they acknowledge that they do not hold ACS accountable by refusing to grant their petitions in these cases. They felt that they could not risk making a mistake and having a child die; spoke of the withering media attention to decisions which turn out badly; and cited the lack of Court of Appeals support for insistence upon solid legal evi-

dence for removal, noting the doctrine of "safer course" that the higher court typically relies upon.

Special Child Welfare Advisory Panel, *Advisory Report on Front Line and Supervisory Practice* 48 (2000) (Ex. 124).

State Family Court judges have not abandoned their responsibilities. Rather, all available evidence suggests that these judges have performed heroically under very difficult circumstances. Because of their heavy caseloads, Family Court judges cannot immediately devote much time to each case. Yet the urgency of child safety demands that judges often make decisions without critical information. Facing this quandary, judges allow ACS expansive latitude because they assume ACS has much better information, at least until the judge can hold a fact-finding hearing. *See Justice Denied* at 21 ("Understandably, once a parent has been accused of endangering a child, no one ... wants to risk sending the child home before there has been an adequate investigation of the facts. Unfortunately, the net effect is that where the health and safety of children are involved, a parent accused of neglect or abuse is guilty until proven innocent.").

When ACS has removed a child, the mother's first opportunity for such a fact-finding hearing is called a 1028 hearing. Technically, a mother is entitled to such a hearing within three days of the child's removal. N.Y. Fam. Ct. Act § 1028 (Consol.2001). Because attorneys are assigned to indigent parents only after they arrive at court, the attorneys must either proceed without any preparation or seek a continuance, during which the child remains in foster care. *See Justice Denied* at 20; Supreme Court of the State of New York, Appellate Division, First Department, *Laywer's Manual on Domestic Violence: Representing the Victim* 214 (Julie A. Do-

monkos & Jill Laurie Goodman, eds., 3rd ed.2000) (reasons why lawyers for battered women may need to delay seeking a section 1028 hearing). Most appointed attorneys seek the continuance, meaning that "the court does not conduct an inquiry into the legality of the removal until several weeks after the child has been removed from the home." *Justice Denied* at 20. Even if the mother wins at the section 1028 hearing, ACS may appeal; resolving the appeal even on an expedited basis usually takes months, and the child will usually remain in foster care during appellate proceedings. Supreme Court of the State of New York, Appellate Division, First Department, *Laywer's Manual on Domestic Violence: Representing the Victim* 214 (Julie A. Domonkos & Jill Laurie Goodman, eds., 3rd ed.2000).

The end result is that Family Court judges usually must rely almost entirely on ACS's representations, and grant any requests by ACS until the parents have a chance to present a meaningful response to the charges, which usually occurs several weeks into the process. This dependence by the Family Court on ACS highlights ACS's responsibility to present fair and accurate charges and information to the court when it decides to file a petition. ACS does not rise to that ethical standard in many instances.

### 2. Representation

### a. Representational Framework

During Family Court proceedings regarding removals or Article 10 petitions, there are at least three parties requiring representation before the court: ACS, the children, and the parents. In domestic violence cases, conflicts of interest normally dictate that the parents be represented separately.

ACS is represented by staff lawyers from the City Law Department's Division of Legal Services (DLS). The annual budget of DLS is approximately $17 million. For the 250 DLS attorneys, there are 325 staff members, and DLS attorneys have access to a wide array of investigative and social service resources. *Justice Denied* at 8.

Children who are named in an Article 10 petition are appointed law guardians at no charge. These law guardians are employed by the Legal Aid Society Juvenile Rights Division ("JRD") or Lawyers for Children ("LFC") under the terms of their contracts with the New York State Office of Court Administration. *See id.* at 6–7; *see also* N.Y. Jud. Ct. Acts § 35(4) (Consol.2001) (requiring the State to bear the cost of law guardians); N.Y. Fam. Ct. Acts § 248 (Consol.2001) (same). The annual budget of the JRD alone is approximately $20 million (arguably quite insufficient). *Justice Denied* at 7. JRD and LFC are "fully staffed law office[s]" with attorneys, receptionists, paralegals, and social workers to work with the law guardians." *Id.* at 7. There has been no suggestion that JRD or LFC lawyers provide anything less than excellent representation to their children clients.

Parents are represented by private counsel if they can afford the fees. If the parent is indigent, Article 18–B of the New York County Law requires that a lawyer be appointed for the parent. The large majority of parents appearing before the Family Court are indigent. Their counsel are selected from a panel of lawyers established in accordance with Article 18–B. *See* Ex. 124 at 46 (a "very large majority of parents" in Family Court are represented by 18–B panel attorneys); Appellate Division, First Department, *Crisis in Legal Representation of the Poor: Recommendations for a Revised Plan to Implement Mandated Governmentally Funded Legal Representation of Persons Who Cannot Afford Counsel* at 13 (2001) [hereinafter *Crisis in Legal Representation of the Poor*] ("Virtually all cases requiring the representation of an indigent adult were handled by panel attorneys ....") (Ex. AP5). The annual payment of fees to 18–B panel attorneys for Family Court work is approximately $8 to $10 million. *Justice Denied* at 10. Unlike the City Division of Legal Services or the Legal Aid Juvenile Rights Division, the 18–B panels are not institutional. They do not provide any office or other support services for the private practitioners who are members.

b. 18–B Crisis.

In 1963, the United States Supreme Court handed down its landmark decision in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), holding that the Sixth and Fourteenth Amendments required that states provide counsel to indigent criminal defendants charged with a felony offense. In response the New York Legislature enacted County Law Article 18–B. This law required each county to devise a plan for the provision of counsel to indigent criminal defendants. N.Y. County Law § 722 (Consol.2001). In 1975, the legislature extended 18–B representation to include indigent persons in Family Court, including respondents to Article 10 petitions or "the parent of any child seeking custody or contesting the substantial infringement of his or her right to custody of such child." N.Y. Fam. Ct. Act § 262 (Consol.2001). The legislature adopted accompanying "legislative findings and purpose" recognizing the critical need for representation of mothers.

Persons involved in certain Family Court proceedings may face the infringements of fundamental interests and rights, including the loss of a chid's society and the possibility of criminal

charges, and therefore have a constitutional right to counsel in such proceedings. Counsel is often indispensable to a practical realization of due process of law . . . .

*Id.* § 261.

Although counties bear the costs of this system, State law sets compensation rates. N.Y. County Law § 722–b (Consol.2001). Originally set at $15 per hour for in-court work and $10 per hour for out-of-court work, the rates were last amended by the legislature more than fifteen years ago, in 1986, to the current levels of $40 per hour in-court and $25 per hour out-of-court. *Id.* There has been no provision for inflation of 58 percent since that time, leading to a substantial erosion in value. *See* U.S. Census Bureau, *Statistical Abstract of the United States: 2001* 453 (2001); *Cf. Insecure About Their Future: Why Some Judges Leave the Bench,* The Third Branch, Feb. 2002 at 2 (effect of inflation on pay); *Spencer Williams v. United States,* 535 U.S. ——, 122 S.Ct. 1598, 152 L.Ed.2d. 513 (2002), (Breyer, J., dissenting) (charts A, B, and C showing effects of inflation on income). Total compensation in any case for attorneys assigned to represent an indigent in Family Court proceedings is statutorily capped at $800 per case. N.Y. County Law § 722–b (Consol.2001). Counsel assigned under 18–B are prohibited from seeking or accepting any additional compensation for their services from the client. *Id.*

Under "exceptional circumstances," a court may award compensation in excess of these limits. *Id.* David Gilman, a former judge on the New York State Family Court for the City of New York, has been a family law practitioner since he left the bench in 1985, and has handled over a *thousand matters* in Family Court as an 18–B assigned counsel. Tr. 12/19/01 21–22, 29. Mr. Gilman testified that most cases require a greater commitment of time than the statutory cap will permit, and that courts routinely award compensation in excess of the cap. Tr. 12/19/01 28–29. In his experience, it was rare for courts to grant compensation in excess of the statutory rates. *Id.* Courts that grant increased compensation rates are regularly overturned by administrative judges who appear to be empowered to review deviations from 18–B limits. *See, e.g., People v. Leonard,* Ind. No.2000/0052, 2001 WL 856474 (N.Y.Sup. May 17, 2001) (rate increase overturned by administrative judge); Michael A. Riccardi, *Judge Challenges Review of Higher 18–B Fees,* N.Y.L.J. June 26, 2001 at 1 (county administrative judges authorized to review all applications for departures from statutory rates).

Although the original notion behind the 18–B panel system was that assigned work would be done on a part-time, quasi *pro bono* basis, it has evolved into a "full-time commitment". *Justice Denied* at 27 & n. 118 (panel attorneys may be expected "to work full-time for the panel and be in court every day"). David Gilman and William Dalsimer, two attorneys who separately accepted 18–B assignments in Family Court for more than a decade, each testified that he stopped doing this work because it is no longer possible to conduct a private practice while doing 18–B work Tr. 12/19/01 30, 49, 73. An 18–B lawyer who has even one matter before the Family Court must be prepared to be in court from 9:00 a.m. until 5:00 p.m. because the system is so overburdened that it can not schedule realistic times for appearances. Tr. 12/19/01 30–32. As a result, lawyers who take 18–B cases must remain in court "six and a half hours a day, five days a week, earning $40 an hour." Furthermore, due to the growing shortage of 18–B attorneys, the panels now require each

lawyer to take on more cases than the lawyer can handle responsibly. The First Department, for example, requires that panel attorneys work six intake days a year. *See* Tr. 12/19/01 73; *Justice Denied* at 16. During intake, a panel lawyer must be at court and accept new cases that come in that day. Tr. 12/19/01 73. Mr. Dalsimer testified that being present at six days of intake translated to having to accept sixty cases a year. He testified that he could not do justice to his 18–B or his private clients given that situation.

> I couldn't operate my office and attend to all of my clients and, at the same time take on sixty new matters a year.... I found it difficult to even do thirty 18–B cases a year and, at the same time, attend to my private practice. I certainly didn't want to get into a position where I was short-changing anyone, whether they were 18–B clients or private clients, and not do the kind of work that I felt is very important to do in Family Court.

Tr. 12/19/01 73–74.

Most lawyers cannot afford to take 18–B cases as a full-time commitment. 18–B practitioners are not supported by an institutional framework, and must pay their own overhead. Mr. Gilman testified that one of the reasons he decided to stop accepting 18–B appointments was because his overhead expenses were higher than the statutory compensation. Tr. 12/19/01 48. One report estimates that a single attorney in a New York law office of five attorneys or less, which is the most common arrangement for assigned counsel, pays an hourly overhead of $34.75; rates in New York City are higher. Chief Administrative Judge Jonathan Lippman, *Assigned Counsel Compensation in New York: A Growing Crisis* 8 (2000) (Ex. AP2) [hereinafter *A Growing Crisis*]; *see also Justice Denied* at 27. With 18–B compensation, such a lawyer will lose $9.75

for every hour he works out of court and will profit only $5.75 for every hour worked in court. *A Growing Crisis* at 8. Based on another report on overhead costs submitted by plaintiffs' expert Dr. Lawrence Stiffman, the average practitioner in a firm of two lawyers profits slightly from in-court work and loses money for out-of-court work; the average practitioner in a firm of three or more lawyers loses money for both types of work. Tr. 12/20/01 125; Am. Decl. of Lawrence H. Stiffman.

Although the 18–B impacts are felt across the State, "the problem is most acute in New York City, where overhead costs are generally the highest." *A Growing Crisis* at 9. In the five boroughs comprising New York City, the number of attorneys actively taking assignments on the Family Court panel has decreased approximately 15 percent since 1989, and the most qualified attorneys have departed. *See Justice Denied* at 14; *A Growing Crisis* at 13 ("[A]ll of the panels have lost many, if not most, of their experienced attorneys."). Over the same period, the number of filings in the Family Courts have increased more than 32 percent. *A Growing Crisis* at 12. Assigned counsel in Manhattan and the Bronx Family Courts regularly carry an active caseload of between 80 and 100 cases. *See Justice Denied* at 15.

As increasingly fewer attorneys are available to handle more numerous filings, representation is more and more unavailable to parents when they first arrive at court. During 2000, there was no 18–B attorney available to accept cases in the Family Courts of Manhattan on 40 percent of court days. Ex. 208. For the Bronx Courts, there was no 18–B attorney available on 21 percent of court days. *Id.* As a result, approximately ten to twenty cases are adjourned without being called each week in each county. *See Justice Denied*

at iv; *see also A Growing Crisis* at 15 ("For example, nearly 50 cases recently on the calender in an intake part in Queens Family Court were never called because assigned counsel were unavailable to staff the part. This occurred even though immediate court intervention may have been necessary in these cases . . . ."). Sometimes mothers must return to Family Court two or three times before counsel is available. *See Crisis in the Legal Representation of the Poor* at 22. At times mothers who are entitled to counsel receive none. *See also* Daniel Wise, *Filing in Litigation on 18–B Rates Shows Many Poor Denied Counsel*, N.Y.L.J. June 1, 2001 (citing Professor Jane M. Spinak of Columbia University Law School, who reports that records of the Family Court indicate that a "substantial" number of indigents in Family Court who are entitled to assigned counsel never receive it).

Even when assigned counsel can be found, they are so overburdened that they often do not prepare for, or even attend, many scheduled court dates. "Because of the greatly increased volume of cases," assigned counsel are "increasingly absent, late or unprepared for routine court appearances and hearings;" the result has been "excessive adjournments, repeated reschedulings, and excessive delays" in "countless" Family Court proceedings. *A Growing Crisis* at 16.

These adjournments and delays directly adversely affect mothers and children. On average, the family is tied up in the Family Court for six to seven months before a full "fact-finding" hearing can be completed. *Justice Denied* at iv. More importantly, when Family Court judges adjourn cases because counsel is not available, they often remand the children to foster care during the adjournment. *See Justice Denied* at iv, 15. When ACS has removed a child prior to receiving judicial authorization, these adjournments extend the length of time before a mother can even begin to seek the return of her child.

Perhaps more significant than the delays is that the lack of attorney preparation and promptness signal that many indigents are receiving inferior representation. *See A Crisis in Legal Representation* at 18 (Indigents are "deprived of effective representation."). Kathryn M. Kase, a former President of the New York State Association of Criminal Defense Lawyers, has declared that

low assigned counsel rates have [a] pernicious effect on the delivery of indigent defense: they create an economic disincentive for lawyers to do a good job of representing their clients. Good legal work requires time, but for the assigned lawyer, the more time spent on the assigned case means that much more negative cash flow. This, in turn, means that the assigned defense lawyer will only make money on 18–B work if she accepts far too many assigned cases and then resolves them as quickly as possible, regardless of the merits of individual cases.

*Crisis in Legal Representation of the Poor* at 20 (quoting First Judicial Department, *Committee on the Representation of the Poor* at 2 (June 14, 2000)); *see also* Tom Perrotta, *Chief Judge Calls on Legislature for 18–B Solution*, N.Y.L.J., Mar. 6, 2002, at 1.

The significant discrepancy between rates paid for in-court and out-of-court work, in conjunction with the statutory cap on total fees, "discourages attorneys from spending sufficient time on case preparation, such as interviewing, research, trial preparation, . . . motions and negotiation." *Crisis in Legal Representation of the Poor* at 20 fn. 21 (quoting Carol Sherman of the Children's Law Center); *See also id.* ("Anyone who practices law knows that the

time an attorney spends in the office preparing for a hearing or trial has far more impact on the outcome of the case than the time an attorney spends [in court]. The current system actually provides a disincentive to thorough case preparation.") (quoting Carolyn P. Wilson of the County Defender Services). These concerns were borne out by a 1997 study finding that parents' attorneys filed at least one motion in only 5 percent of Bronx Family Court cases and 15 percent of Manhattan Family Court cases. *See Justice Denied* at 30–31. Incentive effects aside, the combination of being required to be in court all day and having insufficient money for overhead expenses such as an office means that it is often impossible to do any out-of-court preparation. Mr. Gilman testified that "[i]n Family Court, if you're in the courtroom every day, the only [preparation] you're going to do is talk to your client for twenty minutes in the corridor. The baby is screaming, doors slamming, court officers calling out cases. It's inappropriate. It's ineffective. It's incompetent [lawyering]." Tr. 12/19/01 39.

For the mother and her children the situation is devastating. Even a Kafka would be hard put to address her Catch–22 situation: "You have a right to your child, abused mother, but the child will be taken." "You have a right to due process before your child is taken, but we will take your child first." "You have a right to counsel to defend your rights in court, but we will assign counsel in a way that prevents her from protecting you." "The judge will protect you, but she cannot do so until effective counsel is available to you and such counsel is not available."

The problems created by 18–B deficiencies resonate through the entire court system. As a Family Court judge put it, "[i]f representation is inadequate, then the entire court is inadequate. The court culture accepts delays, adjournments, and being unprepared.... With so few resources, sloppiness is accepted." *Justice Denied* at 32 (quoting Judge Elkins of Brooklyn Family Court). As a matter of fact, the present assigned counsel system is corrupting of legal ethics and a disgrace to the law.

The magnitude of the problem is evidenced by the bellowing cries for reform sounding for years from every corner of the New York legal community. After a recent visit to Family Court, Chief Judge of the State of New York Judith S. Kaye concluded that what in past years was a "crisis" has now become a "catastrophe." *See* John Caher, *Dearth of 18–B Attorneys Creates Near 'Catastrophe' Situation*, N.Y.L.J., Nov. 8, 2001, at 1. Chief Judge Kaye has long pressed for reform in the 18–B system. *See* Hon. Judith S. Kaye, State of the Judiciary Address (Jan. 10 2000) (proposing to increase 18–B rates to $75 for in-court and out-of-court work and to abolish the statutory fee cap), *in* http://www.courts.state.ny.us/ctapps/state00.htm (last visited Feb. 28, 2002).

Judge Jonathan Lippman, Chief Administrative Judge of the New York Courts, in the 2000 report *Assigned Counsel Compensation in New York: A Growing Crisis*, also stressed the desperate need to raise 18–B compensation rates and caps. *See* Ex. AP2. This report resulted from the collaboration of, among others, the New York State Attorney General's Office, the New York State District Attorneys Association, the New York State Association of Counties, the New York State Bar Association, the Association of the Bar of the City of New York, the New York State Defenders Association, and the New York County Lawyers Association. *See A Growing Crisis* at 18 ("Even prior to convening, all of these groups, including local

governments, were united in their view that the current assigned counsel fees are inadequate and must be raised to meaningful levels if our justice system is to function fairly and efficiently.").

Family Court judges have begun to authorize across-the-board compensation rate increases on the ground that the circumstances created by the current crisis of representation constitute extraordinary circumstances in all cases. *See, e.g., Matter of Wager*, N.Y.L.J., Feb. 8, 2001, at 32 (Dutchess County Fam. Ct.) (ruling that the judge would compensate all future assigned counsel appearing in his courtroom at $75 per hour); *Matter of Joshua AA*, 187 Misc.2d 216, 722 N.Y.S.2d 361 (Clinton County Fam. Ct.2001) (same); *cf.* Michael A. Riccardi, *Judge Challenges Review of Higher 18B Fees*, N.Y.L.J., June 26, 2001, at 1 (report that New York Supreme Court Justice will grant $75 per hour compensation to all 18–B counsel she appoints).

Domestic violence cases involve special problems that make the lack of effective representation particularly dangerous. The physical safety of the victim is often at risk, and decisions a mother makes in legal matters may have life or death consequences for herself and her children. *See A Growing Crisis* at 16 (One reason that scarcity of assigned counsel for Family Court is "a matter of paramount concern" is because, "[w]hen counsel is not assigned to represent indigent petitioners in family offense cases, victims of domestic violence must make critical decisions on their own that may affect their future physical safety."). Separation of mother and child may place the child in dangerous conditions—or at least give justifiable rise to such a fear in a mother. *See, e.g., Santosky v. Kramer*, 455 U.S. 745, 765, n. 15, 102 S.Ct. 1388, 71 L.Ed.2d 599 (harm in foster homes); *Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990) (foster parent a child abuser).

Largely because of New York's 18–B fiasco, "[t]he State's ability to assemble its case ... dwarfs the parent's ability to mount a defense." *Santosky*, 455 U.S. at 763, 102 S.Ct. 1388. *See also id.* at 763 n. 13 ("disparity" greater where no court-appointed counsel).

Domestic violence cases present complex issues of accountability and services that few battered women will be able to resolve without an effective advocate. These issues can arise in case conferences, where much of the safety planning actually occurs, as well as in court. *Cf. Justice Denied* at 23 (At post dispositional conferences, "[t]he presence of an attorney or other advocate ... can mean the difference between an inadequate and ineffective case plan, and one that engages the parent and adequately addresses [her] needs."); N.Y. Fam. Ct. Act § 1011 cmt. (McKinney 1999) (practice commentary) (parents do not have an obligation to cooperate with an ACS investigation or ACS services absent a court order).

*F. Summary of Findings of Fact*

All findings of fact in this memorandum and order have been established by clear and convincing evidence—a standard far higher than the preponderance standard required in this civil case. *Cf. Santosky*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (allegations in cases involving permanent separation of child and parent must be established by clear and convincing evidence). The above findings of fact may be summarized as follows:

1) ACS unnecessarily routinely prosecutes mothers for neglect and removes their children where the mothers have been the victims of significant domestic violence, and where the mothers themselves have done nothing wrong. ACS unnecessarily routinely does so without having previously ensured that the mother

has access to the services she needs to protect herself and her children. ACS unnecessarily routinely removes children without a court order. ACS unnecessarily routinely fails to return these children to their mothers promptly after being ordered to do so by a court. Even as it unnecessarily prosecutes the mother and demands that she participate in often ill-advised services, ACS unnecessarily routinely fails to engage the batterer, demand that the batterer participate in needed services, attempt to remove the batterer from the household, or otherwise hold the batterer accountable.

2) ACS caseworkers and case managers who make decisions about what services to provide and when to remove children do so without adequate training about domestic violence. ACS practice is to unnecessarily separate the mother from the child when less harmful alternatives involving non-separation are available.

3) On all of these issues ACS written policies offer contradictory guidance or no guidance at all. As indicated in Parts IV and V, *infra,* these practices by ACS violate the constitutional rights of battered mothers and their children, unnecessarily causing significant harm both to battered women and their children.

4) None of the reform plans submitted by ACS to date can be reasonably expected to resolve these problems within the next year. All of these problems are aggravated by the fact that the assigned counsel system that most mothers rely on is broken, seriously hampering a mother's ability to seek, and the courts' ability to provide, meaningful judicial relief.

## IV. Law

### A. *Jurisdiction and Abstention*

Defendants urge that in the interest of federal-state comity this court should abstain. This same assertion was made by the City in *People United for Children, Inc. v. The City of New York,* 108 F.Supp.2d 275 (S.D.N.Y.2000), where the allegations were similar to those made by the plaintiffs here. The District Court for the Southern District of New York rejected the notion that abstention was required in a comprehensive opinion by Judge Robert J. Ward, followed in the instant case.

The abstention doctrine, first propounded in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and developed in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), represents a "narrow exception" to the principle that a person with a bona fide federal claim is entitled to adjudication in a federal court. *See McRedmond v. Wilson,* 533 F.2d 757 (2d Cir.1976). Abstention is only appropriate in rare cases and "not simply to give state courts the first opportunity to vindicate [a] federal claim." *Zwickler v. Koota,* 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (citing *McNeese v. Board of Education,* 373 U.S. 668, 673, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963)). *See also England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 415–16, 84 S.Ct. 461, 11 L.Ed.2d 440 ("recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law."); *Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962) (holding abstention was inappropriate and the federal court was the proper forum for challenging a statute's constitutionality). Plaintiffs' assertions in the present case implicate fundamental

constitutional rights and allege serious substantive and procedural due process violations. It would be inappropriate for this court to abstain.

### 1. *Pullman*

Federal courts should abstain when state court interpretation of an unsettled state law would negate the need to resolve a federal constitutional issue. *See Pullman*, 312 U.S. at 498, 61 S.Ct. 643. The meaning of "unsettled state law" was clarified in *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). The Court explained that abstention is not mandated merely because a state court could potentially rule in such a way as to render resolution of the federal constitutional question unnecessary. *See id.* at 237, 104 S.Ct. 2321.

> In the abstract, of course, such possibilities always exist. But the relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary. Rather, '[w]e have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of limiting construction.'

*Id.* (quoting *Zwickler*, 389 U.S. at 251 n. 14, 88 S.Ct. 391). *Cf. Freda v. Lavine*, 494 F.2d 107 (2d Cir.1974) (holding that abstention is appropriate where the state courts have been willing to interpret statutes if lower courts have expressed difficulty with confusing statutory schemes).

In the instant case, it is unlikely that the New York courts would make a ruling that caused the federal constitutional issue to evaporate. The child removal process is long, potentially taking many months before the Family Court will determine whether a child should be returned to her mother. A parent's desire to have her children returned quickly often leads to the mother being forced to follow the instructions of ACS workers in order to avoid arduous court proceedings. Even assuming that a state tribunal would eventually have an opportunity to interpret the relevant statutes, the likely harm to the plaintiffs from the delays and lack of effective representation is "so serious ... as to tip the balance in favor of speedy resolution in the federal court." *Dempsey v. McQueeney*, 387 F.Supp. 333, 339 (D.R.I. 1975).

### 2. *Burford*

*Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), does not control. *Burford* abstention is appropriate in cases where there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar" and when the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *People United for Children, Inc.* 108 F.Supp.2d at 288 (quoting *New Orleans Public Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)).

The court of appeals for the Second Circuit, in *Bethphage Lutheran Service, Inc. v. Weicker*, 965 F.2d 1239 (2d Cir. 1992), and again in *Hachamovitch v. De-Buono*, 159 F.3d 687 (2d Cir.1998), discussed three factors in determining whether *Burford* abstention was appropriate: "the degree of specificity of the state regulatory scheme, the necessity of discretionary interpretation of state statutes, and whether the subject matter of the litigation is traditionally one of state concern." *Bethphage Lutheran Service, Inc.*, 965

F.2d at 1243; *see also Hachamovitch,* 159 F.3d at 697.

■■ None of these factors prevents exercise of jurisdiction in the present case. Judge Ward explained, "the state scheme governing child removals is not sufficiently complex to require abstention." *People United for Children, Inc.* 108 F.Supp.2d at 289. The "rules and procedures governing various stages of proceedings to remove a child ... 'contain no broad terms requiring interpretations by a state agency or experts in the field.'" *Id.* at 289 (quoting *Planned Parenthood of Dutchess–Ulster Inc. v. Steinhaus,* 60 F.3d 122, 127 (2d Cir.1995)). "[T]his Court is perfectly capable of interpreting and applying [the rules] to the facts of this case." *People United for Children, Inc.* 108 F.Supp.2d at 289. The fact that a state court provides a competent forum for determining the constitutionality of state regulations is not by itself a ground for abstention. *See Procunier v. Martinez,* 416 U.S. 396, 401, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (citing *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)). In the present case, the urgent need to confront long-standing widespread violations of constitutional rights outweighs the state interest in dealing on a case-by-base basis with the abused mothers' claims of constitutional violations. *But cf. Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (holding abstention was appropriate because of the state interest in child welfare and because the plaintiffs had the opportunity to present their federal claims in state court). Lack of complexity and ambiguity in the statutory scheme weighs against abstention.

3. *Younger*

■ In *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Supreme Court held that federal courts should abstain from hearing cases where there is a pending state litigation that will be disrupted by the federal suit; an important state interest is implicated; and the plaintiff has an opportunity to press its constitutional claims in the state proceeding. *See Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (holding that *Younger* applies to injunctive relief as well as declaratory relief). *See also Huffman v. Pursue, Ltd.,* 420 U.S. 592, 604–05, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (*Younger* applies to noncriminal judicial proceedings involving important state interests).

■ While in the instant case some of the class members are still involved with state proceedings, this court is not being asked to interfere with those cases. Rather, the injunctive relief this court grants targets general ACS practices. *See Marisol,* 929 F.Supp. at 689 ("Because none of the plaintiffs in the instant case are improperly challenging a state court proceeding through the federal courts, the *Younger* abstention doctrine is inapplicable to the instant case."). The preliminary injunction in the present case makes this noninterference clear. *See In re Nicholson,* 181 F.Supp.2d 182, 193 (E.D.N.Y. 2002). The welfare of children is an important state interest. *See Moore* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994; *Neustein v. Orbach,* 732 F.Supp. 333 (E.D.N.Y.1990). It cannot be vindicated by violating the Federal Constitution. Local issues do not predominate. As already noted, the nature of the child removal process makes it unlikely that a state court will rule on the constitutional issue. Any ACS policy or practice that violates a mother's rights is unlikely to be the focus

of a Family Court hearing. *See also La Shawn A. v. Kelly*, 990 F.2d 1319 (D.C.Cir. 1993) (holding that proceedings in the Family Division would be an inappropriate forum to adjudicate claims of due process violations by the District of Columbia Department of Human Services). Much of the harm that has been inflicted on mothers and children already described in Part III.B, *supra*, and elsewhere in this memorandum has occurred in the absence of a final order of disposition by the Family Court. The ordinary avenue of appeal from a state court decision is not a viable method of protecting these plaintiffs' rights. *See McTeague v. Sosnowski*, 617 F.2d 1016, 1021 (3d Cir.1980) ("If deference to the state proceeding means that she will be unable to raise her concerns, abstention may be inappropriate."). Since parent-child relationships are constantly and consistently being harmed by unnecessary removals, there is a special urgency that weighs against abstention. *See Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

4. *Rooker–Feldman*

▮ Defendants rely on the *Rooker–Feldman* doctrine, asserting that this court does not have jurisdiction over plaintiffs' claims. Under *Rooker–Feldman*, a doctrine taken from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), a federal court may not exercise jurisdiction over a plaintiff's claims if doing so would result in the reversal or modification of a state court decision. *See Hachamovitch*, 159 F.3d 687 (the district court had jurisdiction over a claim that attacked state agency procedures, and not the final decisions of the state court); *Storck v. Suffolk County Dep't of Soc. Services*, 62 F.Supp.2d 927 (E.D.N.Y.1999) (a constitu-

tional challenge to a Family Court Act provision was properly adjudicated by the federal district court).

▮ Relief in individual cases is not being sought in this class action. *Cf. Murray v. Admin. for Children's Servs.*, 1999 WL 33869 (S.D.N.Y. Jan.25, 1999) (holding the federal court did not have the jurisdiction to hear case challenging a Family Court removal decision). Plaintiffs are not seeking modification or reversal of any prior state court decisions. Rather, they are asking for prospective relief targeted solely at the general practices and procedures of ACS. *Rooker–Feldman* is no barrier to this court's adjudication of plaintiffs' claims.

B. *Section 1983*

▮ Section 1983 of Title 42 of the United State Code provides a cause of action "against any person who, acting under color of state law, deprives another of a right, privilege, or immunity secured by the Constitution or other laws of the United States." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993). Municipalities and other local governments are persons to whom Section 1983 applies; the Eleventh Amendment does not bar such suits. *Monell v. Dep't of Soc. Serv. of City of N.Y.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In order to prove municipal liability, plaintiffs are required to demonstrate an official policy or custom that subjects the plaintiffs to a denial of a constitutional right. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983).

▮ In its most simple form, municipal policy can be discovered in official statements of policy. Policy can also be gleaned from the statements or actions of policy-making officials. *See Rookard v. Health and Hospitals Corp.*, 710 F.2d 41 (2d Cir.1983). Policy is effectively made

by "governmental 'custom,' even though that custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691, 98 S.Ct. 2018. "So long as the discriminatory practices of city officials are persistent and widespread, they 'could be so permanent and well-settled' as to constitute a 'custom or usage' with force of law[.]" *Sorlucco v. N.Y. City Police Dept.*, 971 F.2d 864, 870–71 (2d Cir.1992).

A finding of official policy may be predicated upon "the failure to train [when it] amounts to deliberate indifference to the rights of those with whom the state official will come in contact." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir.1998) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Indicia demonstrating failure to train include a policymaker's knowledge that employees will confront a given situation when training or supervision will reduce the likelihood of employees mishandling the situation leading to constitutional violations and the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* (internal citations and quotation marks omitted). Lack of adequate training and supervision of ACS employees leading to constitutional violations is at the heart of the present case.

This action originally included actions for monetary, injunctive, and declaratory relief against numerous named defendants and the City of New York, pursuant to Section 1983 of Title 42 of the United States Code. For class certification purposes, the claims for money damages were severed, leaving only the claims for injunctive and declaratory relief to be considered. The claim is now essentially a claim against the City. State officials are parties because of the State policies setting rates and caps on compensation for 18–B attorneys that result in a denial of constitutional rights to abused mothers who are separated from their children. The issue of qualified immunity which often accompanies Section 1983 claims is not pertinent. It is general City and State policy that is central to the case.

### C. Constitutional Issues

#### 1. Fourteenth Amendment

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." The point of departure of any Fourteenth Amendment inquiry in which a deprivation is claimed is to identify whether the interest the state allegedly infringed is a constitutionally recognized liberty interest. Here, the subclasses contend that ACS's practices have interfered with both the mothers' and their children's liberty interest in familial integrity, and the mothers' rights to direct the upbringing of their children.

"Choices about marriage, family life, and the upbringing of children are among associational rights the Court has ranked of 'basic importance in our society,' . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The Supreme Court has deemed a person's right to conceive and raise children to be one of the "basic civil rights of man." *Stanley*, 405 U.S. at 652, 92 S.Ct. 1208. It has found "plain beyond the need for multiple citation" that these interests "undeniably warrant deference and, absent a powerful countervailing interest, protection." *Lassiter v. Dep't. of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640

(1981) (quoting *Stanley*, 405 U.S. at 651, 92 S.Ct. 1208). The court of appeals for the Second Circuit has similarly held it to be "beyond peradventure" that the "existence of a private realm of family life which the state cannot enter has its source not in state law, but in ... intrinsic human rights ...." *Duchesne v. Sugarman*, 566 F.2d 817, 824 (2d Cir.1977) (internal citations and quotation marks omitted).

This interest is not only a fundamental value of American society and constitutional law, but also is protected by international law. International law instruments, of which the United States is a party and signatory, provide that the state must use extreme care when making decisions which could threaten familial integrity. One of these instruments is the Universal Declaration of Human Rights (UDHR). The UDHR is "an authoritative statement of the international community." *Filartiga v. Pena–Irala*, 630 F.2d 876, 883 (2d Cir. 1980). It was promulgated in large part at the United States' insistence, and has been used extensively by United States courts in determining the scope of internationally guaranteed rights. See *Beharry v. Reno*, 183 F.Supp.2d 584 (E.D.N.Y.2002) (providing history of UDHR, including efforts of United States in obtaining its drafting and adoption, and list of cases utilizing UDHR). Article 12 of the UDHR provides that "no one shall be subjected to arbitrary interference with his privacy, family, home or correspondence," and Article 16 states that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State."

Similar provisions are found in the International Covenant on Civil and Political Rights (ICCPR), which has been signed and ratified by the United States (subject to reservations), and in the Convention on the Rights of the Child (CRC), which the United States has signed and which some courts have found to be evidence of customary international law binding on United ed States courts. See ICCPR Art. 17 ("No one shall be subjected to arbitrary or unlawful interference with his ... family"); ICCPR Art. 23 ("The family is the natural and fundamental group unit of society and is entitled to protection by society and the State"); CRC Preamble ("The family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance [and] the child ... should grow up in a family environment."); CRC Art. 7 (a child has "as far as possible, the right to know and be cared for by his or her parents."); *Beharry*, supra (these provisions of CRC have the force of customary international law); *The Nereide*, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769, 780 (1815) (customary international law is enforceable in United States courts).

■ The right under the Constitution of the United States that families retain against state interference in their affairs is buttressed by a number of factors. First, individuals have a constitutionally protected interest in decisions involving the formation of a family, including marriage and procreation. See, e.g., *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Second, parents have a constitutionally protected interest in the control and raising of their children without state interference. See, e.g., *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) (parent's right to make decisions involving child's medical treatment); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (parent's right to make decisions involving a child's

education); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (liberty guaranteed by the Fourteenth Amendment includes the right to establish a home and bring up children). Third, family members have an interest in being together. Members of families have a constitutional interest in familial integrity, or put more plainly, a right not to be forcibly separated. *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) ("We have little doubt that the Due Process Clause would be offended '[if] a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' ") (quoting *Smith v. Organization of Foster Families,* 431 U.S. 816, 862–63, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)).

The "right of the family to remain together without the coercive interference of the awesome power of the state" is "the most essential and basic aspect of familial privacy." *Duchesne,* 566 F.2d at 825. Plaintiffs have established that ACS has consistently violated this right of family integrity.

■ The interest in not being forcibly separated by the state is shared by parents and children. *See Duchesne,* 566 F.2d at 825 ("This right to the preservation of family integrity encompasses the reciprocal rights of both parent and children. It is the interest in the companionship, care, custody and management of his or her children, and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association with the parent.") (internal citations and quotations omitted).

A biological relationship between mother and child generates these rights—though this relationship is not the sole predicate for such rights. "There can be no question that the liberty interest in family privacy extends to a mother and her natural offspring . . . ." *Duchesne,* 566 F.2d at 825. Other familial relationships also receive constitutional recognition. *See Moore v. City of East Cleveland,* 431 U.S. 494, 504, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ("Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition."); *Smith v. Organization of Foster Families,* 431 U.S. at 843 n. 49, 97 S.Ct. 2094 (noting that the Court had previously used the term "parent," in the context of family integrity, to include an aunt who was also a child's "legal custodian"). The relationship may also have its genesis in adoption or even in long-term custody.

■ A permanent termination of the parent-child relationship represents the nadir in destruction of the family integrity interest. *See Santosky,* 455 U.S. at 753, 102 S.Ct. 1388. Even a temporary separation can be destructive; it triggers constitutional protections. *See Tenenbaum v. Williams,* 193 F.3d at 594 (even a temporary removal of a child "depriv[es] the parents of the care, custody, and management of their child" so that judicial authorization is necessary unless the child is immediately threatened with harm); *Southerland v. Giuliani,* 4 Fed.Appx. 33, 36 (2d Cir.2001) (reversing the dismissal of a claim against ACS involving a temporary removal and noting "[w]e have never required—as the district court apparently did—that parental rights be completely or permanently terminated in order for constitutional protections to apply") (unpub-

lished opinion). *Cf. Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it."); *Strail v. Dept. of Children, Youth and Families of Rhode Island*, 62 F.Supp.2d 519, 526 (D.R.I.1999) ("[T]he Supreme Court has afforded protection against temporary deprivations in the parent-child relationship as part of the right to family integrity.").

Parents' fundamental interest in their authority to control ·the raising of their children is adversely denigrated by forced separation. *See, e.g., Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children."); *Parham*, 442 U.S. at 602, 99 S.Ct. 2493 ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over children."). "[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

In *Troxel*, the Court struck down a Washington statute which allowed state courts to rule on petitions by nonparental persons for visitation rights by reference to a court determination of the "best interests of the child" without necessarily considering the parent's position. *Id.* at 67, 120 S.Ct. 2054. A plurality of the Court held that "the Due Process Clause does not permit a State to infringe on the fundamental right of the parents to make child rearing decisions simply because a state judge believes a 'better' decision

could be made." *Id.* at 72–73, 120 S.Ct. 2054. Because the "sweeping breadth" of the statute furnished sufficient grounds to find it unconstitutional, the *Troxel* Court explicitly left undecided the question of whether the state was required to show harm or potential harm to a child before overcoming a parental decision on what was in the best interest of the child. *Id.* at 73, 120 S.Ct. 2054.

■ These rights of family integrity and parental authority are, in the parlance of due process, fundamental liberty interests. When a fundamental liberty interest is at stake there are two potential tracks of Fourteenth Amendment analysis: procedural due process and substantive due process. Where parents are alleging that the state has unlawfully separated them from their children, both tracks must be analyzed. *See Tenenbaum*, 193 F.3d at 592, 599 (1999); *Kia P. v. McIntyre*, 2 F.Supp.2d 281, 290 (E.D.N.Y.1998) ("The liberty interests of parent and child in continued care and companionship has both procedural as well as substantive elements. Accordingly, the Second Circuit ... has typically undertaken discrete procedural and substantive due process analysis."), *aff'd*, 235 F.3d 749 (2d Cir.2000).

■ Procedural due process requires the government to abide by certain procedural rules so that it deliberates carefully and gives these affected an effective right and opportunity to contest the decision before it is made and the rightholder's protected interest is infringed. Procedural due process aims to reduce the possibility that the government will infringe protected interests unnecessarily. *Kia P. v. McIntyre*, 235 F.3d at 759 ("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases.") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 47 L.Ed.2d 18

(1976)). If the government obeys the rules and nonetheless determines that it is necessary to infringe on the interest, that decision is respected against a procedural due process challenge. Procedural due process examines the means by which an outcome is obtained.

 Substantive due process comes into play where, regardless of the procedures followed, a governmental decision or action is so contrary to a fundamental right that it cannot be countenanced. *See Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (Substantive due process rights bar "certain government actions regardless of the fairness of the procedures used to implement them . . . ."). Substantive due process depends upon the outcome itself.

a. Procedural Due Process

In a previous case involving the same named defendant, the court of appeals for the Second Circuit held that even temporary removals by the state threaten the familial association interests of parents, and thus must satisfy requirements of procedural due process. The court held that

> If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, *ex parte* or otherwise, for the child's removal, then the circumstances are not emergent; there is no reason to excuse the absence of the judiciary's participation in depriving the parents of the care, custody, and management of their child.

*Tenenbaum,* 193 F.3d at 594. The court emphasized that "[e]mergency circumstances mean circumstances in which the child is immediately threatened with harm. The mere possibility of danger is not enough." *Id.* at 594 (quotations and citations omitted).

 The government must be able to show "an objectively reasonable basis" for deciding the child is immediately threatened with harm to justify removal from the mother without prior judicial authorization. *See, e.g., Gottlieb v. County of Orange,* 84 F.3d 511, 516 (2d Cir.1996); *Croft v. Westmoreland County Children & Youth Servs.,* 103 F.3d 1123, 1126 (3d Cir. 1997) (requiring "objectively reasonable" grounds to justify removal). A corollary of this rule is that the government must conduct sufficient investigation into the alleged neglect or abuse it relies upon to establish an objectively reasonable belief that the mother has neglected or abused her child. *See, e.g., Croft,* 103 F.3d at 1126 (holding that the child welfare agency must independently corroborate a report of abuse from an anonymous informant in order to separate a child and parent); *Strail,* 62 F.Supp.2d at 529 ("[T]he due process clause will certainly be offended if children are taken away from their parents without sufficient investigation."). The Supreme Court has required that the states provide individual hearings to ascertain unfitness instead of relying on presumptions about categories of people. *See Stanley v. Illinois,* 405 U.S. 645, 656–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

"[L]iability may be imposed only when the [individual] decision by [a] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo,* 457 U.S. 307, 323, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *see Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239 (2d Cir.1984) (taking a restrictive view of what is required to depart from professional judgement); *Thomas by Brooks v. Flaherty,* 902 F.2d 250, 252 (4th Cir.1990) (treatment of mentally retarded "substantially departed from

accepted professional standards"). Here, the widespread departure from accepted standards by employees and leaders of ACS is so patent as to satisfy even the strict analysis of the *Youngberg* line, assuming *arguendo* that doctrine is even applicable to cases where a battered mother is separated from her child merely because she is battered.

Where two parents have an interest in the care and custody of a child, evidence that one has abused the child does not deprive the non-abusing parent of her familial rights. "A non-abusing parent clearly retains some rights in her child's custody, although these may be contingent on separating the child from the abuser." *Yuan v. Rivera*, 48 F.Supp.2d 335, 346 (S.D.N.Y.1999). There may be unusual circumstances where a brief emergency removal of a few hours or a day is necessary while the agency sorts out who has abused whom. *See Tenenbaum*, 862 F.Supp. at 978–79 (E.D.N.Y.1994) (holding that an investigative removal that lasted less than a day did not infringe on the non-abusive parent's familial rights). But if an agency removes or unnecessarily delays the return of a child to a mother against whom it has no evidence of her abuse or neglect, on the grounds that the father is abusive to the mother, the mother's procedural due process rights have been infringed.

Procedural due process also gives rise to a right to appointed counsel in some instances in Family Court. In *Lassiter*, 452 U.S. at 31–32, 101 S.Ct. 2153, the Supreme Court determined that some, but not all, cases involving termination of parental rights in Family Court supported a constitutional right to have counsel appointed. The Court based its decisions on the three factors it set out in *Mathews v. Eldridge:*

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. 893. *See also, e.g., Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Kia P.*, 235 F.3d at 759.

The Court in *Lassiter* determined that the private interest against removal without counsel was extremely great (although not as great as personal liberty), but believed that erroneous deprivations were unlikely because the state shared an interest in a correct decision with the parent. Nevertheless, the complexity of proceedings or incapacity of respondents would sometimes, but not always, be high enough that assistance of counsel would be necessary to avoid erroneous decisions. *Lassiter*, 452 U.S. at 31, 101 S.Ct. 2153.

Because the Court could not "say that the Constitution requires the appointment of counsel in every parental termination proceeding, . . . [it left] the decision whether due process calls for the appointment of counsel for indigent parents in termination proceedings to be answered, in the first instance by the trial court, subject, of course, to appellate review." *Id.* at 31–32, 101 S.Ct. 2615. The Court applied its test to the case of Ms. Lassiter, and found that a trial court did not err in refusing to grant her counsel. *Id.* at 33, 101 S.Ct. 2615. Among the factors the court considered in reaching this decision were that "the case presented no specially troublesome points of law, either procedural or

substantive," "the weight of evidence that she had few sparks of interest [in her son] left were sufficiently great that the presence of counsel for Ms. Lassiter could not have made a determinative difference," and she had made a "plain demonstration that she [was] not interested in attending [the] hearing." *Id.* at 33, 101 S.Ct. 2615. Chief Justice Burger, who joined the Court's opinion, authored a brief concurrence in response to the arguments in the dissent in which he "emphasiz[ed] . . . [t]he purpose of the termination proceeding at issue here was not 'punitive.' On the contrary, its purpose was *protective* of the child's best interests." *Id.* at 34–35, 101 S.Ct. 2615 (Burger, C.J., concurring) (citations omitted, emphasis in original).

■ It need hardly be added that by counsel the Supreme Court was referring to effective counsel. *See, e.g., Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (defendant's right to effective counsel includes the right to be represented by an attorney who does not have a conflict of interest and who notifies the court of any conflict). It follows that, where the government is under a due process obligation to appoint counsel, it cannot do so in a way that structurally impedes the ability of counsel to effectively represent clients. *See Opie v. Meacham,* 293 F.Supp. 647, 650 (D.C.Wyo.1968) ("The state is responsible under the due process requirement contained in the Fourteenth Amendment to protect an accused's right to have the effective assistance of competent counsel.").

■ The right to appointed counsel when necessary for due process is a right to effective counsel. *See Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974) ("We interpret the right to counsel as the right to effective counsel.") (*quoting MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960)). The Supreme Court has recognized the

government's obligation in certain situations to provide counsel to satisfy due process as required by the Fourteenth Amendment. *See, e.g., Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (the Fourteenth Amendment right to due process requires that an indigent defendant in a felony trial be appointed counsel); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (indigent prisoners whom the state wished to treat as mentally ill have right to appointed counsel); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (right to appointed counsel for indigents in some probation-revocation hearings); *Douglas v. California,* 373 U.S. 905, 83 S.Ct. 1288, 10 L.Ed.2d 200 (1963) (state providing appeals as of right must appoint counsel for indigent defendants in those appeals). The Court has separately emphasized the government's related obligation not to impair the effectiveness of counsel under the Sixth Amendment. *See, e.g., Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (states may not conduct trials in a way that unconstitutionally impairs a defendant's right to effective counsel); *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (court order denying defendant the right to consult with counsel during a seventeen hour recess impaired defendant's right to effective assistance of counsel); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (statute allowing judge in non-jury criminal trial to deny counsel the opportunity to give closing statements unconstitutionally denies defendant the right to effective assistance of counsel); *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1972) (court procedures that require defendant, if testifying, to testify before any other defense witnesses, unconstitutionally impairs counsel's ability to effectively as-

sist defendant); *Ferguson v. State of Georgia*, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961) (court rules denying defendant the right to take the stand and be questioned by his attorney unconstitutionally impairs the right to effective assistance of counsel).

■■■■ Ordinarily, claims of ineffective representation are dealt with on an individualized basis after the fact, because a person must show deficient performance by counsel and actual prejudice arising from that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *id.* at 690, 104 S.Ct. 2052 ("a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."). But where the state imposes systemic barriers to effective representation, prospective injunctive relief without individualized proof of injury is necessary and appropriate. *See Benjamin v. Fraser*, 264 F.3d 175 (2d Cir.2001) (no "actual injury" need be shown where prospective injunctive relief is designed to remedy systemic Sixth Amendment violations caused by prisons' attorney visitation policies); *see also Strickland*, 466 U.S. at 692, 104 S.Ct. 2052 ("In certain Sixth Amendment contexts, prejudice is presumed. Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice. So are various kinds of state interference with counsel's assistance."); *U.S. v. Cronic*, 466 U.S. 648, 659–60, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (circumstances may exist such that "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.").

■■■■ The appropriate test for determining whether the system for appointed counsel is adequate should be whether counsel so appointed are "reasonably likely to render ... reasonably effective assistance." *See Herring*, 491 F.2d at 127. Ordinarily, there is a presumption that counsel will fulfill their professional obligations in a competent and effective manner. *See, e.g., Strickland*, 466 U.S. at 688, 104 S.Ct. 2052 (1984) (in actual ineffectiveness claims, there is a presumption that counsel has "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). A system for appointed counsel may be challenged successfully if the evidence demonstrates that the system itself so greatly hinders the effectiveness of the counsel it appoints that a presumption of effectiveness is based on an unbelievable hypothesis of competence.

Where, as in New York, the State itself determines that procedural due process requires counsel for the indigent—as New York does in Family Court neglect and abuse proceedings—then *ad hoc* trial judge denials of counsel can not be permitted under the Constitution. Equal protection of all like litigants demands that they be treated in the same way by the State. By undertaking to supply counsel, the State engages to provide attorneys who can do their job as litigators.

Whether a presumption be deemed procedural or substantive, in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Supreme Court rejected the notion that a state can rely on a presumption that a class of people are unfit. *Stanley v. Illinois*, 405 U.S. at 656–58, 92 S.Ct. 1208. In that case, the presumption was applied procedurally by denying a hearing to a class of parents,

unwed fathers. The rationale underlying the need for individualized determination was that even if most unmarried fathers were neglectful and unfit, not all unmarried fathers are unfit; "some are wholly suited to have custody of their children." *Stanley*, 405 U.S. at 654, 92 S.Ct. 1208. Because this presumption manifested itself as a procedural defect (the denial of a hearing) it was resolved with a procedural remedy (the provision of a hearing). *Stanley*, 405 U.S. at 656–58, 92 S.Ct. 1208.

It would no less violate the due process rights of unwed fathers if Illinois were to grant them hearings, but then proceed to charge them and remove their children on the sole grounds that they were unwed fathers. *See Jarrett v. Jarrett*, 449 U.S. 927, 101 S.Ct. 329, 66 L.Ed.2d 155 (1980) (denial of cert.) (Brennan J., dissenting) (arguing that the Supreme Court should grant certiorari and reverse Illinois Supreme Court decision holding that the fact that a divorced mother was cohabitating with an unmarried male was sufficient grounds to terminate her custody of children despite the absence of any evidence of harm to the children); *Parham*, 442 U.S. at 603, 99 S.Ct. 2493 ("The statist notion that governmental power should supercede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition."). It would not suffice for the state to charge the parent with something more innocuous, say "inadequate guardianship", but then rely on the father's status as an unwed father as its sole basis for finding against him. Nor would it be valid for the state to charge him with something it admitted would not constitute neglect for married fathers, but nonetheless find it sufficient because this father was unmarried. All of these scenarios are simply permutations of the same constitutional violation recognized in *Stanley*—the reliance on a presumption about a class of people

that leads to a violation of the fundamental right of a parent and child to reside together.

b. Substantive Due Process

Substantive due process rights bar "some government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). The concept had its genesis in natural rights as our constitutional history began at the end of the eighteenth century, fell into some neglect prior to the civil war, was revived at the end of the nineteenth century primarily to protect economic freedom of business against regulation, and at the close of the twentieth century emphasized privacy and autonomy, with scope, standards, and effects still developing and being a matter of sharp dispute. *See, e.g.,* Gerald Gunther and Kathleen M. Sullivan, *Cases and Materials on Constitutional Law* 453–616 (13th ed.1997); Gerald Gunther, *Cases and Materials on Constitutional Law* 663 (9th ed.1975) ("it has become perhaps the most prolific source of constitutional litigation"); Lawrence H. Tribe, *American Constitutional Law* 1414–23 (2d ed.1988). *Compare Planned Parenthood v. Casey*, 505 U.S. 833, 876, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (five separate opinions) (plurality abandoned strict scrutiny of abortion regulations in favor of intermediate "undue burden" test because of clash of fundamental interests of parent and state on behalf of fetus) *with Stenberg v. Carhart*, 530 U.S. 914, 946, 951–52, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Ginsburg, J., and Stevens, J., concurrences) (partial-birth abortion laws outlawed only a particular method of abortion and could not be considered to advance the compelling state interest in the health of the fetus that had warranted earlier departure from strict scrutiny). *Cf.*

*Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (expanding concepts of private real property rights over public attempts to limit those rights in the public interest).

In view of these continuing developments, it is not surprising that the precise standard in this Circuit to evaluate a substantive due process claim for liability against a state officer for a past act is not clear. In 1999, two Second Circuit court of appeals cases addressed this issue— both involved claims that ACS officers unconstitutionally removed a child.

In *Tenenbaum,* the court opined that official conduct "without any reasonable justification in the service of a legitimate governmental objective," violated substantive due process. *See Tenenbaum v. Williams,* 193 F.3d 581, 600 (2d Cir.1999). Citing *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the *Tenenbaum* panel held that an official's conduct must be "shocking, arbitrary, and egregious" to violate substantive due process. *Id.*

*Wilkinson* set what some may argue is a slightly lower standard for ACS action than *Tenenbaum*'s reasonable justification test, *viz.,* a child welfare investigation "passes constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse." *Wilkinson v. Russell,* 182 F.3d 89, 104 (2d Cir.1999) (internal citations and quotations omitted); *see also van Emrik v. Chemung County Dept. of Social Services,* 911 F.2d 863, 866 (2d Cir.1990).

Regardless of whether these two tests— "reasonable justification" or "reasonable basis"—require different levels of review or are merely different articulations of the same standard, both panels of the court of appeals marked the tests as deferential. The *Wilkinson* panel explained that the "unusually deferen[tial]" test applies be-cause, when reviewing individual removals, the court must be "especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between 'difficult alternatives' often need to be made on the basis of limited or conflicting information." *Wilkinson,* 182 F.3d at 105. Similarly, the *Tenenbaum* panel noted that "the paramount importance of the child's well-being can be effectuated only by rendering State officials secure in the knowledge that they can act quickly and decisively in urgent situations and that the law will protect them when they do . . . ." *Tenenbaum,* 193 F.3d at 595.

In *County of Sacramento,* which the *Tenenbaum* panel relied upon, the Supreme Court observed that there is a key distinction between the substantive due process standard that should control legislative acts and that which should be applied to the specific acts of an official. "While due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *County of Sacramento,* 523 U.S. at 846, 118 S.Ct. 1708 (internal quotations omitted).

The "conscience-shocking" standard that the Court approved in *County of Sacramento,* and which the *Tenenbaum* panel apparently applied, is an explication of the standard that is applicable to the "specific act of a government officer." *Id.* The Court explained that this relaxed control was motivated by an unwillingness to turn the Fourteenth Amendment into a catchall cause of action in tort.

[W]e have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability

whenever someone cloaked with state authority causes harm. In *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160–1161, 47 L.Ed.2d 405 (1976), for example, we explained that the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States,' and in *Daniels v. Williams*, 474 U.S., at 332, 106 S.Ct., at 665, we reaffirmed the point that [o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.

*County of Sacramento*, 523 U.S. at 848, 118 S.Ct. 1708 (internal quotation marks omitted).

■ In considering the constitutionality of the policy or practice of a state agency rather than the specific acts of individual officers, it is appropriate to apply the higher standard and stricter analysis that is applied to legislation. *See Dunn v. Fairfield High School*, 158 F.3d 962, 964–66 (7th Cir.1998) (applying the executive action standard to review claims challenging specific acts by school officials against two students, but applying legislative standard to review claims challenging the school's written disciplinary classifications and penalty structure). As with legislative decision-making, an agency policy is assumed to be the product of reasoned deliberation by those charged with higher level control of institutions. It is unnecessary to grant to policy makers the special latitude given to workers in the field who must sometimes make time-pressured decisions under difficult conditions. If an agency policy violates constitutional rights, it will be analyzed as would legislation because it will have more far-reaching and continuing consequences than the isolated

acts of a single officer. As with the constitutional analysis of statutes, an agency policy that is studied for the purposes of injunctive or other nonmonetary relief raises no concerns of the constitution becoming a "font of tort law." We deal here with general policy even though that policy may be inferred from a congeries of specific acts by individuals tolerated by those in charge of an agency.

■ In *Joyner v. Dumpson*, 712 F.2d 770 (2d Cir.1983), the Second Circuit laid out a three-part analysis for evaluating substantive due process claims in the legislative context. *See also Yuan v. Rivera*, 48 F.Supp.2d 335, 347 (S.D.N.Y.1999) (applying the *Joyner* formulation); *Kia P. v. McIntyre*, 2 F.Supp.2d 281, 289 (E.D.N.Y. 1998) (same). First, the court examines the nature of the interest at stake to determine whether it is a "fundamental right" protected under the Due Process Clause of the Fourteenth Amendment. Second, the court determines whether the defendants' actions have "significantly infringed" that fundamental right. Third, the court asks whether an "important state interest" justifies the infringement. *See Joyner*, 712 F.2d at 777.

It may well be that *Joyner* needs to be more closely tailored to constitute an accurate expression of the appropriate standard for substantive due process review now applied by the Supreme Court. That Court declared that "the Fourteenth Amendment forbids the government to infringe ... [on] fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (emphasis in original, internal quotation marks omitted) (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)); *see also Littlefield*

*v. Forney Independent School District,* 268 F.3d 275, 288 & n. 18 (5th Cir.2001) ("Government actions that burden the exercise of [Due Process] fundamental rights or liberty interests are subject to strict scrutiny and will be upheld only when they are *narrowly tailored to a compelling governmental interest.*"); *Seal v. Morgan,* 229 F.3d 567, 575 (6th Cir.2000) ("Government actions that burden the exercise of [due process] fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are *narrowly tailored to a compelling governmental interest.*") (emphasis added). Just prior to reaffirming the appropriateness of strict scrutiny where fundamental interests are involved, the *Glucksberg* Court recognized the rights "to have children" and "to direct the education and upbringing of one's children" to be on the short list that deserves a "strict scrutiny," "narrowly tailored" protection. 521 U.S. at 720, 117 S.Ct. 2258 (citations omitted).

The Supreme Court's recent suggestion that any legislative or policy infringement at all of a fundamental liberty interest triggers strict scrutiny suggests that the *Joyner* test—which demands a showing of significant infringement, requires only a substantial rather than a compelling state justification, and apparently places no requirement on the state to narrowly tailor its policies to its goals, may no longer be completely serviceable in a case such as the one we now face—a policy of taking children from their mother because she has been abused. At the least a fourth element of a narrowly tailored state policy effectively designed and applied to meet only the state's interest seems to be needed in the *Joyner* analysis.

The Supreme Court's recent decision in *Troxel* did not need to address this question of narrowing. The plurality apparently saw no need to vocalize a standard of review because it decided that the "sweeping breadth" of the statute made it unnecessary to "define today the precise scope of the parental due process right in the visitation context." *Troxel v. Granville,* 530 U.S. 57, 73, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (state statute interpreted by state to permit paternal grandparents to visit child born out of wedlock over objection of biological mother). Justice Thomas, who concurred with the plurality judgement, noted that although six other Justices recognized the presence of a fundamental right, "curiously none of them articulates the appropriate standard of review. I would apply strict scrutiny to infringement of fundamental rights." *Id.* at 80, 120 S.Ct. 2054 (Thomas, J., concurring). It bears noting that the right of a parent to control transient visitation with a child by a grandparent is far more peripheral than the parent's core right to remain enduringly with the child.

The appropriateness of applying strict scrutiny in a case such as the present one of forced separation of a child from an abused mother simply because she is abused is suggested by the fact that courts have repeatedly recognized that the familial rights protected under the Due Process Clause are more important than property rights. *Santosky v. Kramer,* 455 U.S. 745, 758–759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[A] parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right.") (internal citations and quotation marks omitted); *Stanley,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'comes to this court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting

economic arrangements." ') (citation omitted).

Understandably, the Supreme Court and other courts have hesitated to apply strict scrutiny mechanically and invariably to government legislation and policy that infringes on familial rights. Even as it has recognized the sanctity of familial rights, the Court has always acknowledged the necessity of allowing the states some leeway to interfere sometimes. *See, e.g., Parham v. J.R.*, 442 U.S. 584, 602–03, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children.... Nonetheless, we have recognized that a State is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."); *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (There is a "private realm of family life which the state cannot enter. But the family itself is not beyond regulation in the public interest ... and neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well-being, the state as parens patriae may restrict the parent's control.... [T]he state has a wide range of power for limiting parental freedom and authority in thing's affecting the child's welfare."); *see also Croft*, 103 F.3d at 1125 ("[T]his liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents.").

One interpretation of the substantive due process familial rights cases, up to and including *Troxel*, would be that the state's interest in protecting and promoting child welfare is so compelling that strict scruti-ny is inappropriate because, if applied as it has been traditionally, it might limit too greatly the state's power to protect children. Thus, where the fundamental right of a parent against state interference is pitted against society's equally fundamental obligation to protect the innocent and vulnerable from harm, some flexibility is required to prevent deadlock. But there are degrees of parental rights and degrees of state interest. If the centrality of the mother-child relationship—custody—is being challenged, then the state's interest must be subject to strict justification. The state must demonstrate that its policy of separation really is needed to protect the child. A child may not be taken on the ground, for example, of bureaucratic convenience. Where the state's custody can be demonstrated not to protect, but often to harm, the child, the justification of the state policy is further attenuated.

If the default rule for substantive due process analysis (of the child-mother relationship) is strict scrutiny, but this standard may be relaxed when particularly compelling state interests are present, then a showing that the state has failed to relate its policies to the particularly compelling interest it relies upon reimposes the default rule of strict scrutiny. In other words, in the context of familial rights, if a government's intruding policies can be demonstrated not to advance child welfare then any infringement at all of the mother-child substantive due process right would trigger strict scrutiny; the second prong of the *Joyner* test requiring that a "substantial infringement" be shown would not need to be demonstrated. *See Stanley*, 405 U.S. at 652, 92 S.Ct. 1208 ("We observe that the State registers no gain towards its declared goals when it separates children from the custody of fit parents."); *See id.* at 657, 92 S.Ct. 1208 ("The State's interest in caring for Stanley's children is

de minimis if Stanley is shown to be a fit father.").

■ Whatever the standard to be applied, it is apparent that when potentially unconstitutional policies of a government entity impinge on a fundamental private right such as family integrity, courts have a duty to review alleged infringements closely. "[W]hen the government intrudes on choices concerning family living arrangements, this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation." *Moore v. City of East Cleveland*, 431 U.S. at 499, 97 S.Ct. 1932; *Griswold v. State of Connecticut*, 381 U.S. 479, 502, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) ("[T]here is a 'realm of family life which the state cannot enter' without substantial justification.") (White, J., concurring in judgment) (citation omitted).

■ ACS occupies the role of prosecutor when it initiates an Article 10 petition for neglect against a battered mother. Prosecutors do enjoy broad discretion in the conduct of their office. *See, e.g., U.S. v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) ("[C]ourts are properly hesitant to examine the decision whether to prosecute.") (internal quotations and citations omitted). Nevertheless, the discretion to prosecute is not absolute; it "is subject to constitutional constraints." *Id.* at 464, 116 S.Ct. 1480 (quoting *U.S. v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1978)). Discretion extends only so far as "the prosecutor has probable cause to believe that the accused committed an offense defined by statute." *U.S. v. Bonnet–Grullon*, 212 F.3d 692, 701 (2d Cir. 2000) (quoting *U.S. v. Armstrong*, 517 U.S. at 464, 116 S.Ct. 1480). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). "Prosecutors, both governmental and specially appointed, have an ethical duty to ensure that justice [is] done, and, while responsible for prosecuting the guilty, they must also make sure that the innocent do not suffer." *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1140 (9th Cir. 2001) (quotation marks and citations omitted).

■ Government entities have an immunity against damages liability for actions taken within the scope of the prosecutorial role. That immunity does not extend to injunctive or declaratory relief against repeated abuses of discretion that constitute an unconstitutional policy denigrating substantive due process. *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 739, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980); *id.* at 736, 100 S.Ct. 1967 (prosecutors are "natural targets for § 1983 injunctive suits . . . .").

2. Fourth Amendment

■ When a child asserts a claim against the government, challenging the constitutionality of the government's decision to remove him from his parents, the claim is analyzed under the Fourth Amendment rather than under due process. *Tenenbaum*, 193 F.3d at 600. "Where a particular Amendment provides an explicit textual source of constitutional protection; against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Tenenbaum*, 193 F.3d at 599–600 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The court found in *Tenenbaum* that the removal of a child by

ACS constituted a seizure, *id.* at 602, and therefore his claims "must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process." *Id.* at 600 (quoting *United States v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

The Fourth Amendment prohibits "unreasonable searches and seizures" and requires that warrants only be issued with probable cause. The provisions of this Amendment are applicable to the states through the Due Process Clause of the Fourteenth Amendment. *See, e.g., Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). "The term 'probable cause' is thus not only the explicit Fourth Amendment requirement for obtaining a warrant, but also descriptive of what seizures are 'reasonable' where . . . no warrant has been obtained." *Tenenbaum,* 193 F.3d at 603. "In dealing with probable cause, . . . as the very name implies, we are dealing with probabilities." *Tenenbaum,* 193 F.3d at 603 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

After considering the various doctrines of Fourth Amendment analysis, including probable cause, special needs, and exigent circumstances, the *Tenenbaum* court concluded that "[w]hatever Fourth Amendment analysis is employed, . . . it results in a test for present purposes [in a case involving ACS forced separation of child from mother] similar to the procedural due-process standard." *Tenenbaum,* 193 F.3d at 605.

3. Ninth, Thirteenth, and Nineteenth Amendments

■ The court of appeals for the Second Circuit has acknowledged that "thirty years ago, the Supreme Court recognized that [t]he integrity of the family unit has found protection in the . . . Ninth Amendment." *Wilkinson v. Russell,* 182 F.3d 89, 104 (2d Cir.1999) (internal citations and quotation marks omitted). The Ninth Amendment "reserved" some "powers" "to the people".

■ To the Fourteenth Amendment, also referred to in *Wilkenson,* should be added the Thirteenth. The Thirteenth Amendment bears on the interpretation of the law insofar as it attempts to protect the right of mothers and children not to be forcefully separated without being "convicted"—here adjudicated properly as neglectful and neglected. It provides in part: "Neither slavery nor involuntary servitude, except as a punishment for a crime . . . shall exist within the United States . . . ."

The word race does not appear in the Thirteenth Amendment. Even if it did, it would not preclude inclusion of this Amendment in an overall application of the Constitution to the issue at hand. Race does not differentiate former African American slaves from other members of our homo sapiens species. *See* Ernst Mayr, *The Biology of Race and the Concept of Equality,* Daedalus, Wint. 2002 at 89, 92 ("[T]here is no genetic evidence whatsoever to justify the uncomplimentary evaluation that members of one race have sometimes made of members of other races. There simply is no biological basis for racism."). *But cf.* James F. Crow, *Unequal by Nature: A Geneticist's Perspective on Human Difference,* Daedalus, Wint. 2002 at 81 (noting small but observable differences between different populations). All humans interbreed and are therefore biologically without a significant species difference as "persons" entitled to "equal protection of the laws" and to "due process of law" under the Fourteenth Amendment.

As recently construed by at least one member of the court of appeals for the Second Circuit, the Thirteenth Amendment was designed to protect against "racial discrimination"—race being more modernly defined in this context to mean any "group" traditionally invidiously discriminated against. *U.S. v. Nelson*, 277 F.3d 164, 179 (2d Cir.2002) ("Certainly there is nothing in the conceptual or linguistic structure of the prohibition of 'slavery' and 'involuntary servitude'—which appears in the Thirteenth Amendment, it is worth noting once again, unadorned by the adjective 'racial'—that limits the banning of these evils only when they are imposed along racial lines."). Groups protected by the Thirteenth Amendment include at least those discriminated against in the past in the United States by religion and country of origin. *Id.* at 175–81 (holding that Jews were protected by the Thirteenth Amendment).

Discrimination against women was deeply imbedded in our law and social structure until relatively recently. The law cannot ignore the profound sexual connotations of the Thirteenth Amendment. *See* Michael Vorenberg, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment* 160 ff. (2001) (miscegenation and abolition of slavery); *id.* at 248 & n. 108 ("The Thirteenth Amendment ... should protect exploited workers, abused mothers, neglected children, and all other victims of relationships reminiscent of slavery.") (citing sources).

The exact language of the Thirteenth Amendment could be construed to cover children forcibly and unnecessarily removed without due process and then consigned to the control of foster caretakers. They are continually forcibly removed from their abused mothers without a court adjudication and placed in a forced state custody in either state or privately run institutions for long periods of time. There they are disciplined by those not their parents. This is a form of enthrallation that bears on their due process rights under the Fourteenth Amendment.

The Nineteenth Amendment, adopted in 1920, also bears on the analysis applicable to the Fourteenth. In the United States, there has been long continued discrimination against females, particularly in the context of domestic abuse. *See* Part III. C.1.a *supra* 65–66 (history of government responses to domestic abuse). The Nineteenth Amendment was designed to put females on the same legal constitutional plane as males. *See, e.g.,* Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family,* 115 Harv. L.Rev. 948 (2001); Judith Resnik, *Categorical Federalism: Jurisdiction, Gender, and the Globe,* 111 Yale L.J. 619 (2001). *See also* proposed Amendment XXVII (equality of sexes).

As this memorandum and substantial authority has suggested, the pervasive practice of ACS has been to treat mothers unfairly as a group. For purposes of the issues before the court, mothers are entitled to a particularly scrupulous protection of their rights to custody of their children in construing the Fourteenth Amendment in light of the Fourth, Ninth, Thirteenth and Nineteenth.

### 4. Equal Protection.

■ As the above discussion under Part IV indicates, a mother must be treated equally under the Fourth, Ninth, Thirteenth, Fourteenth, and Nineteenth Amendments. Separating her from her children merely because she has been abused—a characteristic irrelevant to her right to keep her children—treats her unequally from other parents who are not abused. *See People United for Children,*

*Inc.,* 108 F.Supp.2d at 296–297 (discussion of race and unequal protection).

### D. Relief Available

#### 1. Injunction

 "An injunctive order is an extraordinary writ, enforceable by the power of contempt." *Gunn v. University Comm. To End the War in Viet Nam,* 399 U.S. 383, 389, 90 S.Ct. 2013, 26 L.Ed.2d 684 (1970). As a writ, injunctions in general are authorized by the United States Code which grants "The Supreme Court and all courts established by Act of Congress [power to] issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651 (1994). "[T]he English Court of Chancery had the power at the time our government was established to enjoin parties before it from proceeding in another court in a controversy involving the same issues, and that the federal district courts, as courts of equity, have similar power." *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 928 (3rd Cir.1941).

 Injunctions are generally granted only where other relief, such as money damages, is not available or not sufficient as a remedy. *Morales v. Trans World Airlines,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). This relief requires a balancing of possible harms and benefits to the parties. Weighed is the harm suffered by the movant if the injunction is not granted, and the harm suffered by the adverse party if the injunction is granted. If the balance of potential harms favors the non-movant, then the court must deny the injunction. *Amoco Prod. v. Village of Gambell,* 480 U.S. 531, 545–46, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

#### 2. Preliminary Injunction

 To be granted a preliminary injunction, a party must show two elements. *Sonesta Int'l Hotels Corp. v. Wellington Assocs.,* 483 F.2d 247, 250 (2d Cir. 1973). First, it needs to demonstrate a likelihood of irreparable harm in the absence of injunctive relief. *Sperry Int'l Trade, Inc. v. Gov't of Israel,* 670 F.2d 8, 11 (2d Cir.1982). Probable loss or deprivation of a constitutional right is generally enough to meet this standard. See *Bery v. New York,* 97 F.3d 689, 694 (2d Cir.1996); *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1026–28 (2d Cir.1985). Second, there must be proof of likelihood of success on the merits. *Bery,* 97 F.3d at 694; *Plaza Health v. Perales,* 878 F.2d 577, 580 (2d Cir.1989). If the preliminary injunction will stay governmental action, the "movant must show a substantial likelihood of success on the merits, rather than merely a likelihood of success." *Johnson v. Kay,* 860 F.2d 529, 540 (2d Cir.1988). Courts "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." *Standard and Poor's Corp. v. Commodity Exch. Inc.,* 683 F.2d 704, 711 (2d Cir.1982); *see also Long Island R.R. v. Int'l Ass'n of Machinists,* 874 F.2d 901, 910 (2d Cir.1989).

Disputes about material facts at issue for a preliminary injunction will be resolved at a hearing. *Charette v. Town of Oyster Bay,* 159 F.3d 749, 755 (2d Cir. 1998).

### V. Application of Law to Facts

 There is clear and convincing evidence of repeated misconduct constituting a policy and practice for the purpose of section 1983 analysis. The removals and investigations that have been described in

Part III, *supra*, give adequate time for supervisors to recognize and repair violations of policy. Each removal is typically signed off by a caseworker, Supervisor, Case Manager, and ACS lawyer. The ACS witnesses defended their actions, and those of their subordinates, as being fully in-line with ACS policy as it had been explained to them. This is not a case of a single "rogue case manager" repeatedly acting outside the borders of accepted policy; the individual cases presented were the work of a number of different case managers, caseworkers, supervisors, and attorneys that worked with them. Policy documents, while not explicitly directing employees to always remove children of abused mothers, are vague about when children should be removed, except for the clear and over-riding mission statement that "Any ambiguity regarding the safety of the child will be resolved in favor of removing the child from harm's way." Ex. 37. The training program regarding domestic violence is inadequate, despite the admission by top officials that they realize caseworkers often will encounter and have to evaluate domestic violence. Top officials in ACS also were repeatedly made aware of the recurring constitutional violations that were resulting from deficiencies in policy and training by the recurring lawsuits, news articles, and committee reports detailing the problems. The failure to adequately monitor, train, and guide ACS employees, where violations were not only likely but were regular and widely-publicized, constitutes tacit approval by the upper management of the routine practice within the organization.

### A. Unnecessary Removals

 The consistent policy applied by ACS is to remove children of abused mothers in violation of their procedural and substantive due process rights solely because the mother has been abused. No legislatively appropriate policy, no compelling state interest, justifies these removals. The evidence demonstrates that the compelling state interest in protecting children, which justifies removals in other contexts, is not at all advanced, and is in fact greatly hindered, by ACS's policies of prosecuting abused mothers and removing their children. The defendants propose no compelling state interests that justify its policies separating abused women and their children solely because the mother has been abused.

If the *Joyner* test controls, then the state interest would only be required to be "substantial." Regardless, the result is still a violation of plaintiffs' constitutional rights, since the defendants have no defensible interest in separating children from their abused mothers when this state act does not advance the child's safety and does adversely affect the child's physical and psychic well-being.

As a matter of policy and practice, ACS does not conduct "sufficient investigation" before removing children of abused mothers. It fails to determine what the mother has done or can do to address the problem without forced removal. Where a male consort has battered the mother, ACS as a matter of policy and practice does not adequately investigate whether the mother has committed any acts of neglect. Instead, it automatically holds both the abuser and the abusee liable as a unit and relies on unfounded presumptions about the negative character and abilities of battered women. As a matter of policy and practice, ACS fails to adequately investigate what the mother has done to try to protect herself and her children, and what services could be offered to render her efforts successful. As a matter of policy and practice, ACS does not merely fail to advance the best interests of children by

these unnecessary separations—they harm children.

The removals of abused mother's children, even when summarily approved by a court based on ACS representations, infringe on mothers' substantive due process rights. Even if the *Joyner* test is applicable, the infringement must be deemed substantial. While removals for short periods of a few hours have been held not to "substantially" infringe on mothers' rights, *see, e.g., Tenenbaum*, 193 F.3d at 601, here, the unjustified individual removals frequently last for months. These removals constitute substantial infringement of the constitutional rights of mothers and children. Even if an individual governmental act may be judged by the degree to which it impairs the affected individual's rights, a widespread policy must be analyzed according to the aggregate damage it does. The total length of separations of mothers and children ACS has caused is measured in years. The suffering and trauma it has inflicted is so great it cannot be measured.

The last step in the *Joyner* test is to determine whether the infringement on the fundamental liberty interest is justified by an important state concern. Based on Supreme Court precedent the state concern should be required to be compelling. *See supra*, Part IV.C.1.b. The evidence proves that the challenged policies of ACS work against the state interest in protecting the safety of children, not for it. Whatever the level of scrutiny, substantive due process rights of the plaintiffs are being violated, since the policy harms the children. *Cf. Tenenbaum*, 193 F.3d at 595 ("[S]ociety's interest in the protection of children is, indeed, multifaceted, composed not only with concerns about the safety and welfare of children from the community's point of view, but also with the child's psychological well-being, autonomy, and

relationship to the family.") (quoting *Franz v. Lytle*, 997 F.2d 784, 792–93 (10th Cir.1993)) (quotation marks omitted). All of the experts agree that unnecessary removals harm children, and that children from homes with domestic violence are particularly sensitive to being separated from the non-abusive parent. Unnecessary removals thus work against the state interest in protecting children. This adverse effect has been widely recognized by child welfare advocates and domestic violence experts, and informs the best practices in the field of child protection. *See, supra* Part III.C.2.b. ACS policies and practice result in routine removals that are unnecessary and ignore alternatives that would be far better for the children involved. These policies and practices cannot be justified by recourse to any state interest in the child's welfare.

ACS policies and practices substantially infringe on the fundamental liberty interests of mothers and children in family integrity and the fundamental interests of mothers in parental authority over raising children. These policies and practices circumvent the procedural protections to which mothers and children are constitutionally entitled. There is no substantial, let alone compelling, state interest served by these policies and practices. These policies and practices violate the procedural and substantive Fourteenth Amendment rights of mothers and the Fourth Amendment rights of children.

Even where courts approve a separation, the cases brought by ACS are so procedurally skewed against the mother as to prevent the courts from effectively protecting due process and substantive rights of mothers and children. Due process procedural rights including in-court and out-of-court decisions to remove are unconstitutionally denigrated by provision of inadequate 18–B counsel for most mothers.

## B. Improper Prosecutions of Mothers

 As a matter of policy and practice, when ACS prosecutes a woman for neglecting her child when she has done nothing but suffer abuse at the hands of another, it does so under what might at best be termed false assumptions and findings. It infers from the fact that a woman has been beaten and humiliated that she permitted or encouraged her own mistreatment. As a matter of policy and practice ACS presumes that she is not a fit parent and that she is not capable of raising her children in a safe and appropriate manner because of actions which are not her own. As demonstrated in the analysis of *Stanley, supra* Part IV.C.1.a, applying this presumption violates constitutional rights.

It desecrates fundamental precepts of justice to blame a crime on the victim. There was a time in the United States, not so long ago, that a person could be convicted of rape only if the victim exerted the "utmost resistance." *See Perez v. State,* 50 Tex.Crim. 34, 94 S.W. 1036, 1038 (App. 1906) ("Although some force be used, yet if she does not put forth all the power of resistance which she was capable of exerting under the circumstances, it will not be rape."); David P. Bryden, *Redefining Rape,* 3 Buff.Crim. L.Rev. 317, 356 (2000). The belief was that if a woman was not willing to put her life at risk by fighting her attacker, who was usually stronger and often armed, then she had consented. Elsewhere, this belief apparently still prevails. *See, e.g., State Lawmakers Protest Italian Ruling on Rape,* L.A. Times, Feb. 17, 1999, at A17 (Italy's highest court of appeals reversed a rape conviction on the grounds that "it is common knowledge ... that jeans cannot even be partly removed without the effective help of the person wearing them ... and it is impossible if the victim is struggling with all her might."); James Meek, et al., *A Look at*

*Rape Laws Around the World,* The Guardian (London), Feb. 16, 1999, at 19 (In Chile, a "woman must show wounds, prove she fought tooth and nail"); Although there is still debate about how consent and force should be handled in rape cases, the widespread passage of rape shield laws, the elimination of corroboration requirements, and other developments demonstrate the consensus in this country that laws should protect, not blame, victims. *See, e.g.,* David P. Bryden, *Redefining Rape,* 3 Buff.Crim. L.Rev. 317 (2000).

There may be disagreement in our society about whether the government has an obligation to assist those who suffer conditions of debilitating poverty, but there is a consensus that even the most minimalist state has the responsibility of protecting its citizens from violence. Once, it was thought that this responsibility did not extend to violence within the home, but that notion has long since been abandoned in the United States. Just as the government has a responsibility to protect children from an abusive parent, so too does the government have a responsibility to protect a victim of domestic violence from her partner, a responsibility not met by punishing *her* through forcible separation from her children. Yet the court finds as a matter of fact that the effect of the practice and policy of ACS is to punish both the faultless abused mother and her children by separating them from each other and by not providing them with adequate protection.

*DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), is not relevant here. The *DeShaney* Court held that the Fourteenth Amendment does not impose upon the state an affirmative obligation to protect a person's life, liberty, or property from interference by another private person. *Id.* at 195–96, 109 S.Ct.

998. *DeShaney* does not apply to a case such as the present one where state action, rather than state inaction, is the source of harm.

The government's responsibility to protect victims of domestic violence—or at least not to punish them—is particularly poignant given that the state will punish the woman who takes the law into her own hands and attacks her former batterer. It is a long held maxim that the state holds a monopoly on violence, and that unauthorized acts of violence will go unpunished only under special circumstances, such as self-defense or insanity. Although "Battered Women's Syndrome" is admissible in New York, as in many other jurisdictions, as evidence of state of mind, it is not a legal defense *per se*. *See, e.g., People v. Seeley*, 186 Misc.2d 715, 720 N.Y.S.2d 315, 320 (N.Y.Sup.Ct.2000). Our society expects that a woman who has been battered (and indeed, any victim of violence) will, if possible, allow the state to shield her.

Often, ACS's vague allegations against the mother mask the fact that she has only "done what the law plainly allows [her] to do." *Bordenkircher*, 434 U.S. at 363, 98 S.Ct. 663. ACS routinely fails to specify the details of "failure to cooperate" allegations that would permit adequate review of whether any probable cause justifies them. Family Court judges have properly complained that the lack of specificity in such allegations makes it difficult for the judges to exercise meaningful review over ACS early in the judicial process; the judges are forced to wait until weeks or months have passed before it becomes clear that ACS never had a case in the first place. The delay in meaningful review caused by ACS's lack of specificity in allegations of "failure to cooperate with services" irreparably harms mothers by greatly extending the duration of what are often unnecessary removals. This lack of specificity adds to the total pattern of routine violations of mothers' procedural due process rights.

The evidence demonstrated that the City's practices and policies in this field harm children much more than they protect against harm. The children suffer the trauma of being separated from both of their parents, blame themselves for the abuse of their mothers, confront an unfamiliar and often dangerous foster care system, while all the time their mother could likely be giving them care and comfort if only ACS, with the cooperation of other city agencies, would carry the government's own burden of protecting her from violence.

Children's welfare, the state interest which is so often the great counterweight deployed to justify state interference in family affairs, has virtually disappeared from the equation in the case of ACS's practices and policies regarding abused mothers. Where, as here, a state action infringes on parents' and children's fundamental liberty interests and also demonstrably works against the welfare of the child, defendants' attempts to justify its policies are constitutionally wanting.

### C. Inadequate Representation

The record proves that representation of counsel of abused mothers is largely a sham. The 18–B attorney system as now organized and financed holds out the promise to an abused mother that she will be properly represented by a competent attorney when she seeks to retain or obtain the return of her children illegally seized by ACS. It then cruelly supplies attorneys who can not, and do not, properly represent her. They do not investigate. They do not consult with their client. They are not available for consultation. Their very existence delays hearings and proper prompt resolution of cases in Family Court, resulting in unnecessary separa-

tion of mothers and children and in unnecessarily prolonging those separations. The result is a practice and policy by the State and City of New York violating the substantive and procedural constitutional rights of many abused mothers and their children.

### 1. Due Process Right to Effective Assigned Counsel

 This court is facing a much narrower and more well-defined class of plaintiffs than that confronted by the Supreme Court in *Lassiter*. The *Lassiter* Court examined the rights of the broad class of all parents facing separation from their children by the state. The circumstances and characteristics of members of this class varied widely. Ms. Lassiter, for instance, was an incarcerated murderer who had left her son languishing in foster care for over two years without trying to contact him, whose termination proceedings were rather straightforward, and for whom counsel would probably have made no difference in the outcome. *Lassiter*, 452 U.S. at 20–21, 32–33, 101 S.Ct. 2153. Other parents in this broad class would have presented far more sympathetic cases. Observing that "the facts and circumstances" of this broad class "are susceptible of almost infinite variation," the *Lassiter* Court found it "neither possible nor prudent" to treat this class uniformly. *Id.* at 32, 101 S.Ct. 2153.

By contrast, the discrete class of mothers in subclass A are all accused under the same dubious theory of neglect, all are deeply concerned with caring for their children, all face state proceedings complicated by important yet subtle issues of fact, state law, and constitutional law, and all would have a good chance of maintaining uninterrupted custody or of reacquiring their children sooner if represented by effective counsel. No class of litigants is ever perfectly uniform, but these mothers are similar enough for uniform treatment in all the aspects that the *Lassiter* Court considered relevant. *See*, 452 U.S. at 32–33, 101 S.Ct. 2153.

The similarity of class members makes uniform treatment possible. There are at least three strong reasons why it is also desirable. First, the State of New York has chosen to grant a state right to counsel to all indigents before the Family Court, thus shutting off any case-by-case analysis of the federal right anticipated by *Lassiter*. This is relevant because individuals who have a federal right to counsel have a right to *effective* counsel, *see infra* Part V.C.1. Whether New York's statutory scheme includes a right to *effective* counsel implicit in the State's statutory right to counsel need not be decided by this court. What is relevant in this present proceeding is that the mechanism for determining federal rights to counsel in removal cases envisioned by the *Lassiter* Court has been short-circuited in New York where every member of subclass A is entitled to counsel as a matter of state law.

Second, the *Lassiter* Court deferred decisions about counsel to individual trial courts on the condition that those decisions would be "subject, of course, to appellate review." 452 U.S. at 32, 101 S.Ct. 2153. Cases, such as that considered in *Lassiter*, which involved permanent termination of parental rights usually involve a final judicial disposition that may be appealed. In the removal cases before this court, the damage to constitutional rights is accomplished in the many months preceding the opportunity for a final judicial disposition. Appellate review could not as a practical matter repair this harm, and it is rarely available because long delays force mothers to choose between their constitutional rights and their children. They tend to choose custody of their children, acquiesc-

ing in ACS demands and sacrificing the opportunity to obtain a final, appealable judicial determination. The lack of any meaningful opportunity for a state or federal court to protect these rights on an individualized, *ex post facto* basis weighs in favor of a class-wide order.

Third, even if the trial court mechanism for determining federal rights were still in place and effective appellate review were possible, the complaints about the 18–B system raised by subclass A plaintiffs are not problems that vary significantly from case to case. The basic problem is not that some mothers who deserve counsel are not being granted counsel (a problem arguably well-suited to individualized review). The problem is that every mother who deserves counsel but cannot afford to pay for a lawyer is being granted counsel rendered ineffective by system-wide statutorily created defects. This issue is analytically separate from the question of which, if any, mothers have a right to counsel. It is relevant to the issue of class treatment because it bears on the relief to be granted. Where a class of litigants are systematically deprived of constitutional rights by well-defined state practice, relying on retrospective, individualized relief is wasteful of judicial resources and harmful to the aggrieved parties.

■ A generalized treatment of the narrow class of mothers in this case is both possible and desirable. Applying the *Eldridge* factors as approved in *Lassiter*, a court must weigh the parents' interests, the state interests, and the risk of error. *See Lassiter*, 452 U.S. at 31, 101 S.Ct. 2153. The mothers' interest in family integrity and care of the children is strong. It is especially potent because most mothers are justifiably extremely concerned about the well-being of their children, who are at increased risk psychologically and physically while in foster care. Relation-

ships between mothers and children from homes with domestic violence may already be adversely affected. Abused mothers have a strong interest in avoiding further trauma to the familial bonds that would result from months of separation. The government's interests are particularly weak; its actions are motivated by bureaucratic pusillanimity and ignorance that harm rather than help the interests of the child. The risk of error, which in this case constitutes protracted unnecessary removals, is high, given that ACS caseworkers rely on deficient training and official policies. Effective judicial review of ACS action is inhibited in large measure due to deficiencies in the 18–B system at least for an initial period of weeks or months.

■ Based on the balance of relevant factors, subclass A members have a constitutional right to appointed counsel. This, of course, does not end the analysis, because subclass A mothers, like all other indigents in New York Family Court, are ostensibly granted appointed counsel. The question is whether the appointed counsel is necessarily ineffective. If it is, defendants have violated the plaintiffs' constitutional rights as surely as if no counsel was provided at all.

The evidence overwhelmingly demonstrates that 18–B appointed counsel are not effective. They regularly are appointed too late, fail to appear in court for hearings, do not properly prepare for hearings, inadequately interview and advise clients, and are not available to return phone calls about court or related matters. These problems are a direct result of the fact that 18–B lawyers are compensated at a level at which they cannot afford the essential accouterments of basic professional service (such as an office), prevented from maintaining a separate private practice to supplement this inadequate compensation, and required to take on unman-

ageable caseloads because so few other lawyers will put up with the first two conditions.

No finding is made that reasonable compensation is always due appointed counsel. Courts have recognized that lawyers are officers of the court owing a duty of public service, and that it does not violate the lawyer's constitutional rights to be compelled to represent indigent clients without compensation. *See Immediato v. Rye Neck School Dist.*, 73 F.3d 454 (2d Cir. 1996); *See also U.S. v. 30.64 Acres of Land, More or Less, Situated in Klickitat County, State of Wash.*, 795 F.2d 796 (9th Cir.1986); *Williamson v. Vardeman*, 674 F.2d 1211, 1214–15 (8th Cir.1982). Requiring counsel to *always* work without adequate compensation by creating a system in which they cannot practice privately at all may so egregiously "jeopardize [lawyers'] personal finances," *Williamson*, 674 F.2d at 1216, as to trigger due process concerns on behalf of counsel. None of the court's holdings are based on any rights that may be claimed by counsel. The court is at present concerned only with the rights of mothers to effective counsel. The evidence is overwhelming that the 18–B system deprives them of that right.

The 18–B compensation rules, as currently applied, systematically deprive indigents of effective counsel. As applied to subclass A mothers, who have a federal constitutional right to appointed counsel in New York, the 18–B compensation system violates the right to effective counsel, as guaranteed by the Fourteenth and Sixth Amendments of the United States Constitution.

### 2. General Due Process

Whether the class members have a federal right to counsel or not, in New York they have a state statutory right to counsel. *See* Family Court Act § 262(a)[iv] (Consol.2001). *See also, e.g., In re Guardianship and Custody of Orneika J.*, 112 A.D.2d 78, 491 N.Y.S.2d 639, 641 (1985) ("The right to counsel in termination proceedings is guaranteed by statute.... Parental rights may not be curtailed in New York without a meaningful opportunity to be heard, which in these circumstances includes the assistance of counsel.") (internal citations and quotation marks omitted). The scope of this state statutory right, and whether there exists any state constitutional obligation to provide this right, are not at issue, and are not now decided.

Whatever its federal or state constitutional obligations, New York has undertaken to provide representation to all indigent parents in Family Court. Like the good samaritan doctor who stops to care for an injured stranger, the State may induce reliance or otherwise alter the situation of those offering help so that they incur obligations to provide non-harmful services. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 261–266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (due process requires governments to conduct pre-deprivation hearings before administratively terminating welfare benefits, even if it was never obligated to offer welfare benefits in the first instance); *Matthews v. United States*, 150 F.Supp.2d 406, 414 (E.D.N.Y.2001) (in maritime tort case United States may be liable under good samaritan doctrine if it undertakes to gratuitously render services to another which it should recognize as necessary for the protection of the other's person or things, physical harm results from the government's failure to exercise reasonable care in that undertaking, and (a) the government's failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking).

If the State did not provide mothers with appointed counsel, a mother might be driven to obtain help from friends or a religious advisor or even argue strongly on her own behalf. When the mother must speak through appointed counsel she is lulled into not acting for herself; and then sold-out by the system.

If the State did not rely on 18–B panels at all, and instead accepted or compelled occasional service from practicing attorneys, the state bar conceivably might have provided effective counsel as part of its pro bono obligations to society. But the 18–B system, with its panel requirements, minimum service, and unavoidable courtroom delays have transformed the role of appointed counsel into a full-time job rather than a pro bono activity. The evidence demonstrated a broken system that not only prevents 18–B counsel from being effective, it prevents private lawyers from filling the void.

This is not to say that no 18–B lawyer does an adequate job. Some undoubtedly do meet their professional responsibilities at great personal sacrifice. But the evidence demonstrates that the system as a whole falls short and results in a form of betrayal of those to whom effective counsel was promised. And it is the system as a whole for which the State is responsible.

Where the State chooses to intervene in an area with constitutional dimensions, it may not do so in a way that undermines constitutional rights. The right to counsel, which was recognized by the founders to be so fundamental to due process that it earned explicit Constitutional recognition in the Sixth Amendment, is one such area. Offering counsel to a mother accused of neglect, and then hamstringing that counsel in such a way that the mother is likely to receive inadequate representation impairs the litigant's Sixth Amendment right to effective counsel. Creating a system of appointed counsel that is so ineffective that the entire court system becomes plagued with long and unavoidable delays, so that urgent claims of violations of constitutional rights go unaddressed for months, impairs subclass A members' due process as guaranteed by the Fourteenth Amendment. Having undertaken the role of good samaritan in providing counsel to the needy, inducing their reliance and preventing others from assisting, the State and City must carry out the role they have assumed with propriety.

## VI. Relief

### A. Appropriateness of Injunction

Children and parent-child relationships are particularly vulnerable to delays in repairing custodial rifts. Even relatively short separations may hinder parent-child bonding, interfere with a child's ability to relate well to others, deprive the child of the essential loving affection critical to emotional maturity, and interfere substantially with schooling and necessary friendships. A preliminary injunction has been granted for the purpose of ensuring that 1) battered mothers who are fit to retain custody of their children do not face prosecution or removal of their children solely because the mothers are battered, and 2) the child's right to live with such a mother is protected. Subclass B makes no claim against the State; subclass A will obtain all the protection it seeks without any preliminary order directed against the State.

After this suit was commenced, and in large measure as a result of the litigation, ACS began to attempt remediation of the grave deprivations and threats of deprivations of plaintiffs' constitutional rights. These initial moves by ACS, while praiseworthy, have not cured the constitutional violations. In a discussion with the Commissioner of ACS while he was on the

witness stand, the court agreed that it would be appropriate to provide defendants with a six month stay. This delay will give ACS the opportunity to implement further changes that secure and protect plaintiffs' constitutional rights without unnecessary interference by the court.

Granting a stay is not antithetic to the need for prompt action. It permits time for an expedited appeal, avoiding the need for changes in procedures that may need further revision should the court of appeals have a view different from that of the trial court. Most importantly, the court assumes the bona fides of ACS's leadership in seeking promptly to eliminate its unconstitutional practices and policies.

### B. Preliminary Injunction

"A violation of plaintiffs' rights having already been established, ... the district court ... has a duty to fashion appropriate injunctive relief, using its broad equitable powers." *Barnett v. Bowen,* 794 F.2d 17, 23 (2d Cir.1986); *See Swann v. Charlotte–Mecklenburg Bd. of Ed.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").

The preliminary injunction issued in this case will remain in effect. *See In re Sharwline Nicholson, et al.,* 181 F.Supp.2d 182 (E.D.N.Y.2002). As noted in the memorandum and order supporting the preliminary injunction, there are six issues that were addressed in the preliminary injunction: first, what ACS should do when reporting the results of investigations of child abuse or neglect to the New York State Central Register of Child Abuse and Maltreatment, *see* preliminary injunction, at ¶ 2; second, what ACS should do prior to removing a child, *see id.* at ¶¶ 3, 4, 5; third, what ACS should do when it drafts and files a petition against a mother under Article Ten of the New York Family Court Act, *see id.* at ¶ 6; fourth, what ACS should do after a removal has occurred, *see id.* at ¶¶ 3, 5, 7, 8; fifth, what ACS should do in connection with prior petitions that have resulted in injustice, *see id.* at ¶ 9; and sixth, what should be required of ACS in terms of training and administration, *see id.* at ¶¶ 10, 11, 12.

A distinction was drawn in the preliminary injunction between petitions already filed and those which will be filed. Where the petition has already been filed, since an order may have been issued by a state court, precatory language was used to try to induce ACS to attempt to rectify continuing injustices. Out of concern for comity with the state judicial system, the provisions of the preliminary injunction are not mandatory for pending or resolved petitions, as they are with respect to future petitions. *Compare* ¶ 9 (pending and resolved petitions) *with* ¶ 6 (future petitions).

The court recognizes that the State of New York, its courts, its administrative agencies, and its municipal governments have the primary responsibility for protecting mothers and children. The State has largely delegated these duties to municipalities such as the City of New York. No part of the court's preliminary injunction was designed to interfere in the slightest with the jurisdiction of New York's Family Court or of any other court of New York. Comity with all state institutions was preserved.

Nevertheless, serious inadequacies in providing counsel for the mothers were addressed. Compensation for attorneys appointed to represent mothers threatened with separation from their children do not even cover office overhead of well-prepared attorneys. The differential between

compensating for in-court and out-of-court work results in lack of adequate investigation, preparation, effective advice to the client and adequate representation in court. The result of these inadequacies in providing even minimally adequate counsel for mothers is that members of subclass A are consistently deprived of their constitutional procedural rights of due process and their constitutional substantive rights to be joined as a family with their children.

The provisions of the preliminary injunction requiring increased compensation for attorneys appointed pursuant to Article 18–B of the New York County Law representing members of subclass A are vital for two reasons: first, the defendants' practice of providing indigent mothers with representation at inadequate compensation levels currently required by Article 18–B violates the constitutional rights of subclass A plaintiffs, and second, adequate representation of subclass A mothers is necessary in order to ensure that the provisions of this preliminary injunction designed to protect these constitutional rights are effectuated. No other decision is possible in light of the overwhelming consensus of State officials, judicial officers, legal experts, and court opinions, as well as the evidence, that the current statutory rates do not permit 18–B lawyers to provide competent representation to their clients, and that as a result mothers are consistently denied their constitutional rights.

The court received extensive evidence regarding the minimum appropriate compensation necessary to repair the 18–B system and ensure adequate representation to the indigents it serves. Dean Norman Lefstein of the Indiana University School of Law testified that, based on his extensive and long-standing experience with indigent defense issues throughout the United States, one hundred dollars per hour was required:

> [the] rate of compensation for assigned counsel should be at least one hundred dollars [per hour]. Having said that, I would hasten to add it seems to me that such a rate of compensation is, in effect, a discounted rate applied in public interest kinds of settings.... The one hundred dollar rate doesn't come close ... to what attorneys who are providing representation on a retained basis in Family Court are likely to receive.

Tr. 12/20/2001 at 177. The Judicial Conference of the United States has recommended that a rate of $113 per hour be paid to counsel appointed in federal criminal cases. Report of the Proceedings of the Judicial Conference of the United States, September 19, 2000 50 (recommending a compensation rate of $113 per hour in-court and out-of-court for federal non-death penalty cases; death penalty cases have a higher rate). The rate of $75 previously paid to appointed counsel in federal criminal cases has been widely criticized as too low, and has recently been raised to $90 per hour. *Cf.* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, Pub.L. No. 107–77 (2001) (authorizing funding for Fiscal Year 2002 sufficient for the Federal Judicial Conference to raise compensation of attorneys appointed pursuant to 18 U.S.C. section 3006–A from $75 per hour to $90 per hour); H. Rep. No. 107–139 (2001) (accompanying H.R. 2500, Pub.L. No. 107–77) ("The Committee is supportive of the need to raise hourly rates [provided by the Criminal Justice Act] and provides funding to increase the panel attorney rates to $90 per hour").

While this rate of $90 per hour may be too low, particularly in New York City where attorneys' overhead and fees are exceptionally high, the court errs on the

side of caution in interfering with state affairs. It finds that this is the minimal level which will protect the constitutional rights of indigent mothers. The compensation ceiling set by the preliminary injunction is also likely too low. Both may be increased by state courts in individual cases. The court assumes the New York courts will continue their practice of granting compensation in excess of the statutory maximum when necessary to ensure adequate representation.

It may well be that the most effective way to ensure adequate representation for members of subclass A would be to create an institution modeled along the lines of the Legal Aid Society. Such an organization would have attached to it the paraprofessionals, office workers, investigators, and experts who could provide stability and institutional know-how, as well as the supervision necessary to ensure that minimum constitutional standards are met. A radical restructuring of this nature is beyond the appropriate exercise of power by this court.

## VII. Conclusion

The findings of fact and law embodied in this memorandum and order, and in the memorandum and order accompanying the preliminary injunction, have been established by clear and convincing evidence after full evidentiary hearings.

The preliminary injunction was issued to protect plaintiffs. The need for it has been established by clear and convincing evidence. The probabilities of the plaintiffs' succeeding in obtaining a final injunction are clear and convincing. The balance of equities clearly and convincingly favor the plaintiffs. Complying with the injunction will clearly and convincingly not unduly burden defendants or any other interested private or public agency.

There remains some doubt about whether the State's officials should remain in the case. The State of New York itself was dismissed on consent. The State's officials remain defendants on the theory that it is the State which sets 18–B rates.

It is doubtful whether the named defendants can themselves raise the rates without legislation. The City can pay more to the extent that the State limitations are found to be unconstitutional. As applied to the separation of an abused mother and child, the State statutory 18–B limitations are unconstitutional. The duty remains on the Family Court under the separable 18–B statute to supply counsel paid by the City at rates sufficient to obtain competent attorneys for abused mothers. On appeal should the preliminary injunction against the City be upheld, and the fee limitations in Article 18–B be held to have properly been declared unconstitutional, this court will dismiss the case against the State's officials. For the time being it is desirable to have the State Attorney General appear on behalf of parties in the suit to defend the State's 18–B provision. The court takes no position on whether or how the State and City should divide the burden of increasing the compensation to 18–B attorneys.

SO ORDERED